## Exhibit E

## Defendant West's September 16, 2020, posts on Twitter and

## documents posted on Twitter

## (Kanye West 9.16.20 Twitter 00002-00120)

2:19-cv-00366-RMG    Date Filed 09/18/20    Entry Number 116-6    Page 2 of 60

**Tweets**   Tweets & replies   Media   Likes

 **ye** ✓ @kanyewest · 1d

I need to see everybody's contracts at Universal and Sony

I'm not gonna watch my people be enslaved

I'm putting my life on the line for my people

The music industry and the NBA are modern day slave ships

I'm the new Moses

💬 7,493    🔁 26.1K    ♡ 116K    

 **ye** ✓ @kanyewest · 1d

I deleted that tweet about riches... the wealth is in our love of family and our brothers  and our service to God ... let's rise up... let's communicate

💬 1,350    🔁 4,802    ♡ 39.5K    

 **ye** ✓ @kanyewest · 1d

Let's stop killing each other ... let's show God that we are Gods people ... my ego gets the best of me too... God doesn't measure us by money in his kingdom ... let's love each other... I love my brothers and I miss my friends ... real talk

💬 1,874    🔁 17.3K    ♡ 96.8K    

12:04

**Tweets**   Tweets & replies   Media   Likes

💬 343   ⬇ 1,294   🤍 10.4K

**ye** ✔ @kanyewest · 16h

Contracts in all industries need to be simplified now.  Complicated contracts are how businesses, music companies and sports take advantage of talent  We will expose these contracts and make them transparent now    support new talent, startups and amend all old contracts

💬 1,308   🔁 7,342   🤍 42.6K   ⬆

**ye** ✔ @kanyewest · 16h

The Y Combinator started companies like Dropbox and Airbnb. For the first time, it cleaned up contracts and made venture capital transparent. It empowered start ups with the tools to succeed and grow their businesses. It changed the Silicon Valley game.

💬 523   🔁 2,506   🤍 18.2K   ⬆

**ye** ✔ @kanyewest · 18h

When I spoke to Katie Jacobs who is on the board of Vivendi we decided to create a "Y combinator" for the music industry so artist have the power and transparency to to be in control of our future ... no more shady contracts ... no more life long deals

💬 887   🔁 3,301   🤍 26.8K   ⬆

**ye** ✔ @kanyewest · 19h

Jared Kushner will have done more for

12:02

Tweets | Tweets & replies | Media | Likes

What can mere mortals do to me?

💬 514    🔁 2,988    ♡ 15.1K    ⬆️

 **ye** ✔ @kanyewest · 2h

EVERYONE AT UNIVERSAL AND VIVENDI PLEASE UNDERSTAND THAT I WILL DO EVERYTHING IN MY LEGAL POWER AND USE MY VOICE UNTIL ALL ARTIST CONTRACTS ARE CHANGED   STARTING WITH GETTING MY MASTERS FOR MY CHILDREN   I WILL NOT STOP  I PROMISE YOU  IM AM PETTY AND VERY PERSONAL

💬 793    🔁 4,618    ♡ 29.8K    ⬆️

 **ye** ✔ @kanyewest · 2h

SONY YOU NOT OFF THE HOOK EITHER ... ONE BATTLE AT A TIME

💬 614    🔁 2,486    ♡ 21.4K    ⬆️

 **ye** ✔ @kanyewest · 2h

NAT TURNER

Nat Turner, (born October 2, 1800, Southampton County, Virginia, U.S.—died November 11, 1831, Jerusalem, Virginia), black American slave who led the only effective, sustained slave rebellion (August 1831) in U.S. history.

🜋 Britannica.com › biography › Nat-T...

Nat Turner | American slave and bondsman | Britannica

Born: October 2, 1800  Southampton County, VA

‹  ›  ⬆️  📖

💬 341    🔁 1,005    ♡ 8,940    ⬆️

🏠    🔍    🔔    ✉️

2:19-cv-00366-RMG   Date Filed 09/18/20   Entry Number 116-6   Page 5 of 60

## ye
1,537 Tweets

**Tweets**     Tweets & replies     Media     Likes

# Topics to follow
Tweets about the Topics you follow show up in your Home timeline



**ye** @kanyewest · 1h

Here are my ten Universal contracts ... I need every lawyer in the world to look at these

💬 693     🔁 1,729     ♡ 14.9K     ⬆️



**ye** @kanyewest · 1h

💩 this is my daughters favorite emoji... she'll be able to do nothing but put emojis up for the rest of her life because my children will own my masters

💬 761     🔁 2,813     ♡ 23.8K     ⬆️



**ye** @kanyewest · 1h

Who made up the term major label in the first place??? 💩💩💩

💬 435     🔁 919     ♡ 10.4K     ⬆️



**ye** @kanyewest · 1h

I forgive everyone from the music industry that is involved with modern day slavery. Vengeance is only the lords.

💬 456     🔁 1,626     ♡ 13.1K     ⬆️



**ye** @kanyewest · 1h

Colossians 3:12-17
"Put on then, holy and beloved,



   

1:32

# Conversation



ye ✔
@kanyewest

Trust me ... I WONT STOP



0:06

1.4M views

1:13 PM · 9/16/20 · Twitter for iPhone

**32.6K** Retweets   **34.5K** Quote Tweets

**95.2K** Likes

Kanye West 9.16.20 Twitter

00006

Meaning that we can argue that Universal and Sony have not supported you fully. And that as a result they have breached. This is the lawsuit/termination nuclear option.

If we went that route we would litigate and ask for your masters as part of a settlement. This is a high risk but high reward strategy.

Re masters ownership we can look into buying. But if Taylor's cost $300 million yours would cost a lot more I assume.  Remember that if you re-recorded these songs you could own these new masters outright.

A much more radical consideration would be to propose an entirely new relationship or joint venture with Universal. One that is equal and not one sided. I am not sure you are interested in that. But if could be a Yeezy Media/Universal joint venture play but one where you have the power.

I'm not open to any form of business with Universal or Sony

**ISLAND DEF JAM MUSIC GROUP**
**A Division of UMG Recordings, Inc.**
**1755 Broadway**
**New York, New York 10019**

Dated as of May 17, 2012

Kanye West &
Getting Out Our Dreams, Inc.
c/o Carroll Guido & Groffman, LLP,
1790 Broadway, 20th Floor
New York, New York 10019
Attn: Michael Guido, Esq.

Gentlemen:

Reference is made to the following agreements, as said agreements may have been heretofore amended and/or modified and which agreements are in full force and effect as of the date hereof:

(i) the agreement between Island Def Jam Music Group, a division of UMG Recordings, Inc. ("IDJ"), as successor-in-interest to Roc-A-Fella Records, LLC, and Kanye West, as successor-in-interest to Rock The World, LLC ("Grantor"), dated April 13, 2005, pursuant to which Grantor furnishes to IDJ his exclusive recording services (the "Recording Agreement");

(ii) the label agreement between IDJ and Getting Out Our Dreams, Inc. ("Label"), dated May 31, 2011 (the "Label Agreement"); and

(iii) that certain agreement entered into by IDJ on the one hand, and Label and Artist on the other hand, dated March 27, 2012, with respect to IDJ's contribution towards production of a motion picture being commissioned by Artist and/or Label entitled *Kanye West Presents: Cruel Summer* (the "Film Agreement").

All terms not specifically defined herein shall have the same definition used in either the Recording Agreement or the Film Agreement, it being understood that if the same term is used in both agreements and are defined differently in each, then the definition used in the Recording Agreement shall apply. Label and Artist are hereinafter individually and collectively referred to as the "Artist Parties" or "you."

WHEREAS, pursuant to the Film Agreement, IDJ has paid to the Production Company the IDJ Investment, and has since contributed an additional One Million Dollars ($1,000,000) towards production costs for the Film (the "Second IDJ Investment");

WHEREAS, Artist has advised IDJ that the production costs incurred thus far in connection with the Film have exceeded the original Three Million Two Hundred Thousand Dollars ($3,200,000) production budget for the Film by One Million Five Hundred Thousand Dollars ($1,500,000) (the "Excess Film Costs");



1

WHEREAS, Artist has requested that IDJ pay the Production Company an amount equal to the Excess Film Costs in order to enable the Production Company to finalize and deliver the Film;

NOW THEREFORE, in consideration of the mutual covenants made herein, IDJ and you hereby agree to modify and/or amend the Film Agreement and the Recording Agreement, as applicable, as follows:

1.    (a)    Reference is hereby made to that portion of the Album Six Recording Fund that IDJ has not yet paid pursuant to the Recording Agreement (the "Album Six Back-End"). Notwithstanding anything to the contrary contained in the Recording Agreement, IDJ shall deduct One Million Dollars ($1,000,000) from the Album Six Back-End and pay such amount to you promptly following full execution hereof (such payment is sometimes hereinafter referred to as the "First Artist Investment"). To the extent that such deduction causes there not to be sufficient monies remaining in the Sixth Album Recording Fund to incur all Recording Costs required to be paid in connection with the Sixth Album, then IDJ shall deduct the monies necessary to pay such Recording Costs from the Recording Fund for Seventh Album Recording Fund.

      (b)    Notwithstanding anything to the contrary contained in the Recording Agreement, IDJ shall deduct Five Hundred Thousand Dollars ($500,000) from the Album Seven Recording Fund and pay such amount to you promptly following satisfactory completion and delivery of the Film as determined by IDJ in IDJ's sole discretion (such payment is sometimes hereinafter referred to as the "Second Artist Investment").

      (c)    You hereby authorize and direct IDJ to pay the First Artist Investment, and as and when applicable, the Second Artist Investment, on your behalf directly to the following party at the following address:

                        Good Company Pictures, LLC ("GCP").
                        31-11 Crescent Street
                        Astoria, N.Y. 11106

You acknowledge and agree that payment of the First Artist Investment and the Second Artist Investment to GCP shall constitute payment to you, and that IDJ shall have no liability by reason of any erroneous payments or failure to comply with your authorization. IDJ's compliance with the foregoing authorization will constitute an accommodation to you alone; GCP is not a beneficiary of it. You indemnify and hold IDJ harmless from and against any claims asserted against IDJ and damages, losses, liabilities or expenses IDJ incurs by reason of any such payment or otherwise in connection herewith.

      (d)    The first One and One Half Million Dollars ($1,500,000) of the Artist Film Share (as defined in paragraph 3 below) received in connection with the commercial exploitation of the Film, if any, shall be remitted to IDJ and IDJ shall apply such monies as follows:

            (i)    IDJ shall first apply any of such monies towards replenishment of the Seventh Album Recording Fund; and

            (ii)    IDJ shall then apply any of such monies towards replenishment of the Album Six Back-End.

2



2.      The Film Agreement is hereby modified such that:

      (a)      you shall only be required to deliver to IDJ one (1) Film Video. For purposes of clarification, the penalty described in subparagraph 3(c)(ii) of the Film Agreement shall nonetheless apply but shall be with respect to your failure to deliver one (1) Film Video to IDJ as of the Video Delivery Date; and

      (b)      the last sentence of subparagraph 1(a) is hereby deleted and replaced with the following:

      "You warrant and represent that: a Person other than IDJ (e.g., Doha Film Institute) shall contribute One Million Dollars ($1,000,000) in cash and Five Hundred Thousand Dollars ($500,000) in In-Kind Investments towards the production costs of the Film; and, the total out-of-pocket production costs for the Film (including, without limitation, any and all clearances in connection therewith but not including DFI's In-Kind Investments) shall not exceed Four Million Seven Hundred Thousand Dollars ($4,700,000)."

      (c)      the words "and the Second IDJ Investment, the First Artist Investment and the Second Artist Investment" shall be added in subparagraph 3(c)(i) after the words "IDJ Investment". You and IDJ acknowledge and agree that the intent of the foregoing modification is to cause the Second IDJ Investment, the First Artist Investment and the Second Artist Investment to be direct debts from Artist and Label to IDJ in addition to the First IDJ Investment in the event that you breach any of the Film Agreement's terms or if you fail to cause the Film to be completed as of the Film Delivery Date.

3A.      Reference is hereby made to that certain agreement between DFI and Label, dated April 14, 2012, with respect to the Film (the "DFI Agreement"). IDJ hereby agrees that to the extent the First Artist Investment and/or the Second Artist Investment is paid as set forth above, and/or to the extent that the Second DFI Investment (as defined in subparagraph 4(e) below) is applied towards the production costs for the Film, the ownership interests in the Rights Company (as defined in the DFI Agreement) will be revised to reflect the respective investments made by IDJ, DFI and you to fund the total production budget for the Film. The share of receipts payable to you in connection with the commercial exploitation of the Film, as based on your ownership interest in the Film, is sometimes referred to herein as the "Artist Film Share." IDJ acknowledges that the Artist Film Share shall be based on One Million Five Hundred Thousand Dollars ($1,500,000) for purposes of recoupment under the DFI Agreement, but only One Million Two Hundred Thousand Dollars ($1,200,000) for post-recoupment profit calculation under the DFI Agreement.

3B.      IDJ and Artist agree to grant synchronization licenses, on a gratis basis, for the use in the Film (and in advertisements and promotions therefor) of Master Recordings that were delivered under either the Recording Agreement or the Label Agreement. Nothing in the preceding sentence shall be construed such as to require IDJ and/or Artist to grant a synchronization license with respect to any particular Master Recording (other than the Master Recording entitled "Mercy" and newly-recorded Master Recordings created specifically for the Film or the Compilation Album, which Master Recordings are hereby approved by IDJ and you to the extent of IDJ's and your rights therein and subject to the applicable artist's consent).

3



4.      You hereby warrant and represent as to each of the following, it being agreed that your breach of any of the following shall constitute a breach of the Film Agreemet, as amended hereby:

(a)      you have heretofore caused the Production Company to apply the IDJ Investment and the Second IDJ Investment towards the production costs for the Film;

(b)      Doha Film Institute ("DFI") has heretofore applied One Million Dollars ($1,000,000) in cash, and Five Hundred Thousand Dollars ($500,000) in the form of so called "in-kind" investments   (the "Second DFI Investment"), towards the production costs for the Film;

(c)      the production costs incurred in connection with the Film have thus far exceeded the original production budget for the Film (in the amount of Three Million Two Hundred Thousand dollars ($3,200,000)) by the amount of the Excess Film Costs;

(d)      you shall cause the Production Company to apply the First Artist Investment and the Second Artist Investment solely towards production costs (including Production Company's fee for services rendered in connection with the Film) for the Film;

(e)      the total amount in production costs that will now be required to complete the Film (not including any costs required to be incurred in connection with the synchronization of Master Recordings and Compositions in the Film [hereinafter, the "Synch Costs"]) is Four Million Seven Hundred thousand Dollars ($4,700,000) plus the In-Kind Investment by DFI;

(f)      IDJ shall not be responsible for any Synch Costs required to be incurred in connection with the exploitation of the Film, whether or not such exploitation will be by IDJ;

(g)      you shall cause DFI to enter into an amendment of the DFI Agreement with you such that the terms of subparagraph 1(d) and paragraph 3 above are reflected in such amendment;

(h)      except as expressly set forth herein, IDJ shall not be required to make any payments or incur any costs in connection with the Film. You acknowledge and agree that the warranty and representation made by you in this subparagraph 4(h) is of the essence of this agreement to IDJ and served as an inducement to cause IDJ to enter into this agreement; and

(j)      after the date of the Film Agreement, Rock The World, LLC assigned its prospective rights under the Recording Agreement to Artist. Artist hereby affirms the terms of the Film Agreement insofar as they relate to the Recording Agreement and agrees to be bound by the terms thereof as if Artist was the sole party, other than IDJ, whose consent was required to modify or amend the Recording Agreement.

4



00011

5.    Except as expressly or by necessary implication modified hereby, the terms and binding effect of the Film Agreement remain unchanged and are hereby ratified. This amendment may be signed in counterparts, and may be executed and delivered by facsimile and or electronic mail as a so called "pdf", which when taken together will have the same effect as if signed it its original form by all the parties.

Very truly yours,                                ACCEPTED AND AGREED TO:

THE ISLAND DEF JAM MUSIC GROUP,
A DIVISION OF UMG RECORDINGS, INC.


By:_____        By:_____
      Steve Gawley                                   Kanye West
Its: EVP Business & Legal Affairs

                                                              - and -

                                                 GETTING OUT OUR DREAMS, INC.


                                                 By: _____
                                                       An Authorized Signatory


5

# THE ISLAND DEF JAM MUSIC GROUP, A DIVISION OF UMG RECORDINGS, INC. 1755 BROADWAY NEW YORK, NEW YORK 10019

Dated as of March 10, 2013

Kanye West
c/o Carroll, Guido & Groffman, LLP
1790 Broadway, 20th Floor
Suite 800
New York, NY 10019
Attention: Michael Guido, Esq.

Getting Out Our Dreams, LLC
c/o Carroll, Guido & Groffman, LLP
1790 Broadway, 20th Floor
Suite 800
New York, NY 10019
Attention: Michael Guido, Esq.

Re:     **Kanye West / Sixth Album Amendment**

Dear Gentlepersons:

Reference is hereby made to the following agreements, as said agreements may have been amended and which agreements are in full force and effect as of the date hereof:

The exclusive recording agreement between The Island Def Jam Music Group, a division of UMG Recordings, Inc. (as successor-in-interest to Roc-A-Fella Records, LLC [collectively, "IDJ"]) and Rock The World, LLC ("RTW") f/s/o Kanye West (the "Artist"), dated as of April 13, 2005, as amended and in full force and effect as of the date hereof (the "Recording Agreement");

The letter of direction and assignment agreement between RTW and Artist, on the one hand, and IDJ, on the other hand, dated as of May 4, 2012, wherein RTW assigned its rights in and to the Recording Agreement to Artist (the "Assignment Agreement");

The label agreement between IDJ and Getting Out Our Dreams, Inc. ("Label"), dated as of May 27, 2012 (the "Label Agreement"); and

The film agreement in connection with the film entitled *Kanye West Presents: Cruel Summer* (the "Film") entered into by IDJ on the one hand, and Label and Artist on the other hand, dated as of March 27, 2012, as amended and in full force and effect as of the date hereof (the "Film Agreement").

All terms not specifically defined herein shall have the same meaning used in the Recording Agreement or the Label Agreement, it being understood that if the same term is used in both agreements and are defined differently in each, then the definition used in the Recording Agreement shall apply.

WHEREAS, the parties have agreed to allocate Six Hundred Thirty-Nine Thousand Dollars (**$639,000**) (the "Cruel Summer / Hawaii Costs") of recording costs incurred in connection with recording sessions in Hawaii for both the compilation album entitled "Cruel Summer" (the "Cruel Summer Album") (delivered to IDJ pursuant to the Label Agreement) and the Sixth Album, to Sixth Album Recording Costs;

WHEREAS, Artist has incurred One Million One Hundred Sixty-Three Thousand Dollars (**$1,163,000**) in connection with Sixth Album Recording Costs through December 31, 2012;

WHEREAS, One Million One Hundred Ninety-Eight Thousand Dollars (**$1,198,000**) (the "Sixth Album Balance") remains in the Sixth Album Recording Fund as of December 31, 2012 (i.e., the $12,000,000 Sixth Album Recording Fund, reduced by the following costs: $8,000,000, paid as an execution Advance; $1,000,000, paid in connection with production of the Film; $639,000, paid in connection with the Cruel Summer Album [i.e., Cruel Summer / Hawaii Costs]; and $1,163,000, incurred in connection with Sixth Album Recording Costs through December 31, 2012);

WHEREAS, Artist has advised IDJ that Recording Costs in connection with the Sixth Album will exceed the Sixth Album Balance by One Million Five Hundred Twenty-Three Thousand Dollars (**$1,523,000**) (the "Excess Sixth Album Costs") (i.e., **$2,721,000** to complete the Sixth Album, inclusive of the Sixth Album Balance);

WHEREAS, Artist has incurred approximately, Four Hundred Ninety-Three Thousand Dollars (**$493,000**) (the "Approximate Paris Costs") in connection with Sixth Album Recording Costs incurred during sessions in Paris between January 1, 2013 and the date hereof, which costs have been or will be paid by IDJ directly; and

WHEREAS, Artist and IDJ have agreed that certain revenues and expenses incurred in connection with the Film will be allocated to Label's venture with IDJ pursuant to the Label Agreement.

NOW THEREFORE, in consideration of the mutual covenants made herein, the parties hereby agree to modify and amend the Recording Agreement, Film Agreement and Label Agreement as follows:

2                                West IDJ LP6 Amendment 5-clean (3)

1.    Sixth Album / Cruel Summer Album / Recording Costs.    Notwithstanding anything to the contrary contained in the Recording Agreement or the Label Agreement, solely in connection with the Sixth Album, the parties hereby acknowledge that:

(a)    Cruel Summer / Hawaii Costs will be allocated to the Sixth Album as Sixth Album Recording Costs (i.e., in reduction of the Sixth Album Recording Fund). For the avoidance of doubt, the balance of recording costs incurred in connection with the Cruel Summer Album [approximately, an additional $1,3000,000] will remain allocated to a separate Cruel Summer recording budget pursuant to Label's venture with IDJ.

(b)    Cruel Summer / Hawaii Costs shall be fully "cross-collateralized" with Artist's main royalty account under the Recording Agreement, subject to the following: IDJ may recoup Cruel Summer / Hawaii Costs from: (i) one hundred percent (100%) of Profits generated pursuant to the Label Agreement in connection with the Cruel Summer Album (on a cumulative basis; there shall be a standalone "P&L" for the Cruel Summer Album without regard to Overhead Funding); and (ii) in the event that there is a Cruel Winter project ("Cruel Winter"), from 100% of Profits generated pursuant to the Label Agreement (if any) in connection with Cruel Winter (without regard to Overhead Funding). To the extent Cruel Summer / Hawaii Costs are recouped pursuant to (i) or (ii) of the prior sentence, Artist's main royalty account under the Recording Agreement will be credited with an equal amount.

(c)    Artist hereby agrees and acknowledges that Recording Costs incurred in connection with the Sixth Album through December 31, 2012 total One Million One Hundred Sixty-Three Thousand Dollars ($1,163,000) and such Recording Costs shall not be re-allocated to any other Artist Album or Label project in connection with Label Agreement (i.e., such Recording Costs are appropriate and bona fide Sixth Album Recording Costs).

2.    Excess Sixth Album Costs.  Notwithstanding anything to the contrary contained in the Recording Agreement, solely in connection with the Sixth Album, the parties hereby acknowledge that:

(a)    (i)    The Sixth Album Balance (i.e., $1,198,000) will be increased by the Excess Sixth Album Costs (i.e., $1,523,000) for a total remaining balance of Two Million Seven Hundred Thousand Dollars ($2,721,000) (the "New LP 6 Remaining Balance").

(ii)    Five Hundred Thousand Dollars ($500,000) of the New LP 6 Remaining Balance will be allocated to the Sixth Album Recording Fund in reduction of the Seventh Album commencement Advance (i.e., the Seventh Album commencement Advance set forth in paragraph 2(b)(i) of the May 4, 2012 amendment to the Recording Agreement shall be reduced to $2,500,000).

(iii)    In the event that the worldwide performance of LP 6 exceeds 2,650,000 units (as determined by IDJ's internal reporting system, including 10-track so-

called "track equivalent album sales" or "TEAS"), IDJ will increase the Seventh Album commencement Advance by Five Hundred Thousand Dollars ($500,000) (i.e., IDJ will increase the Seventh Album commencement Advance by the amount which was paid, per paragraph 2(a)(ii) above in reduction of the Seventh Album commencement Advance).

(b)     For the avoidance of doubt, the New LP 6 Remaining Balance (i.e., $2,721,000) will not be reduced by Cruel Summer / Hawaii Costs.

3.     Artist's   Administration   of   Certain   Sixth   Album   Recording   Costs. Notwithstanding anything to the contrary contained in the Recording Agreement, solely in connection with the Sixth Album, the parties hereby acknowledge that:

(a)     IDJ will pay to Artist One Million Seven Hundred Twenty-One Thousand Dollars ($1,721,000) of the New LP 6 Remaining Balance, less Approximate Paris Recording Costs (for the avoidance of doubt, to the extent Approximate Paris Recording Costs are determined to be less than or in excess of $493,000, IDJ shall adjust the New LP 6 Remaining Balance accordingly), promptly following the complete execution hereof, and Artist shall directly administer such Recording Costs in connection with the Sixth Album. IDJ will provide evidence of payment of the Approximate Paris Costs paid by them so such costs can be verified and so that IDJ and Company can avoid making any duplicative payments to vendors. The remaining One Million Dollars ($1,000,000) will be held and administered by IDJ (in accordance with the terms of paragraph 6.01[a] of the Recording Agreement) in connection with costs associated with samples, side-artists, producers and mastering, and if, after deduction of all Recording Costs paid or incurred by IDJ in connection with the Sixth Album, there remains any balance of the New LP 6 Remaining Balance, it shall be paid to Artist promptly following delivery of all Master Recordings and other materials required to be delivered to IDJ pursuant to Articles 3 and 4 of the Recording Agreement in connection with the Sixth Album (and promptly after IDJ reasonably believes that it has received bills or accruals for all Recording Costs actually incurred in connection with the Sixth Album.

(b)     Artist shall deliver to IDJ a finished Sixth Album (less mastering and clearances) ready for commercial release by IDJ.

4.     Film Revenues / Expenses.  Notwithstanding anything to the contrary contained in the Film Agreement or otherwise, the parties hereby acknowledge that any and all revenues and expenses incurred in connection with the Film, solely to the extent of the IDJ Investment in the Film (pursuant to paragraph 1[a] of the Film Agreement [i.e., up to $2,200,000]), shall fall under the Label Agreement (as already specified in the Film Agreement; and for the avoidance of doubt, all revenue received in connection with Artist's $1,500,000 investment in the Film shall be retained by Artist).

5.     This writing sets forth the entire understanding between the parties hereto with respect to the subject matter hereof, and no modification, amendment or waiver of this document shall be binding upon either party hereto unless confirmed by a written instrument signed by an authorized signatory of the party sought to be bound.  No waiver

of any provision of, or waiver of a default under this amendment or any failure to exercise rights hereunder shall prejudice the rights of either party thereafter, nor shall it form precedent for the future.

6.      Except as expressly or by necessary implication modified hereby, the terms and binding effect of the Recording Agreement, Label Agreement and Film Agreement are hereby ratified and confirmed without limitation or exception.

7.      This Amendment may be signed in counterparts, and may be executed and delivered by facsimile and or electronic mail as a pdf, which when taken together will have the same effect as if signed it its original form by all the parties.

Very truly yours,

THE ISLAND DEF JAM MUSIC GROUP,
a division of UMG Recordings, Inc.

By:

an authorized representative

AGREED AND ACCEPTED:

Getting Out Our Dreams, LLC

By:

An authorized signatory

(insofar as I am concerned)

Kanye West

(insofar as I am concerned)

**DEF JAM RECORDING,**
**A DIVISION OF UMG RECORDINGS, INC.**
**1755 BROADWAY**
**NEW YORK, NEW YORK 10019**

Dated as of August 11, 2014

Getting Out Our Dreams II, LLC
c/o Carroll, Guido & Groffman, LLP
5 Columbus Circle
20th Floor
New York, NY 10019
Attention: Michael Guido, Esq.

Re:    **Def Jam Recordings -w- Getting Out Our Dreams II, LLC f/s/o Kanye West // Amendment to the P&D Agreement (LPs 7 – 10)**

Dear Gentlepersons:

Reference is hereby made to the following agreements, as said agreements may have been amended and which agreements are in full force and effect as of the date hereof:

The exclusive recording agreement between Def Jam Recordings, a division of UMG Recordings, Inc. (as successor-in-interest to the Island Def Jam Music Group, as successor-in-interest to Roc-A-Fella Records, LLC [collectively, "UMG"]), and Rock The World, LLC ("RTW") f/s/o Kanye West (the "Artist"), dated as of April 13, 2005, ("Recording Agreement");

The profit split agreement between UMG and RTW f/s/o Artist, dated as of May 4, 2012, which amendment to the Recording Agreement, among other things, sets forth the profit split and reversion terms in connection with the sixth Album and seventh Album ("Profit Split Agreement");

The assignment and assumption agreement between RTW and Artist, dated as of May 4, 2012 (including the exhibit, which exhibit, among other things, directs UMG to pay Artist and RTW directly in connection with the Recording Agreement) with respect to RTW's assignment of its prospective rights under the Recording Agreement to Artist, dated as of May 4, 2012 (collectively, "RTW Letter of Direction"); and

The exclusive pressing and distribution agreement between UMG and Getting Out Our Dreams II, LLC ("Grantor" or "you") with respect to the pressing and distribution of Artist's eighth Album and ninth Album, dated as of May 7, 2012 ("P&D Agreement").

The aforementioned agreements, as amended hereby, shall be collectively referred to herein as the "Kanye Agreements". All terms not specifically defined herein shall have the same meaning used in the P&D Agreement and Recording Agreement, unless otherwise provided herein. If any of the terms contained herein (hereinafter, the "P&D Amendment) conflict with the terms of the Recording Agreement, the terms of the P&D Amendment shall govern.

For good and valuable consideration, the receipt of which each party hereby acknowledges, the parties agree to modify the Kanye Agreements as follows:

1.    **Term / Product.** Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment):

(a)    Grantor and Artist hereby acknowledge and agree that UMG timely and properly exercised its option to extend the Term of the Recording Agreement for the sixth Option Period during which UMG is entitled to receive delivery of the seventh Album of the Minimum Recording Obligation (the

"Seventh Album"). The Seventh Album shall hereinafter be deemed the first Album of the P&D Agreement (i.e., the Sixth Album shall be the final Album delivered to UMG in satisfaction of the Minimum Recording Obligation of the Recording Agreement, subject to the provisions of paragraph 7 below). Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment), in connection with the Seventh Album (and each of the other P&D Albums), all of RTW's, Grantor's and/or Artist's, as applicable, covenants, warranties, representations and grants of rights, including, without limitation, all representations and warranties and covenants pursuant to the Recording Agreement, and all of UMG's rights in connection therewith, shall remain in full force and effect (including any payment obligations to RTW in connection with the Seventh Album) with respect to each of the P&D Albums as if incorporated herein.

(b)    During the term of the P&D Agreement (the P&D Term"), Grantor may, at its sole option, deliver to UMG one (1) extra-contractual Album comprised of previously recorded, unreleased Master Recordings, featuring the performances of Artist, tentatively entitled the "Lost Yeezus Tapes" (collectively, the "Lost Tapes"). In the event that Grantor delivers the Lost Tapes to UMG, the Lost Tapes shall be deemed a P&D Album (defined below) subject to the same financial terms set forth herein with respect to the Seventh Album (i.e., with respect to payments, the administration of Recording Costs, the applicable Distribution Fee and Licensing Fee, Third Party Marketing Costs, accountings, etc.). For the avoidance of doubt, Grantor shall not be permitted to release the Lost Tapes to any party other than UMG.

(c)    Grantor hereby grants to UMG one (1) additional separate option to extend the P&D Term for one (1) additional Contract Period (i.e., the tenth Album of the Minimum Recording Obligation ["Tenth Album"]). For the avoidance of doubt, following the Initial Period, UMG shall have a total of three (3) additional separate options for three (3) Albums (i.e., the Eighth Album, Ninth Album and Tenth Album).

(d)    The following provisions shall replace paragraph 1(c) of the P&D Agreement and are incorporated herein:

"(c)    The Minimum P&D Recording Obligation hereunder shall be as follows:

| Contract Period | Minimum P&D Recording Obligation |
| --- | --- |
| Initial Period | the Seventh Album |
| First Option Period | the Eighth Album |
| Second Period | the Ninth Album |
| Third Option Period | the Tenth Album |

The Seventh Album, Eighth Album, Ninth Album and Tenth Album shall hereinafter be collectively referred to as the "P&D Albums"; each, a "P&D Album". The P&D Albums shall be deemed "Subject Materials" (as such term is defined in paragraph 1(d) below)."

2.    **Administration of Recording Costs**. Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment):

As of the date hereof, UMG's obligation to fund any and all Recording Funds, Advances, Recording Costs (including, but not limited to, the Recording Funds set forth in paragraph 3[b] of the P&D Agreement) to Grantor pursuant to the P&D Agreement is hereby deemed terminated. Notwithstanding the foregoing, commencing as of the date hereof, Grantor shall prospectively fund any and all Recording Costs (including, but not limited to, clearance costs, studio costs, equipment rentals, performer fees, union related costs, A&R related travel expenses, producer advances, side-artists advances, musician fees, sample fees, etc.) in connection with Artist's recording of the P&D Albums hereunder (including, without limitation, the Seventh Album), it being understood that any such costs paid or committed to be paid by UMG in connection with the P&D Albums (including, without limitation, the Execution Advance set forth in paragraph 3(a) of the P&D Agreement, and all Advances and/or Recording Costs, paid by UMG in connection with the Seventh Album), shall be deducted from "Net Billings" (defined in paragraph 3[d] below) or Net Licensing Billings, as applicable, otherwise payable to Grantor hereunder.

3.    **Distribution Fee**. Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment):

(a)    (i)    Seventh Album / Distribution Fee. Solely in connection with the exploitation of the Seventh Album in the United States, UMG shall retain a Distribution Fee of twenty-one percent (21%) of Net Billings, reducing prospectively to seventeen percent (17%) of Net Billings upon reaching sales in excess of one million (1,000,000) units in the United States as determined by Soundscan (or its equivalent if UMG ceases to use the Soundscan service). Notwithstanding the foregoing, Grantor's share of Net Proceeds otherwise payable to Grantor and/or Artist in connection with the Seventh Album shall be paid to Grantor, Artist (or Artist's designee) and RTW pursuant to the terms of the RTW Letter of Direction, subject to the terms and conditions herein.

(ii)    Seventh Album / Ex-U.S. Rate. For the avoidance of doubt, the Basic Rate shall be twenty-five percent (25%) in connection with UMG's sales, distribution and other exploitation of the Seventh Album outside of the United States (through affiliates or other third parties).

(b)    (i)    Eighth Album Distribution Fee. Solely in connection with the exploitation of the Eighth Album in the United States, UMG shall retain a Distribution Fee of seventeen percent (17%) of Net Billings.

(ii)    Eighth Album / Ex-US Rate. For the avoidance of doubt, the Basic Rate shall be twenty-five percent (25%) in connection with UMG's sales, distribution and other exploitation of the Eighth Album outside of the United States (through affiliates or other third parties).

(c)    (i)    Ninth & Tenth Album / Distribution Fee. Solely in connection with the exploitation of the Ninth, and Tenth Albums in the United States, UMG shall retain a Distribution Fee of seventeen percent (17%) of Net Billings.

(ii)    Ninth & Tenth Album / Ex-U.S. Rate. For the avoidance of doubt, the Basic Rate shall be twenty-six percent (26%) in connection with UMG's sales, distribution and other exploitation of each the Ninth Album and Tenth Album outside of the United States (through affiliates or other third parties).

(d)    "Net Billings" shall mean, for all purposes of the P&D Agreement, gross billings in connection with the exploitation of the applicable P&D Albums hereunder, less returns and reserves against anticipated returns and credits earned hereunder in the United States. In establishing reserves, UMG will take into consideration the sale and returns history of previous Records shipped hereunder as well as that of the Record concerned, SoundScan reports (or similar retail sales reports) and reports from UMG's distributor regarding to what extent the Record concerned is "selling through" at retail outlets. For the avoidance of doubt, in calculating Net Billings, UMG does not take reserves against anticipated returns for Records sold in the form of Electronic Transmissions. Notwithstanding the foregoing, Net Billings shall also include any reserves UMG liquidates. The foregoing definition of Net Billings shall replace Section 1.01. of Exhibit B of the P&D Agreement.

4.    **Recoupment.** Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment):

(a)    Artist's royalty and net profit account pursuant to the Recording Agreement (collectively, the "Recording Agreement Royalty Account") and the RTW Account (as defined in paragraph 4[b] below) which is a portion of the Recording Agreement Royalty Account, shall at all times remain uncrossed from Grantor's share of Net Proceeds pursuant to the P&D Agreement (and this P&D Amendment) (the "P&D Account"), except as follows: solely in connection with the P&D Albums and following recoupment of any and all costs paid or incurred by UMG on a P&D Album-by-P&D Album basis (including, without limitation any marketing costs and/or Third Party Marketing Costs [as defined in paragraph 6 below]), UMG shall apply the next Two Million Dollars ($2,000,000) of Grantor's share of Net Proceeds otherwise payable per P&D Album to the unrecouped Recording Agreement Royalty Account (inclusive of the RTW Account),

4

subject to an aggregate cap of Six Million Dollars ($6,000,000) across all P&D Albums. After the aforementioned Two Million Dollar ($2,000,000) application of recoupment per P&D Album set forth in the immediately preceding sentence is applied to the unrecouped Recording Agreement Royalty Account (inclusive of the RTW Account), any and all future monies in connection with Grantor's Share of Net Proceeds payable for the applicable P&D Album shall be applied to the P&D Account only. Notwithstanding the generality of the foregoing, for the purpose of this paragraph 4(a): (i) all costs incurred by UMG in connection with the Seventh Album shall be included in costs when determining recoupment in connection with the Seventh Album herein; (ii) one-half (1/2) of the Execution Advance (i.e., $1,500,000) shall be included in costs when determining recoupment of costs in connection with the Eighth Album herein; and (iii) the balance of the Execution Advance (i.e., $1,500,000) shall be included when determining recoupment of costs in connection with the Ninth Album.

(b)     For the avoidance of doubt, that portion of royalties, net profits, and/or Grantor's share of Net Proceeds paid into the Recording Agreement Royalty Account by Grantor as set forth in paragraph 4(a) above, and pursuant to the RTW Letter of Direction (as the same may be amended from time to time), shall constitute the RTW account (the "RTW Account"). For the further avoidance of doubt pursuant to the RTW Letter of Direction, the RTW Account shall not be deemed payable until such time as the Recording Agreement Royalty Account (of which the RTW Account is a portion of) is in a fully recouped position. No royalties accruing pursuant to the Recording Agreement shall be paid through to Artist until such time as the Record Agreement Royalty Account is in a fully recouped position, subject further to the terms and conditions of paragraph 4(a) above.

5.    **Timely Delivery of Seventh Album.**  Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment), Grantor shall be obligated to Deliver the Master Recordings comprising the Seventh Album to UMG within a reasonable time for such Seventh Album to be commercially released by UMG in 2015; such delivery date may only be extended by mutual approval of the parties hereto.

6.    **Marketing.**  Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment), solely in connection with its commercial release of the P&D Albums in the United States, UMG will advance or incur all costs to third parties in connection with marketing, promotion, publicity, and advertising, including without limitation, the cost of promotional Records and Videos that are part of the marketing plan approved in writing by UMG for the P&D Album concerned (collectively, the "Third Party Marketing Costs"); provided, however, that UMG shall be required to incur Third Party Marketing Costs up to, but not in excess of, an amount equal to twenty-five percent (25%) of the amount of Net Billings that UMG reasonably projects (in UMG's sole reasonable good faith judgment, based on UMG's projected sales less returns and discounts of the P&D Album concerned, and without the deduction of any reserves) will be earned in connection with its distribution of the P&D Album concerned. Notwithstanding anything to the contrary set forth herein, all Third Party Marketing Costs hereunder shall be deemed Advances pursuant to the P&D Agreement and deducted from Net Billings or Net Licensing Billings, as applicable, in the computation of Grantor's share of Net Billings otherwise payable to Grantor hereunder.

7.    **Exclusivity.**  Notwithstanding anything to the contrary contained in the Kanye Agreements (including, without limitation, this P&D Amendment), during the P&D Term and the period one (1) year immediately following the expiration of the P&D Term (the "Exclusivity Period"), Grantor shall continue to furnish the recording services of Artist exclusively to UMG and neither Grantor nor Artist, or any Person deriving any rights from Grantor or Artist, shall at any time, do, or authorize any Person to do, anything inconsistent with, or which might diminish or impair, any of UMG's rights of exclusivity hereunder (including, but not limited to the rights and restrictions set forth in section 10 of the Recording Agreement). For the avoidance of doubt, the provisions of paragraph 2 of the P&D Agreement shall apply hereunder.

8.    **Letters of Direction.**  UMG will honor letters of direction from Grantor (in a format approved by UMG) to pay third party record royalties and mechanical royalties to producers, remixers and sample licensors due in connection with P&D Album sales and exploitations. For the avoidance of doubt, UMG shall not honor any letter of direction from Grantor to pay advances to third parties.

Kanye West PD Amendment LPs 7-10 (12 02 14) v4 nw f clean

5

9.     **Audit**. UMG acknowledges its receipt of Grantor's intent to audit the Recording Agreement accounting and royalty statements rendered for the periods commencing January 1, 2010 through December 31, 2013 (the "Audit"). UMG hereby agrees to a prospective extension of the contractual time to commence action, and a prospective tolling of the statute of limitations (whether contractual, statutory, or otherwise) if applicable, with respect to Grantor's claims relating to those royalty statements rendered by UMG in connection with the Audit. By providing this tolling agreement, UMG is not agreeing that any of the issues raised in the Audit are valid or that UMG owes any additional amounts in connection with the Audit, the royalty statements or otherwise. This tolling agreement will expire, unless further extended, on March 31, 2015, and does not extend or revive any limitations period (whether contractual, statutory, or otherwise) that have already expired as of June 12, 2014, and does not affect or limit any claim or defense that may already exist, including, without limitation, those based upon principles of estoppel, waiver and laches and/or relating to a previously limitations period that may have already expired as of June 12, 2014.

10.     **Miscellaneous**.

(a)     The parties hereto, or constitute either party the agent of the other, and neither party shall become liable for any representation, act or omission of the other which is contrary to the provisions of this paragraph 10(a).

(b)     This writing sets forth the entire understanding between the parties hereto with respect to the subject matter hereof, and no modification, amendment or waiver of this document shall be binding upon either party hereto unless confirmed by a written instrument signed by an authorized signatory of the party sought to be bound. No waiver of any provision of, or waiver of a default under this P&D Amendment or any failure to exercise rights hereunder shall prejudice the rights of either party thereafter, nor shall it form precedent for the future.

(c)     Except as expressly or by necessary implication modified hereby, the P&D Agreement and all provisions thereof are hereby ratified and affirmed as being in full force and effect, without limitation or exception.

(d)     This document may be signed in counterparts, and may be executed and delivered by facsimile, electronic mail (as a scanned attachment or pdf. file), which when taken together will have the same effect as if signed it its original form by all the parties.

Very truly yours,

**DEF JAM RECORDINGS,
A DIVISION OF UMG RECORDINGS, INC.**

By: _____
        An Authorized Representative

AGREED AND ACCEPTED:

GETTING OUT OUR DREAMS II, LLC.

By: _____
        An Authorized Representative

_____
Kanye West

Kanye West PD Amendment LPs 7-10 (12 02 14) v4 nw f clean

Agreement made as of the 13th day of April, 2005, by and between ROC-A-FELLA RECORDS, LLC ("RAF"), at Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019 and ROCK THE WORLD, LLC. ("Grantor") c/o West Entertainment Services, Inc., 1775 Broadway, 23rd floor, New York, New York 10019, Attn: Louise West, Esq. and Ronald Sweeney, Esq.

## X.   PREFACE

WHEREAS, Grantor and RAF have previously entered into a recording agreement (the "Current RAF Recording Agreement") with respect to the exclusive recording services of Kanye West ("Artist"), dated as of August 13, 2002, as amended, and in full force and effect as of the date hereof; and the parties hereto agree that such Current RAF Recording Agreement is hereby deemed superceded in all respects by this agreement between the parties.

NOW, THEREFORE, IN CONSIDERATION OF THE MUTUAL PREMISES, COVENANTS AND PROMISES SET FORTH BELOW, IT IS HEREBY AGREED AS FOLLOWS:

## 1.   TERM

1.01.  The term of this agreement (the "Term") will begin on the date of the commencement of the Current RAF Recording Agreement and shall continue, unless extended as provided herein, for a first Contract Period (sometimes referred to as the "Initial Period") ending on the earlier of: (a) twelve (12) months after the delivery to RAF of the last Master Recordings that are required to be delivered hereunder in fulfillment of the Minimum Recording Obligation during the Initial Period; or (b) nine (9) months after the initial commercial release in the United States of the Album required to be delivered hereunder in fulfillment of the Minimum Recording Obligation during the Initial Period. Notwithstanding anything to the contrary contained herein, the months of December shall not be included when computing the ending date of the Initial Period.

1.02.  (a)    Grantor grants RAF six (6) separate options to extend the Term for additional Contract Periods (sometimes referred to as "Option Periods"). RAF may exercise each of those options by sending Grantor a notice at any time before the expiration of the Contract Period then in effect. If RAF exercises such an option, the Option Period concerned will commence upon the end of the current Contract Period (or, if RAF so advises, such period will begin on the date of such exercise notice) and end on the earlier of: (i) twelve (12) months after the delivery to RAF of the last Master Recordings that are required to be delivered hereunder in fulfillment of the Minimum Recording Obligation during such Option Period; or (ii) nine (9) months after the initial commercial release in the United States of the Album required to be delivered hereunder in fulfillment of the Minimum Recording Obligation during such Option Period. Grantor hereby acknowledges that, prior to the date hereof, RAF has previously, timely and properly exercised its option to extend the Term of the Current RAF Recording Agreement for the first Option Period during which Grantor is obligated to deliver and RAF is entitled to receive delivery of the second Album of the Minimum Recording Obligation (the "Second Album") (i.e., five (5) Option Periods remain as of the date hereof). Notwithstanding anything to

1

Kanye West 9.16.20 Twitter     00023



the contrary contained herein, the months of December shall not be included when computing the ending date of any Option Period.

(b)     Notwithstanding anything to the contrary contained in this paragraph 1.02, if RAF has not exercised its option to extend the Term for a further Contract Period as of the date on which the then-current Contract Period (the "Current Contract Period") would otherwise expire, then the following procedure shall apply: (i) Grantor shall send RAF a written notice (an "Option Warning") stating that RAF has not yet exercised such option; (ii) RAF shall have the right to exercise such option at any time until the date (the "Extended Option Date") which is thirty (30) days after its receipt of the Option Warning; and (iii) the Current Contract Period shall continue until the earlier of (A) the Extended Option Date, or (B) the date of RAF's written notice (the "Termination Notice") to Grantor that RAF does not wish to exercise such option. Nothing contained herein shall limit RAF's right to send a Termination Notice to Grantor at any time, nor limit RAF's right to exercise an option at any time if Grantor fails to send RAF an Option Warning in accordance with this paragraph 1.02(b).

## 2.    RECORDING OBLIGATION

2.01.    RAF hereby engages Grantor to furnish the exclusive services of Artist to deliver to RAF Master Recordings as provided for herein, and to furnish the services of individual producers to produce such Master Recordings. Grantor warrants that during the Term Artist shall perform for the purpose of making Phonograph Records exclusively for Grantor and RAF.

2.02.    During each Contract Period, Artist will perform for and Grantor will record and deliver a minimum number of Master Recordings ("Minimum Recording Obligation") specified in the following schedule:

| Contract Period | Minimum Recording Obligation |
| --- | --- |
| Initial | "The College Dropout" Album |
| First Option | One (1) Album |
| Second Option | One (1) Album |
| Third Option | One (1) Album |
| Fourth Option | One (1) Album |
| Fifth Option | One (1) Album |
| Sixth Option | One (1) Album |

Grantor has previously delivered to RAF the Album (the "First Album") in satisfaction of the Minimum Recording Obligation for the Initial Contract Period entitled "The College Dropout" Album.

## 3.    PROCEDURES

3.01.    Grantor shall be responsible for coordination of recording sessions and Grantor, Artist and the individual producers shall render their services subject to the terms and conditions hereof to the best of their ability and in accordance with first-class standards of performance for the production of Master Recordings in the Phonograph Record industry.



Kanye West 9.16.20 Twitter

3.02.    Prior to making each Recording, Grantor shall designate and submit to RAF for RAF's approval each of the following "Recording Elements", before proceeding further:  (a) selection of the individual producer(s) of the Master Recordings hereunder, (b) selection of Compositions to be recorded, (c) specification of accompaniment, arrangement and copying services, and (d) selection of dates of recording and studios where recording is to take place.  At least fourteen (14) days prior to the date of the first recording session for the recording of any Master Recordings, Grantor will submit to RAF for its written approval, a written proposed budget (the "Proposed Budget") setting forth, in itemized detail, all anticipated Recording Costs. Without limitation of the foregoing obligation to submit a budget and/or of RAF's right of approval with respect to each element thereof, an aggregate budget amount of no greater than eighty percent (80%) of an amount equal to the applicable Recording Fund shall not be disapproved by reason of its overall amount with respect to each Album of the Minimum Recording Obligation hereunder. In consultation with Grantor and subject to Artist's prior professional commitments, the booking of all studio time will be done by RAF.  Grantor shall notify the appropriate local chapter of the American Federation of Musicians ("AFM") in advance of each recording session.  Grantor shall allow RAF's representatives to attend all recording sessions hereunder at RAF's non-recoupable expense, unless such representatives are producers engaged by RAF pursuant to the provisions of paragraph 10.06(b) below (in which event the provisions of said paragraph shall apply), engineers, remixers or otherwise engaged in the recording process.

3.03.    With respect to Master Recordings hereunder, Grantor shall simultaneously deliver to RAF stereo mixed down tape masters of the original multi-track recordings which are of a quality reflecting then-current "state of the art" analog and/or digital recording techniques and a final two-track equalized tape copy of such recordings, together with the following: (a) two (2) safety copies of the multi-track recordings and so-called "clean" versions of each Master, and (b) the following additional mixes of each Master Recording to be embodied on the "A-Side" of the first Single to be released in connection with a particular Album hereunder, if any such Single is to be so released: (i) Album mix (instrumental), (ii) 7-inch Single mix for TV, cold ending, (iii) 7-inch Single mix for TV (instrumental and background vocals only), cold ending, and (iv) a cappella versions (i.e., vocals only). It is expressly agreed that RAF will not reduce the Recording Fund for a particular Album by the Recording Costs incurred with respect to the delivery materials required solely under this paragraph 3.03(b) with respect to the first Single to be released with respect to such Album, if any.   Such stereo mixed down tape masters shall be satisfactory for the production of reference discs for Phonograph Record manufacturing, equalized tape transfers for cassette manufacturing, digital transfers for compact disc and digital cassette manufacturing, and such elements of future technology as may hereinafter be utilized in the Phonograph Record industry.  Upon RAF's reasonable request, Grantor shall re-record any Composition until a technically satisfactory Master Recording shall have been obtained; however, notwithstanding anything to the contrary expressed or implied in the preceding sentence, each Master Recording delivered hereunder shall embody performances by the Artist that (a) are "first class" (as that term is understood in the record industry), (b) are at least of the quality of the Artist's prior recorded performances and (c) embody performances of approximately the same number of Controlled Compositions as are performed on prior Phonograph Records hereunder. All tapes and work parts of whatever nature (including, without limitation, multi-tracks, out-takes or other tracks recorded during the Term) shall be delivered to RAF concurrently with delivery of the foregoing items under this paragraph 3.03 or maintained at a recording studio or other location designated by RAF in RAF's name and subject to RAF's control.

3.04.   Grantor shall furnish RAF in writing with all information, consents and clearances required for the recording, manufacture and distribution of Phonograph Records hereunder including, without limitation, all licenses in respect of "Embodied Copyrighted Materials" (as defined in paragraph 10.05 below), the label copy (including song titles and any subtitles), names of composers and lyricists, complete publisher line, music performing rights organizations (e.g., BMI, ASCAP, etc.), timings, any credits to arrangers or accompanists, names of engineers, list of musicians with instruments played, list of all vocalists (and whether the vocalist is a featured or background vocalist), exact recording date(s), studio location(s), album liner credits, and any information required to be submitted to unions, guilds or other third parties.  Notwithstanding the foregoing, Embodied Copyrighted Materials shall not include material embodied solely by RAF, The Island Def Jam Music Group or third parties engaged by RAF subsequent to Grantor's satisfactory delivery to RAF of such Master Recording(s) pursuant to the terms herein.

3.05.   Subject to the terms of paragraph 10.12 below, as between Grantor and Artist, on the one hand, and RAF, on the other hand, RAF shall be responsible for preparing the actual paperwork in connection with all mechanical licenses and sample clearances required to be obtained from the copyright proprietors of Compositions embodied on Recordings to be delivered to RAF hereunder; provided that RAF's failure to prepare any such paperwork in any instance shall not be deemed a breach of this agreement.  Notwithstanding anything to the contrary contained in the preceding sentence or elsewhere in this agreement, Grantor and Artist shall be solely responsible for securing and delivering to RAF fully-executed copies of any and all licenses in respect of Embodied Copyrighted Materials in connection with the Recordings to be delivered to RAF hereunder.

3.06.   Artist's performances hereunder shall be reasonably consistent in concept and style, and each Master Recording delivered hereunder will be similar in general artistic concept and style to Master Recordings previously delivered hereunder.  Grantor further agrees that none of the following shall apply in fulfillment of the Minimum Recording Obligation without RAF's prior written consent:  so-called "live" Recordings; Multiple-Record Albums; Joint Recordings; instrumental Recordings; or Recordings which were not made in compliance with the provisions of this agreement.  Without limiting the generality of the foregoing, any Multiple-Record Album delivered hereunder shall be deemed a single Album for the purposes of product delivery and payment of Advances.  RAF agrees that it shall not require Grantor to deliver any Multiple-Record Album or Joint Recording as part of the Minimum Recording Obligation hereunder.

3.07.   If Grantor or Artist shall for any reason whatsoever, unless caused solely by the acts or omissions of RAF or The Island Def Jam Music Group, delay the commencement of or be unavailable for any recording sessions for the Masters, Grantor shall, upon RAF's demand, pay RAF an amount equal to the expenses or charges paid or incurred by RAF by reason thereof.  RAF may, without limiting RAF's other rights and remedies, deduct that amount from any and all monies otherwise payable to Grantor or Artist hereunder (excluding mechanical royalties payable hereunder).

3.08.   RAF may, at its election, discontinue any recording sessions for any Master Recordings hereunder if in RAF's reasonable, good faith judgment the Recording Costs incurred or to be incurred will exceed one hundred and ten percent (110%) of the approved recording budget (excluding any in-pocket Advances) or if the Master Recordings being produced will not conform to the requirements set forth herein.

Kanye West 8.10.20 Twitter                                                        00026

## 4.    DELIVERY PROCEDURE

4.01.    (a)    (i)    Each Album of the Minimum Recording Obligation shall be delivered to RAF no later than one hundred eighty (180) days following commencement of the applicable Contract Period hereunder.

(ii)    Notwithstanding anything to the contrary contained herein, including without limitation, paragraphs 4.01(a)(i) and 12.01, delivery of all Master Recordings and other materials required to be physically delivered to RAF (accompanied by all related artwork, credits, sample, co-producer and side artist information, if applicable) in respect of the Second Album shall be delivered no later than May 24, 2005 (the "Target Date"). For the avoidance of doubt, the parties agree that satisfactory and timely delivery of the Second Album by the Target Date is a material inducement to RAF's entering into this New RAF Recording Agreement and is of the essence.

(iii)    Reference is made to the amendment to the current RAF Recording Agreement dated as of May 19, 2004 between RAF and Grantor (the "Compilation Amendment"). For the avoidance of doubt, Grantor hereby ratifies and affirms the terms of the Compilation Amendment and agrees to deliver the Compilation Album (as defined therein) to RAF by September 30, 2005.

(b)    Grantor will deliver to RAF, simultaneously with the delivery of the Master Recordings for each Album of the Minimum Recording Obligation, "camera-ready" artwork embodying Grantor's Symbol for use by RAF in accordance with the provisions of paragraph 5.01(b)(xvi) below.

(c)    Notwithstanding anything to the contrary expressed or implied in paragraph 4.01(a) above, if Artist is performing on a tour consisting of at least fifteen (15) committed tour dates within one hundred and twenty (120) days following the commercial release of any Album of the Minimum Recording Obligation, and the performance of such tour would prevent or delay Grantor from delivering the applicable Album of the Minimum Recording Obligation to RAF within the applicable time period set forth herein, Grantor shall not be deemed in breach of this agreement solely as a result of the performance of such tour. Notwithstanding the foregoing and for the avoidance of doubt, no Album of the Minimum Recording Obligation shall be delivered to RAF later than two (2) years following delivery of all Master Recordings required to be delivered pursuant to Articles 3 and 4 hereof with respect to the previous Album of the Minimum Recording Obligation.

4.02.    Satisfactory completion by Grantor of the procedures in Article 3 and this Article 4 shall be among the necessary conditions to determine whether any Recording has been delivered within the meaning of this agreement. RAF's election to make a payment which was to have been made upon delivery of Recordings or release such Recording shall not be deemed to be its acknowledgment that such delivery was properly made, and RAF shall not be deemed to have waived either its right to require such complete and proper performance thereafter or its remedies for Grantor's failure to perform in accordance herewith.

4.03.    No Master Recordings delivered hereunder shall have been recorded earlier than six (6) months prior to delivery of such Master Recordings to RAF, nor shall any Master

Recording embody any Composition which has been previously recorded by Artist (whether as a group or an individual) (excluding any so-called "demonstration" recordings which have not been commercially exploited or manufactured in any quantity beyond a reasonable number of duplicates for demonstration purposes only). Grantor shall not commence recording any Album prior to ninety (90) days after delivery to RAF of Master Recordings constituting the immediately preceding Album.

4.04. (a) RAF shall send Grantor written notice of the date which RAF deems to be the applicable delivery date of Master Recordings hereunder. If Grantor disputes the date of such notice, Grantor shall give notice in writing to RAF within thirty (30) days of RAF's notice to Grantor. Grantor's failure to so notify RAF shall be deemed Grantor's acceptance of the date contained in RAF's notice.

(b) If Grantor has not received any notice from RAF pursuant to paragraph 4.04(a) above within thirty (30) days after the date Grantor deems to be such applicable delivery date, then Grantor shall notify RAF within ten (10) days after such thirty (30) day period of the date Grantor deems the applicable delivery date. RAF shall have the right to object to such date within thirty (30) days after receipt of Grantor's notice.

(c) If either party objects to the date contained in the notice given by the other party, RAF and Grantor shall mutually and in good faith agree in writing on the date to be deemed the delivery date. If the parties do not reach such agreement or if neither party gives notice of the delivery date of Master Recordings as provided above earlier than thirty (30) days prior to the date of initial release in the United States of such Master Recordings, then the delivery date of such Album shall be deemed to be thirty (30) days prior to such date of initial release for the purposes of determining the last day on which RAF may exercise its option for the next Contract Period.

## 5. RIGHTS

5.01. (a) All Master Recordings recorded during the Term which embody the performances of Artist, from the inception of the recording thereof, all artwork created for use on or in connection with Phonograph Records or other derivatives of such Master Recordings including, without limitation, for use in advertising and Artist Websites ("Artwork") and including, without limitation, Mobile Materials shall be deemed "works made for hire" for RAF. All such Master Recordings, from the inception of the recording thereof, and all Phonograph Records and other reproductions made therefrom, together with the performances embodied therein, and all Artwork, and all copyrights therein and thereto, and all renewals and extensions thereof, shall be entirely RAF's property, free of any claims whatsoever by Grantor, Artist, or any other Person, throughout the world and in perpetuity. Accordingly, RAF shall have the exclusive right to obtain registration of copyright (and all renewals and extensions) in those Master Recordings and in all Artwork and Mobile Materials, in RAF's name, as the owner and author thereof. If for any reason any such Master Recording(s) or Artwork are deemed not to be "works made for hire", then Grantor and Artist hereby irrevocably assign to RAF all of Grantor's and Artist's right, title and interest in and to such Master Recordings, Artwork and Mobile Materials (including, without limitation, all copyright therein, and all renewals and extensions thereof) in perpetuity throughout the world. Without limiting the generality of the foregoing, RAF and its subsidiaries, affiliates, licensees and designees shall have the sole and exclusive right, throughout the world and in perpetuity, to manufacture and/or distribute Records, by any

method(s) now or hereafter known embodying all or any portion(s) of the performances embodied on such Master Recordings and/or all or any portion(s) of any such Artwork and Mobile Materials; to publicly perform such Records; to import, export, sell, transfer, lease, license, transmit, rent, deal in or otherwise dispose of or exploit such Master Recordings, Artwork, Mobile Materials and Records derived therefrom throughout the world under any trademarks, trade names or labels designated by RAF; to edit or adapt such Master Recordings, Mobile Materials and/or Artwork to conform to the technological or commercial requirements of Phonograph Records in various formats now or hereafter known or developed, or to eliminate material which might subject RAF to any civil or criminal action; to exploit such Master Recordings for background music, synchronization in motion pictures and television soundtracks and other similar purposes, including, without limitation, use on transportation facilities, without any additional payments to Artist or Grantor other than as expressly set forth in paragraph 7.06 hereof; or, notwithstanding the provisions of this agreement, RAF and its subsidiaries, affiliates and licensees may, at their election, delay or refrain from doing any one or more of the foregoing. Without limiting the generality of the foregoing, it is acknowledged and agreed that the provisions of this paragraph 5.01(a) shall not be construed to grant RAF any ownership rights in or to the underlying Compositions embodied on the Master Recordings hereunder. Grantor will cause Artist to grant to RAF the ~~first right of refusal and~~ matching right to acquire the exclusive worldwide exploitation rights to the "Mobile Materials" defined in paragraph 13.13 of this agreement, in each instance, at the end of the term of each of Artist's current exclusive arrangements with third parties with respect to such rights.

      **(b)**    Notwithstanding anything to the contrary contained in this agreement, with respect to sales of Records in the United States during the Term (unless otherwise expressly set forth herein):

      (i)    During and after the Term, RAF shall not, without Grantor's prior written consent, release any so-called "outtakes" (i.e., preliminary or unfinished Master Recordings) recorded hereunder.

      (ii)    Except with respect to promotional Records, Audio-Visual Recordings or Records used in connection with public transportation carriers or facilities and consumer-created or -selected combinations of recordings, RAF shall not, during any one (1) calendar year of the Term, couple more than two (2) Master Recordings delivered hereunder with Master Recordings not embodying Artist's performances without Grantor's written consent, which shall not be unreasonably withheld.

      (iii)    During and after the Term, RAF shall not, without Grantor's prior written consent, use Master Recordings delivered hereunder on premium Records produced for use in promoting the sale of merchandise or commercial services other than Phonograph Records.

      (iv)    RAF shall not, without Grantor's prior written consent, which shall not be unreasonably withheld, release as a Budget Record any Album delivered hereunder as part of the Minimum Recording Obligation until the earlier of (the "Holdback Date"): (A) eighteen (18) months after the initial release of such Album; or (B) six (6) months after the release of any Album as a Mid-Price Record, provided, however, that if any such Budget Record is so released by RAF prior to the Holdback Date without Grantor's consent, RAF shall, as Grantor's sole remedy in such event, accrue to Grantor's account hereunder the so-

Kanye West 9/16/20 Twitter

00029

called "top-line" basic royalty rate set forth in paragraph 7.02 below (provided, that if such Album has been previously released as a Mid-Price Record in accordance with the provisions hereof, the royalty rate with respect to Mid-Price Records shall instead apply), then RAF shall not be deemed to have breached the terms of this subparagraph.

(v)     RAF shall not, without Grantor's prior written consent, which shall not be unreasonably withheld, release as a Mid-Price Record any Album delivered hereunder as part of the Minimum Recording Obligation until twelve (12) months after the initial release of such Album provided, however, that if any such Mid-Price Record is so released by RAF during such twelve (12) month period and RAF accrues to Grantor's account hereunder the so-called "top-line" basic royalty rate set forth in paragraph 7.02 below, then RAF shall not be deemed to have breached the terms of this subparagraph.

(vi)     RAF shall not sell Records derived from Master Recordings hereunder as "cut-outs" during a period of twenty-four (24) months from the date of initial United States release of such Records.

(vii)     RAF shall not, without Grantor's prior written consent, license any Master Recordings delivered hereunder (A) for synchronization in any motion picture or television production and/or (B) in connection with any advertisements for products, services, religious or political causes (other than Phonograph Records or Artist's career).

(viii)     RAF shall meaningfully consult with Grantor with respect to the "A" and "B" side of each Single, if any, derived from any Album of the Minimum Recording Obligation released by RAF, provided however, that RAF's decision with respect thereto shall control and provided further that any inadvertent failure by RAF to so consult with Grantor shall not be deemed a breach hereof.

(ix)     RAF shall meaningfully consult with Grantor with respect to the initial marketing plan and initial United States commercial release date with respect to each Album of the Minimum Recording Obligation, provided however, that RAF's decision with respect thereto shall control and provided further that any inadvertent failure by RAF to so consult with Grantor shall not be deemed a breach hereof.

(x)     The initial release of each Album of the Minimum Recording Obligation hereunder shall be on a label designated by RAF generally as a label for the majority of top artists of comparable style.

(xi)     (A)     During the Term, RAF shall not, without Grantor's prior written consent, which shall not be unreasonably withheld, release a "Greatest Hits" compilation Album (each, a "GH Album") consisting entirely of Artist's Master Recordings recorded hereunder, provided that Grantor's royalty account is in a recouped position. Notwithstanding the foregoing, and for the avoidance of doubt, RAF shall not release more than one (1) GH Album during the Term, without Grantor's prior written consent. In the event that RAF requests that Grantor cause Artist to record and deliver to RAF new Master Recordings, in excess of the Minimum Recording Obligation hereunder, for inclusion in a GH Album, the parties hereto agree to negotiate in good faith with respect to the budget for such new Master Recordings.

(B)     If, during the Term (and subject to the provisions of

8

Kanye West 9.16.20 Twitter

paragraph 5.01(b)(xi)(A) above), RAF elects to release one (1) or more GH Album(s), then RAF shall submit to Grantor a written proposal of the Master Recordings recorded hereunder to be included on such GH Album, and Grantor shall have the right to object to any or all of the Master Recordings proposed by RAF and to recommend alternative Master Recordings to be included within seven (7) business days after Grantor's receipt of RAF's proposal. In no event shall Grantor have the right to object to any Master Recording embodied in a Single which achieved a position in the "Top 100" chart of any national trade publication at any time prior to the initial release of such GH Album. If Grantor does so object to the inclusion in any such GH Album of any Master Recordings proposed by RAF, each of RAF and Grantor shall select one-half (1/2) of the Master Recordings so disputed, provided that if the number of disputed Master Recordings is an odd number, RAF shall have the right to select one more Master Recording than Grantor. If Grantor does not object to any of the Master Recordings proposed by RAF, or does not respond within said seven (7) business day period, the Master Recordings proposed by RAF shall be included on such GH Album.

(xii)    RAF shall not, without Grantor's prior written consent, release or otherwise exploit any so-called live Recordings, joint recordings or demonstration recordings. For purposes of clarification, "joint recordings" shall not include Artist's Master Recording embodying a side artist performance by another recording artist.

(xiii)    RAF shall not release any Album hereunder through a record club until six (6) months after the initial release of the applicable Album in the United States.

(xiv)    With respect to sales of Records outside the United States, RAF will request its licensees outside the United States to comply with the provisions of this paragraph 5.01(b)(i), (ii), (iii) and (vii); if Grantor notifies RAF of sales of Records outside the United States in violation of the provisions of this paragraph 5.01(b)(i), (ii), (iii) and (vii), RAF will instruct its licensees to discontinue such violative sales, but neither RAF nor its licensees shall have any liability by reason of such sales occurring prior to RAF's receipt of such notice, and RAF shall have no liability by reason of such sales at any time.

(xv)    In connection with the initial release of each Album of the Minimum Recording Obligation, Grantor shall have the right to consult with RAF regarding the preparation of the Artwork and the right to approve such Artwork, provided that such approval shall not be unreasonably withheld, it being acknowledged and agreed that Grantor's withholding of such approval based on its request for any changes to such Artwork which would require deviations from RAF's standard cost guidelines shall be deemed to be unreasonable, and provided further that the giving of such approval shall not conflict with the scheduled release date of the applicable Album. Grantor shall be responsible for arranging appointments with RAF, at a mutually convenient time, sufficiently far in advance of the scheduled release date of the applicable Album to allow Grantor to timely exercise the above right of consultation and approval. Grantor's approval shall be deemed given within seven (7) business days following Grantor's receipt of RAF's request therefor unless Grantor notifies RAF of Grantor's specific objections within such seven (7) business day period. After Grantor's exercise of such right of consultation and approval (or failure to exercise such right), RAF shall have the right to prepare and use such Artwork without any further right of consultation or approval by Grantor. All rights in and to any Artwork or related material furnished by Grantor or at Grantor's request, including the copyright and renewals and extensions thereof, shall be RAF's property throughout the world in perpetuity. All matters relating to trademarks, notices, including, without limitation,

9



(xii)    RAF shall not, without Grantor's prior written consent, release or otherwise exploit any so-called live Recordings, joint recordings or demonstration recordings. For purposes of clarification, "joint recordings" shall not include Artist's Master Recording embodying a side artist performance by another recording artist.

(xiii)    RAF shall not release any Album hereunder through a record club until six (6) months after the initial release of the applicable Album in the United States.

(xiv)    With respect to sales of Records outside the United States, RAF will request its licensees outside the United States to comply with the provisions of this paragraph 5.01(b)(i), (ii), (iii) and (vii); if Grantor notifies RAF of sales of Records outside the United States in violation of the provisions of this paragraph 5.01(b)(i), (ii), (iii) and (vii), RAF will instruct its licensees to discontinue such violative sales, but neither RAF nor its licensees shall have any liability by reason of such sales occurring prior to RAF's receipt of such notice, and RAF shall have no liability by reason of such sales at any time.

(xv)    In connection with the initial release of each Album of the

2:19-cv-00366-RMG   Date Filed 09/18/20   Entry Number 116-6   Page 33 of 60

UPC symbols (i.e., bar-coding), or disclosures deemed advisable by RAF's attorneys, and any matter other than the Album cover layout and the picture or art to be used on the cover, will be determined in RAF's sole discretion.

(xvi)   (A)   With respect to the initial release of Records derived from the Master Recordings delivered hereunder, RAF will print Grantor's logo or other trade symbol designated by Grantor (individually and collectively, the "Symbol") on the packaging of such Records and all one-quarter (1/4) page or larger trade advertisements where the RAF logo also appears relating solely to Artist. The size of the Symbol on such packaging and advertisements shall be no less than the same size as the nearest RAF logo. The placement of the Symbol on such packaging and advertisements shall be determined by RAF, in its sole discretion. If RAF fails to comply with the preceding sentences in any instance, its sole obligation to Grantor shall be to rectify the failure in materials prepared after RAF's receipt of notice of such failure from Grantor. If the artwork embodying such logo or Symbol is not properly and timely delivered to RAF in accordance with the provisions of Article 4 above, RAF shall have no obligation at all to utilize such logo or Symbol.

(B)   Each Symbol, whenever used by RAF or its licensees, will be deemed included as an item of "Materials," as defined in paragraph 10.05 below, and shall be subject to all of Grantor's warranties, representations and indemnities set forth in Article 10. The registration and maintenance of the Symbol shall be Grantor's sole responsibility, and at Grantor's sole expense. Grantor shall cooperate with RAF if RAF deems it advisable for RAF and/or its licensees to become a "registered user" of the Symbol, and Grantor shall execute any documents necessary to evidence the foregoing. RAF may refrain from using the Symbol at any time if, in RAF's sole, good faith, reasonable judgment, such use might violate any law or the rights of any Person; provided that if Grantor remedies such potential violation to RAF's satisfaction, RAF shall resume use of the Symbol as set forth herein, on a prospective basis.

(xvii)   Following the delivery of any Album of the Minimum Recording Obligation pursuant to the terms herein, RAF shall not, without Grantor's prior written consent, resequence or change the title of any such Album.

(xviii)   RAF shall not, in connection with the initial release of Records embodying Master Recordings hereunder, edit or remix the Master Recordings hereunder except as necessary for so-called "specialty" remixes (i.e., dance mixes, etc.), the release of Singles, or non-disc configurations, or to eliminate material which might, in the opinion of RAF's counsel, constitute a defamation, libel or violate or infringe upon any right, including, without limitation, the right of privacy, of any Person; provided, however, that RAF shall offer to Grantor the first opportunity to so edit the Master Recordings (unless same would interfere with a scheduled release date), which editing shall be completed within five (5) days following RAF's notice to Grantor, and which offer shall be deemed rejected if Grantor does not respond and/or complete such editing within said five (5) day period. If Grantor does not so edit such Master Recordings within said five (5) day period, RAF shall have the right to so edit such Master Recordings without further consultation with Grantor.

(xix)   The provisions of paragraph 5.01(b) above shall not apply if Grantor has not fulfilled Grantor's then-current delivery obligations described in Articles 3 and 4 above with respect to any Master Recordings hereunder within ninety (90) days following the time periods set forth in such Articles.

Kanye West 9.16.20 Twitter                                                            00033

(c)    Provided that Grantor has fulfilled all of Grantor's material obligations hereunder and the Master Recordings for each Album of the Minimum Recording Obligation hereunder are delivered within sixty (60) days following the time periods set forth in Article 4 above, if RAF does not commercially release each Album of the Minimum Recording Obligation in the United States on or before one hundred twenty (120) days following the date of delivery to RAF of such Album, then Grantor may, within forty-five (45) days following the expiration of such one hundred twenty (120) day period, give RAF notice of such failure to release such Album. RAF shall either cure such failure within sixty (60) days after RAF's receipt of such notice, or Grantor shall have the right by written notice to RAF within forty-five (45) days following the expiration of such sixty (60) day period to terminate the Term of this agreement. In the event of such termination, the parties shall be deemed to have fulfilled all of their obligations hereunder except for those obligations which survive the end of the Term, such as warranties, re-recording restrictions, and the obligation to pay royalties, if payable, and such termination shall be Grantor's sole remedy for RAF's failure to release Records derived from the said Master Recordings. If Grantor fails to give RAF either of the notices specified in this paragraph, Grantor's right to terminate hereunder shall lapse with respect to such Album. The running of each of the aforementioned one hundred twenty (120), forty-five (45) and sixty (60) day periods will be suspended for the period of any suspension of the Term of this agreement. For purposes of computing said periods, the month of December shall not be counted. For purposes of this paragraph 5.01(c), an Album shall be deemed released when RAF or its licensee has made it available for sale in the United States.

(d)    Provided that Grantor has fulfilled all of Grantor's material obligations hereunder and the Master Recordings for each Album of the Minimum Recording Obligation are delivered within sixty (60) days following the time periods set forth in Article 4 above, if RAF does not commercially release each Album of the Minimum Recording Obligation within one hundred twenty (120) days following the date of entry of such Album in the "TOP 60" ("TOP 30" in respect of Japan and The United Kingdom) of the Billboard "Top 200" chart, or, solely in the event that Billboard ceases to exist or is superseded as the leading United States national music industry trade journal with respect to such chart positions, such superseding journal's equivalent to the Billboard "Top 200" chart, in the territories of Japan, The United Kingdom, Canada, Germany and France (the "Release Territories"), then Grantor may give RAF notice, within forty-five (45) days following the expiration of such one hundred twenty (120) day period, of such failure so to release such Records in a particular Release Territory, and RAF shall have a period of sixty (60) days following the date of such notice to cure such failure. If RAF does not cure such failure within said sixty (60) day period, Grantor will have the option, which may be exercised by giving RAF written notice within forty-five (45) days following the end of such sixty (60) day period, to require RAF to enter into an agreement with a licensee designated by Grantor, which licensee is actually engaged in the business of manufacturing and distributing Records in the Release Territories, authorizing such licensee to manufacture and distribute Records derived from the Master Recordings not released in accordance with this paragraph 5.01(d) in the applicable Release Territory in which such Records were not released. Grantor's sole remedy for RAF's failure to release an Album in the applicable Release Territory(ies) pursuant to this paragraph 5.01(d) shall be the exercise of Grantor's option hereunder. If Grantor fails to give RAF either of the notices specified in this paragraph 5.01(d), Grantor's rights under this paragraph 5.01(d) will lapse with respect to such Album. Fifty percent (50%) of all revenues actually received by RAF under such licenses will be credited to Grantor's royalty account under this agreement. Each such license agreement will provide for such compensation for the license

J:\IDJ- Legal\McMillan\wpdata\Kanye West\Kanye West_New_Recording_Agreement v3.doc

Kanye West 9.16.20 Twitter                00034

as Grantor negotiates with the licensee, and will contain such other provisions as RAF shall reasonably require, including but not limited to the following:

   (i) The licensee will be required to deliver to RAF all consents required by RAF, including the consent of the Artist, and all agreements which RAF may require for any third party to look to the licensee, and not to RAF, for the fulfillment of any obligations arising in connection with the manufacture or distribution of Records under the license. The licensee will also become a first party to the Phonograph Record Manufacturers' Special Payments Fund Agreement with the American Federation of Musicians, or any successor agreement then in effect. The license agreement will not become effective until the licensee has complied with all the provisions of this subsection 5.01(d)(i).

   (ii) The licensee will make all payments required in connection with the manufacture, sale or distribution, by parties other than RAF, in the applicable Release Territory of Records made from those Master Recordings after the effective date of the license, including, without limitation, all royalties and other payments to performing artists, producers, owners of copyrights in musical compositions, the Music Performance Trust Fund and Special Payments Fund, and any other unions and union funds, and will authorize the applicable Fund Administrator's designated agent to audit Grantor's books and records with respect to the sale and/or distribution of such Records. The licensee will comply with all applicable rules and regulations covering any use of the Master Recordings by the licensee.

   (iii) No warranty or representation will be made by RAF in connection with the applicable Master Recordings, the license, or otherwise. Grantor and the licensee will indemnify and hold harmless RAF and its licensees against all claims, damages, liabilities, costs, and expenses, including reasonable counsel fees, arising out of any use of the Master Recordings or exercise of such rights by the licensee (subject to the terms of paragraph 10.10 below).

   (iv) RAF will instruct its licensees in the applicable Release Territory not to manufacture Records derived from the Master Recordings licensed to the licensee. If the licensee notifies RAF of such manufacture RAF will instruct its licensees to discontinue it, but neither RAF nor its licensees shall have any liability by reason of such manufacture occurring before RAF's receipt of such notice, and RAF shall have no liability by reason of such manufacture at any time.

   (v) Each Record made under the license will bear a sound recording copyright notice identical to the notice used by RAF for initial United States release of the Master Recordings concerned, or such other notice as RAF shall require, but those Records will not otherwise be identified directly or indirectly with RAF.

   (vi) RAF shall have the right to examine the books and records of the licensee and all others authorized by the license to manufacture or distribute Records under the license, for the purpose of verifying the accuracy of the accountings rendered to RAF by the licensee.

   (vii) The licensee will not have the right to authorize any other party to exercise any rights without RAF's prior written consent.

J:\IDJ- Legal\McMillan\wpdata\Kanye West\Kanye West_New_Recording_Agreement v3.doc

Kanye West 9.16.20 Twitter    00035

(viii)    RAF and its licensees will have the continuing right at all times to manufacture and sell recompilation Albums which may contain the Master Recordings. A recompilation Album is an Album, such as a "Greatest Hits" or "Best Of" Album, containing Master Recordings previously released in different Album combinations.

The running of each of the one hundred twenty (120) and sixty (60) day periods described in paragraph 5.01(d) above will be suspended for the period of any suspension of the Term of this agreement. For purposes of computing said periods, the month of December shall not be counted. For purposes of this paragraph 5.01(d), an Album shall be deemed released when RAF or its licensee has made it available for sale in the Release Territory concerned.

(e)    If Grantor exercises Grantor's option described in paragraph 5.01(d) above in a timely manner with respect to any two (2) consecutive Albums of the Minimum Recording Obligation which are subject to the provisions of paragraph 5.01(d) above, then Grantor shall have the right, by written notice to RAF within sixty (60) days following Grantor's exercise of Grantor's said option described in paragraph 5.01(d) with respect to the second such Album to terminate the Term of this agreement with respect to the particular Release Territory where such Albums were not released, and RAF will deliver to Grantor an agreement licensing to Grantor the right to exploit in the applicable Release Territory where such Albums were not released, the Master Recordings embodied in such unreleased Albums and all Master Recordings embodied in Albums of the Minimum Recording Obligation hereunder subsequent to such second unreleased Album, subject to such terms and conditions as RAF may reasonably require, and provided that all the provisions of paragraph 5.01(d) as same apply to Grantor, the licensee under the applicable license agreement under paragraph 5.01(d) shall apply with respect to Grantor in such Release Territory. Fifty percent (50%) of the gross proceeds in any form whatsoever derived by Grantor from the exploitation of the said Master Recordings in the Release Territory wherein RAF's rights hereunder are terminated pursuant to this paragraph 5.01(e) will be paid to RAF promptly following Grantor's receipt of the proceeds concerned (i.e., fifty percent (50%) shall be paid directly to Grantor and no monies will be credited to Grantor's royalty account). RAF will have the right to examine Grantor's books and records therefore solely for the purpose of verifying the accuracy of the accountings rendered by Grantor to RAF under this paragraph. All agreements entered into by Grantor with others regarding the exploitation of such rights will require them to pay such sums directly to RAF and furnish RAF on a timely basis with duplicate copies of all accountings rendered by them to Grantor, and will provide for the examination of their books and records by RAF. RAF will remit to Grantor any overpayments made to it by reason of the preceding sentence. This termination with respect to the applicable Release Territory shall be Grantor's sole remedy for RAF's failure to release said Albums in such Release Territory. If Grantor fails to give either of the required notices, Grantor's right to so terminate shall lapse. The running of the time periods described in this paragraph 5.01(e) will be suspended for the period of any suspension of the Term hereof.

5.02.    (a)    Without limiting the generality of paragraph 5.01, RAF shall have the exclusive right to publicly perform and otherwise to utilize Artist's performances in connection with Audio-Visual Recordings for promotional and commercial purposes, including without limitation, release on Audio-Visual Devices. Grantor shall cause Artist to perform for said Recordings upon RAF's request provided that Artist shall not be required to perform in any Contract Period for the recording of Audio-Visual Recordings greater in playing time than the playing time of the sound Recordings constituting the Minimum Recording Obligation in such

Contract Period, nor shall Artist be required to perform for any so-called "long-form" Audio-Visual Recording without Artist's consent. The term "long-form" Audio-Visual Recording shall mean a full length audio-visual program, as such term is generally understood in the recording industry, and specifically excludes any compilation of so-called "short-form" or promotional Audio-Visual Recordings. If Grantor or Artist shall for any reason whatsoever delay the production of any Audio-Visual Recording, or if Artist is not available for any scheduled appearance relating to the production of Audio-Visual Recordings, Grantor shall pay to RAF, upon RAF's demand, an amount equal to the expenses or charges paid or incurred by RAF by reason thereof. RAF may, without limiting RAF's other rights and remedies, deduct that amount from any and all monies otherwise payable to Grantor or Artist hereunder.

(b)    RAF and Grantor shall mutually approve the director, budget, scheduling and concept of each "short-form" Audio-Visual Recording produced hereunder.

(c)    Grantor's and Artist's compensation in connection with Artist's performances for Audio-Visual Recordings, including, without limitation, those performances referred to in paragraph 10.07 hereof, shall be limited to the royalties payable to Grantor pursuant to Articles 7 and 9 below and to any minimum amounts required to be paid for such performances pursuant to any collective bargaining agreements pertaining thereto, provided, however, that with respect to amounts required to be paid pursuant to any collective bargaining agreement, Grantor and Artist hereby waive any right to receive such compensation to the extent that such right may be waived in connection with any applicable collective bargaining agreement.

5.03.    Grantor shall execute and deliver promptly to RAF any instruments of transfer and other documents RAF may reasonably request to carry out the purposes and effects contemplated by this agreement. If Grantor fails or refuses to deliver any such executed document within ten (10) business days following RAF's request therefor, each of Grantor hereby irrevocably appoints RAF as Grantor's and Artist's agent and attorney-in-fact to sign any such documents in Grantor's name and to make appropriate disposition of them consistent with this agreement and irrevocably authorizes RAF to proceed, whether in RAF's name or Grantor's name, with any appropriate action necessary to enforce RAF's rights hereunder (including, without limitation, all rights of exclusivity). Grantor acknowledges that RAF's agency and power are coupled with an interest. RAF shall, from time to time upon Grantor's request in each instance, endeavor to provide Grantor with copies of documents signed by RAF pursuant to this paragraph 5.03, provided that a failure to provide any such document shall not be deemed a breach hereof.

5.04.    (a)    Subject to the terms of paragraph 5.04(b) below, Grantor hereby grants to RAF the perpetual right, without any liability to any Person, to use and to authorize other Persons to use Grantor's name and approved biographical material and the names (including any professional names or sobriquets), and any approved likenesses, whether or not current, (including pictures, portraits, caricatures and stills from any Audio-Visual Recordings made hereunder), approved autographs (including facsimile signatures) and approved biographical material of or relating to Artist and any producer of Master Recordings hereunder solely for purposes of advertising, promotion and trade (including, without limitation, the distribution of promotional merchandise subject to the terms herein) relating to or in connection with Artist, the making and exploitation of Records hereunder, including, without limitation, in connection with Mobile Materials and in general goodwill advertising. Each of Grantor and Artist warrants and

Kanye West 9.16.20 Twitter                                     00037

represents that Grantor and/or Artist owns the exclusive rights to so use such names, likenesses, autographs and biographical materials and that the use of same will not infringe upon the rights of any Person. Without limiting the foregoing, RAF shall have the right (but not any obligation) to cause a search to be instituted to determine whether the use of any of the professional names or sobriquets proposed to be used by Artist or Grantor hereunder may infringe upon the rights of any Person. If, in the opinion of RAF's counsel, the use of any such professional name or sobriquet may infringe upon the rights of any Person, or if any Person challenges RAF's, Grantor's or Artist's right to use any such professional name or sobriquet, then RAF may, at its election and without limiting its rights, require Grantor to cause Artist to adopt another professional name or sobriquet approved by RAF without awaiting the determination of the validity of such challenge. Furthermore, during the Term, Artist will not change the name by which Artist is professionally known without the prior written approval of RAF, not to be unreasonably withheld.

(b) Grantor shall supply RAF with the biographies and likenesses of Artist and the individual producer(s) of Master Recordings hereunder, which biographies and likenesses are intended for use solely in connection with the release and distribution of Master Recordings hereunder, and shall be delivered to RAF by no later than the date of delivery of the relevant Album required to be delivered in fulfillment of the Minimum Recording Obligation in each Period. Grantor further agrees to supply to RAF, promptly after RAF's request, additional and/or updated biographies and likenesses. All likenesses and biographies supplied by Grantor shall be deemed approved by Grantor. In the event RAF desires to use any likenesses not supplied by Grantor, or biographical material substantially different from that supplied by Grantor, then Grantor shall have the right to approve same (unless such approval would interfere with a scheduled release date for the Master Recordings), which approval shall not be unreasonably withheld and shall be deemed to have been given within seven (7) business days following Grantor's receipt of such material, unless Grantor notifies RAF to the contrary within said seven (7) business day period. Notwithstanding the foregoing, any inadvertent failure by RAF to obtain the aforesaid approval shall not be deemed a breach of this agreement, provided RAF rectifies such failure in future manufacturing "runs" of materials prepared after RAF's receipt of notice of such failure from Grantor.

(c) For the avoidance of doubt, no commercial merchandising rights (as such term is customarily used in the recording industry) are granted to RAF hereunder.

(d) RAF agrees that Grantor shall have the non-exclusive right to use and to authorize the use by others of cover artwork of Albums embodying solely the Master Recordings in connection with the exploitation of merchandising rights, and further agrees to supply to Grantor, at Grantor's sole cost, duplicate negatives of such artwork for such purpose at Grantor's request. Grantor's exploitation of such merchandising rights shall be subject to any and all restrictions of which RAF may advise Grantor, and Grantor shall exercise the merchandising rights only in accordance with such restrictions. In no event shall Grantor have the right to reproduce any trademark, trade name or logo of RAF without RAF's express written consent, which may be withheld for any reason whatsoever. For the rights granted to Grantor pursuant to this paragraph 5.04(d), Grantor agrees that it shall do nothing to derogate from RAF's copyright in said artwork, and Grantor agrees further to reproduce RAF's copyright notice at all times in conjunction with reproduction of such artwork. Grantor shall pay to RAF fifty percent (50%) of the total amount of actual, out-of-pocket expenses incurred or paid by RAF in connection with the preparation of such Artwork, plus one hundred percent (100%) of any costs which become

15

Kanye West 9-10-20 Twitter

00038

due or payable as a result of Grantor's exploitation or exercise of any merchandising and shall pay such monies to RAF on or before ten (10) days following Grantor's receipt of the duplicate negatives.

5.05.   (a)   Grantor and Artist hereby grant to RAF and its designees an exclusive license (subject to the terms herein) during the "License Period" (as defined below), without any liability to any Person, to do the following: (i) to create, maintain and host one (1) music-related Website relating to Artist in connection with the marketing and exploitation of Records hereunder (the "RAF Artist Website"); and (ii) to use the name "kanyewest.xxx" and/or any and all variations thereof which embody Artist's name or use a name similar to Artist's name as Uniform Resource Locators ("URLs"), addresses and/or domain names ("Artist Domain Name") in connection with the RAF Artist Website. As used in the preceding sentence ".xxx" shall mean each and every so-called "second level" domain name now in existence or hereafter implemented including without limitation, ".com", ".net", ".org" together with territorial identifiers, e.g., ".uk". For the avoidance of doubt, RAF agrees that, as between RAF, Grantor and Artist, Grantor or Artist (as applicable) shall retain ownership of the Artist Domain Name and all rights therein, subject to the license herein granted to RAF. Grantor represents and warrants that Grantor or Artist has registered the Artist Domain Name as a URL and will maintain such registration during the Term.

(b)   Notwithstanding the provisions of paragraph 5.05(a) above, but without limiting RAF's right during and after the Term to create, maintain and host the RAF Artist Website in connection with Artist's services hereunder, the License Period shall expire nine (9) months following the end of the Term. Upon the expiration of the License Period, the license herein granted to RAF shall automatically expire, and, accordingly, RAF's rights to use the Artist Domain Name as a website address shall immediately cease. RAF shall, however, retain the non-exclusive right to continue to create, maintain and host an Artist Website after the expiration of the License Period, provided such Artist Website is located at a URL other than the Artist Domain Name and such Artist Website is used solely to promote and market Artist's Records which were delivered to RAF during the Term.

(c)   (i)   Notwithstanding the provisions of paragraph 5.05(a) above, during the License Period, Grantor or Artist shall have the right to register, host and maintain one (1) mutually approved Artist Website located at an Artist domain name (the "Excluded Site"), provided, however, that during the License Period neither Grantor nor any Person deriving any rights from Grantor shall use, authorize or endorse any such Artist Website as the "official" Artist Website in connection with Artist's recording career, and provided further that during the License Period, RAF shall have the right to require Grantor or Artist to include on the Excluded Site so-called "hyperlinks" to Artist Domain Name and/or any RAF Website. For the avoidance of doubt, the provisions of paragraph 10.10 below shall apply with respect to the Excluded Site.

(ii)   Notwithstanding the foregoing provisions of paragraph 5.05(c)(i) above, RAF hereby agrees that at Grantor's request, RAF will include a hyperlink from the RAF Artist Website to the Excluded Site, if any (provided such Excluded Site is not directly competitive with RAF's normal course of business).

5.06.   (a)   With respect to the RAF Artist Website, Website Material and ECD Material, all artwork and other creative elements produced in connection therewith, including, without limitation, production personnel, shall be mutually approved by Grantor and RAF,

16

Kanye West 9.16.20 Twitter                                          00039

provided, however, that any Artwork or other materials furnished or approved by Grantor or Artist for any other purpose hereunder shall be deemed approved by Grantor and Artist for use in connection with the RAF Artist Website, Website Material and ECD Material and provided further that RAF shall have the right to include on the RAF Artist Website and within ECD Material so-called "hyperlinks" to the Artist Domain Name and other URLs in RAF's sole discretion (subject to the terms set forth herein). RAF shall not be required to seek Grantor's or Artist's approval of any hyperlink to the URL for a Record retailer (accordingly, all other "hyperlinks" shall be approved by Grantor). In addition, RAF hereby agrees that, except as provided in the following sentence, RAF will not place or authorize the placement of any banners or other advertisements directly on the RAF Artist Website without Grantor's or Artist's prior consent. Grantor and Artist expressly acknowledge and agree, however, that, notwithstanding the foregoing restriction, RAF shall have the right to place on the RAF Artist Website banners and/or advertisements for RAF, its parent and affiliated companies, and/or to any other seller of phonograph records designated by RAF, and to place advertising, banners and/or hyperlinks on so-called RAF Frames. RAF will consult Grantor with respect to the "look and feel" of the user interface of the RAF Artist Website.

(b)     RAF is and will be the sole owner of all worldwide rights in and to all ECD Material and Website Material created hereunder in connection with the RAF Artist Website, all individual elements thereof, and the selection and arrangement of such elements, including the worldwide copyrights therein and thereto, throughout the world and in perpetuity. Notwithstanding anything to the contrary contained in this paragraph 5.06(b), to the extent Grantor or Artist (and not RAF) creates and owns the copyright in any materials that are provided by Grantor or Artist to RAF for use on the RAF Artist Website (other than those materials to be generally delivered by Grantor to RAF pursuant to the terms of this agreement), then, as between Grantor or Artist and RAF, Grantor or Artist shall own the copyright in any materials so licensed by Grantor or Artist to RAF for use hereunder.

(c)     Grantor will issue (or cause the music publishing companies having the right to do so to issue) (i) worldwide, perpetual synchronization licenses, and (ii) worldwide, perpetual licenses for public performance to RAF on terms customarily applied by RAF under comparable circumstances (provided that such licenses shall be issued at no cost for promotional exploitation) for the use of all Compositions in Website Material and ECD Material effective as of the commencement of production of the applicable Website Material or ECD Material (and Grantor's execution of this agreement constitutes the issuance of such licenses by Grantor, Artist and any music publishing company that is owned or controlled by Grantor, Artist or any Person owned or controlled by Grantor or Artist). In the event that Grantor fails to cause any such music publishing company to issue any such license to RAF, or if RAF is required to pay any fee to such music publishing company in order to obtain any such license, RAF will have the right to deduct the amount of such license fee from any and all monies (excluding future Advances that may become payable to Grantor pursuant to paragraph 6.01(a) hereof) otherwise payable to Grantor hereunder.

(d)     Upon RAF's reasonable request, and subject to Artist's prior professional commitments, Artist will be available (at RAF's sole non-recoupable expense) for a reasonable number of on-line "chats" hosted on the RAF Artist Website.

(e)     Grantor will supply RAF, at RAF's request and sole non-recoupable expense, with Website Material for possible inclusion on the RAF Artist Website, including,



without limitation and if reasonably available, transcripts of published interviews of Artist, transcripts of articles relating to Artist, photographs, and other similar materials; provided that if any such Website Materials (other than those materials to be generally delivered by Grantor to RAF pursuant to the terms of this agreement) are requested by RAF for use on the RAF Artist Website (and not requested by Grantor), then RAF shall undertake to clear the rights to use such Website Materials and shall hold Grantor harmless in connection therewith).

(f)    Unless otherwise explicitly set forth herein, RAF will have the same rights in and to the RAF Artist Website, Website Material and ECD Material as are otherwise applicable hereto with respect to Master Recordings made hereunder (subject to the same terms and conditions in connection therewith, where actually applicable), including, without limitation, the right to use and publish, and to permit others to use and publish, Grantor's and Artist's name and likeness and/or, without limitation, Mobile Materials in the RAF Artist Website (subject to paragraph 5.04(b) above), Website Material and ECD Material and for advertising Records and other exploitations of Masters hereunder.

(g)    RAF shall have the obligation to reasonably create, host and maintain the RAF Artist Website during the License Period in a "first-class" manner. RAF shall use its best reasonable efforts to update the RAF Artist Website when new and pertinent information in connection with the Artist becomes available to RAF. In the event RAF does not maintain or update the RAF Artist Website as set forth herein, and RAF has not updated the RAF Artist Website within sixty (60) days following receipt of Grantor's written notice of RAF's failure to do so, the License Period shall be deemed to have expired. For the avoidance of doubt, in the event the License Period expires pursuant to this paragraph 5.06(g), no other provisions of this agreement (other than paragraphs 5.05 and 5.06) shall be affected.

## 6.    ADVANCES

6.01.    Provided Grantor has fulfilled Grantor's material obligations hereunder, RAF shall pay, as Advances to be charged against and be recoupable from royalties (excluding mechanical royalties, except as expressly permitted herein) accruing to Grantor's account hereunder, the following:

(a)    All Recording Costs in the approved budget. Grantor shall be responsible for the payment of all Recording Costs or other costs in connection with making Master Recordings which costs have not been specifically approved in writing by RAF. If RAF elects to pay any such costs for which Grantor is responsible, then RAF shall have the right to demand reimbursement therefor from Grantor (and Grantor shall immediately make such reimbursement) and/or the right to deduct such costs from any and all monies, excluding mechanical royalties, otherwise payable to Grantor hereunder.

(b)    (i)    · (A)    Grantor hereby acknowledges prior receipt of any and all advances payable in connection with the First Album.

(B)    With respect to the Second Album, RAF will pay to Grantor an Advance equal to the excess of Three Million Five Hundred Thousand Dollars ($3,500,000) (the "Second Album Recording Fund") over Recording Costs for such Album. Such Second Album Recording Fund shall be payable as follows: (1) Two Million Three Hundred Thousand Dollars ($2,300,000) (the "Second Album Execution Advance") to Grantor

18



promptly following the complete execution hereof; (2) the balance, if any, after deduction of all Recording Costs paid or incurred by RAF in connection with such Second Album promptly following delivery of all Master Recordings and other materials required to be delivered to RAF pursuant to Articles 3 and 4 in connection with such Second Album. The balance of the Recording Fund shall be administered by RAF and if, after deduction of all Recording Costs paid or incurred by RAF in connection with such Second Album, with an allowance for a reasonable provision for recording costs (including initial so-called "sample payments") not yet billed or accrued, there remains any balance of the Recording Fund, it shall be paid to Grantor promptly following delivery of all Master Recordings and other materials required to be delivered to RAF pursuant to Articles 3 and 4 in connection with the Second Album. The Second Album Recording Fund shall be recoupable from any and all royalties, excluding mechanical royalties, otherwise payable to Grantor under the Agreement. Notwithstanding anything expressed or implied to the contrary herein, if a commercially satisfactory Second Album is physically delivered to RAF (accompanied by all related artwork, credits, sample, co-producer and side artist information, if applicable) by the Target Date, then RAF will increase the Second Album Recording Fund by Seven Hundred Fifty Thousand Dollars ($750,000) (the "Timely Delivery Advance"). The Timely Delivery Advance shall be payable, less any actual and anticipated overages of the Second Album Recording Fund, promptly following the Target Date.

(C)    Provided that Grantor and Artist are in compliance with all of their respective obligations under the Agreement, with respect to the Second Album, in addition to any other Advances payable to Grantor hereunder in connection therewith, RAF will pay to Grantor, promptly following Grantor's notice to RAF that the applicable thresholds have been achieved and RAF's confirmation thereof, the following further Advances (if applicable):

(1)    Two Hundred Fifty Thousand Dollars ($250,000), if, as of the last day of the eighteenth month following the initial United States release of the Second Album△, such Second Album has achieved world-wide sales of three million (3,000,000) units.

(2)    Five Hundred Thousand Dollars ($500,000), if, as of the last day of the eighteenth month following the initial United States release of the Second Album, such Second Album has achieved world-wide sales of three million five hundred thousand (3,500,000) units.

(D)    Provided that Grantor and Artist are in compliance with all of their respective obligations under the Agreement, if sales of the First Album through Normal Retail Channels in the United States (as reported by Soundscan) exceed three million (3,000,000) units within eleven (11) months following the date of this agreement, then RAF will pay to Grantor an additional Advance in the amount of Five Hundred Thousand Dollars ($500,000) promptly following RAF's confirmation that such sales threshold was attained; provided that and subject to the Second Album having been delivered to RAF by the Target Date as provided herein.

(E)    Notwithstanding anything expressed or implied to the contrary in paragraph 8.01 of this agreement, promptly following the complete execution hereof, RAF will pay Grantor an Advance of Three Hundred Thousand Dollars ($300,000) against so-called "pipeline" royalties attributable to the First Album, including, but not limited to, royalties in respect of the royalty accounting period ending December 31, 2004.

Kanye West 9.16.20 Twitter                    00042

(iii)    (A)    With respect to each Album of the Minimum Recording Obligation subsequent to the Second Album, if any, RAF shall pay to Grantor an Advance equal to the excess of the amount ("Recording Fund") set forth below over Recording Costs for each such Album. The Recording Fund for each such Album shall be that amount, as reflected in an estimated trial balance prepared by RAF as of the end of the month prior to the month in which the Master Recordings constituting the applicable Album are initially required to be delivered hereunder, equal to seventy percent (70%) of the lesser of: (1) the royalties earned on Net Sales through Normal Retail Channels in the United States of the immediately preceding Album of the Minimum Recording Obligation, or (2) the average of the royalties earned on Net Sales through Normal Retail Channels in the United States of the immediately preceding two (2) Albums of the Minimum Recording Obligation (if there are two (2) such Albums) which calculation shall include RAF's good faith estimate of so-called "pipeline" royalties. For the purposes of this paragraph 6.01(b)(ii)(A) only, delivery of an Album shall be deemed to occur on the date which is the earlier of: (x) actual delivery of the applicable Master Recordings; or (y) the last date that upon which delivery of the applicable Master Recordings would have been timely pursuant to paragraph 4.01 above. For purposes of the foregoing calculation only, Net Sales figures shall be revised to reflect a deduction of fifteen percent (15%) as and for reserves with respect to each applicable Album in lieu of any amount otherwise permitted to be deducted for such reserves hereunder. If the foregoing calculation of the applicable Recording Fund is based upon less than fifteen (15) months of royalty earnings, then RAF shall make a subsequent re-calculation to determine the Recording Fund when such Album has been released for fifteen (15) months and pay Grantor the actual Recording Fund Advance, if any, determined pursuant to such re-calculation, promptly following such re-calculation.

| Album of Minimum Recording Obligation | Minimum Recording Fund | Maximum Recording Fund |
|---|---|---|
| third | $300,000 | $650,000 |
| fourth | $325,000 | $700,000 |
| fifth | $400,000 | $850,000 |
| sixth | $425,000 | $900,000 |
| seventh | $450,000 | $950,000 |

(B)    Each such Advance shall be paid as follows: (x) an amount equal to twenty percent (20%) of the applicable Recording Fund, promptly following RAF's receipt of Artist's notice that it has commenced recording in accordance with the terms hereof; and (y) the balance shall be paid, after deduction of all Recording Costs paid or incurred by RAF in connection with such Album, promptly following delivery to RAF of all Master Recordings and other materials required to be delivered pursuant to Articles 3 and 4 with respect to each such Album.

(iii)    Costs in excess of the applicable Recording Fund to the extent due to Grantor's or Artist's acts or omissions shall be Grantor's responsibility and, to the extent RAF elects to pay any of such costs, RAF shall have the right to demand reimbursement therefor from Grantor (and Grantor shall immediately make such reimbursement) and/or RAF may deduct such amounts from any and all monies otherwise payable to Grantor hereunder. If any Album of the Minimum Recording Obligation is not delivered within ninety (90) days following the time periods set forth in Article 4 above, the Recording Fund for such Album shall be reduced by five

percent (5%) of the otherwise applicable Recording Fund for each month (or portion thereof) subsequent to the applicable delivery date until that Album is delivered, provided, however, RAF shall not reduce the Recording Fund below the amount of the approved budget for such Album.

(c)    It is expressly understood and agreed that any and all Advances paid by RAF pursuant to the terms of this paragraph 6.01 shall specifically include the prepayment of session union scale, as provided in the applicable union codes, and Grantor and Artist agree to complete any documentation required by the applicable union to effectuate the terms of this sentence.

6.02.    (a)    Except as otherwise set forth herein, any monies paid to Grantor or Artist during the Term and any monies paid by RAF on Grantor's or Artist's behalf or at Grantor's or Artist's direction, other than royalties paid pursuant to this agreement shall be deemed Advances.

(b)    All costs paid or incurred by RAF in connection with any search or registration in respect of any trademark, name or sobriquet now or hereafter used or proposed to be used by Artist under this agreement, up to Seven Hundred Dollars ($700) shall be deemed Advances.

6.03.    (a)    All Video Costs shall be deemed Advances; provided, however, that only fifty percent (50%) of such Video Costs shall be recoupable from audio-only Record royalties payable pursuant to the provisions of Article 7 hereof. Notwithstanding the foregoing, one hundred percent (100%) of any video production costs in excess of Three Hundred Thousand Dollars ($300,000) per Video shall be recoupable from audio-only Record royalties payable pursuant to the provisions of Article 7 hereof. For the avoidance of doubt, RAF shall not recoup any Video Costs more than once.

(b)    Fifty percent (50%) of the following costs incurred by RAF shall also be deemed Advances: (i) costs incurred in connection with the creation, hosting and/or maintenance of Artist Websites; (ii) costs incurred in connection with securing, registering and/or protecting Artist Domain Names; (iii) costs incurred in connection with the creation of ECD Materials; (iv) costs incurred in connection with independent promotion, independent marketing and independent publicity; and (v) all worldwide costs paid or incurred by RAF or RAF's affiliates in connection with a substantial television, movie or radio campaign. Notwithstanding the foregoing, RAF shall not recoup more than Forty Thousand Dollars ($40,000) for each Album of the Minimum Recording Obligation in connection with paragraphs 6.03(b)(i), (ii) and (iii) (collectively, the "Website Cost Provisions"). For the avoidance of doubt, RAF shall not recoup any costs with respect to any services rendered by any RAF-employee in connection with the Website Cost Provisions.

7.    ROYALTIES

RAF shall accrue to the account of Grantor in accordance with the provisions of Article 8 below the following royalties for the sale of Phonograph Records derived from Master Recordings hereunder provided, however, no royalties shall be due and payable to Grantor until such time as all Advances have been recouped by or repaid to RAF:

Kanye West 9.16.20 Twitter                    00044

7.01.  A royalty of eight percent (8%) of the Royalty Base for Net Sales through Normal Retail Channels in the United States ("USNRC Net Sales") of all Singles and Long-Play Singles, except twelve percent (12%) in respect of Net Sales during the second Contract Period.

7.02.  With respect to USNRC Net Sales of Albums hereunder:

(a)  (i)  A royalty of fourteen percent (14%) of the Royalty Base with respect to Master Recordings recorded during the initial Contract Period.

(ii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the initial Contract Period in excess of five hundred thousand (500,000) USNRC units, the royalty rate for such excess units of such Album only shall be fourteen and one-half percent (14-1/2%) of the Royalty Base in lieu of the royalty rate provided in paragraph 7.02(a)(i) above.

(iii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the initial Contract Period in excess of one million (1,000,000) USNRC units, the royalty rate for such excess units of such Album only shall be fifteen percent (15%) of the Royalty Base in lieu of the royalty rate provided in paragraphs 7.02(a)(i) or 7.02(a)(ii) above.

(b)  (i)  A royalty of eighteen percent (18%) of the Royalty Base with respect to Master Recordings recorded during the second Contract Period.

(ii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the second Contract Period in excess of one million (1,000,000) USNRC units, the royalty rate for such excess units of such Album only shall be eighteen and one-half percent (18-1/2%) of the Royalty Base in lieu of the royalty rate provided in paragraph 7.02(b)(i) above.

(iii) For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the second Contract Period in excess of two million (2,000,000) USNRC units, the royalty rate for such excess units of such Album only shall be nineteen percent (19%) of the Royalty Base in lieu of the royalty rate provided in paragraphs 7.02(b)(i) or 7.02(b)(ii) above.

(c)  (i)  A royalty of fifteen percent (15%) of the Royalty Base with respect to Master Recordings recorded during the third Contract Period.

(ii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the third Contract Period in excess of five hundred thousand (500,000) USNRC units, the royalty rate for such excess units of such Album only shall be fifteen and one-half percent (15-1/2%) of the Royalty Base in lieu of the royalty rate provided in paragraph 7.02(c)(i) above.

(iii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the third Contract Period in excess of one million (1,000,000) USNRC units, the royalty rate for such excess units of such Album only shall be sixteen percent



(16%) of the Royalty Base in lieu of the royalty rate provided in paragraphs 7.02(c)(i) or 7.02(c)(ii) above.

(d)  (i)  A royalty of sixteen percent (16%) of the Royalty Base with respect to Master Recordings recorded during the fourth and fifth Contract Periods.

(ii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the fourth and fifth Contract Periods in excess of five hundred thousand (500,000) USNRC units, the royalty rate for such excess units of such Album only shall be sixteen and one-half percent (16-1/2%) of the Royalty Base in lieu of the royalty rate provided in paragraph 7.02(d)(i) above.

(iii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the fourth and fifth Contract Periods in excess of one million (1,000,000) USNRC units, the royalty rate for such excess units of such Album only shall be seventeen percent (17%) of the Royalty Base in lieu of the royalty rate provided in paragraphs 7.02(d)(i) or 7.02(d)(ii) above.

(e)  (i)  A royalty of seventeen percent (17%) of the Royalty Base with respect to Master Recordings recorded during the sixth and seventh Contract Periods.

(ii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the sixth and seventh Contract Periods in excess of five hundred thousand (500,000) USNRC units, the royalty rate for such excess units of such Album only shall be seventeen and one-half percent (17-1/2%) of the Royalty Base in lieu of the royalty rate provided in paragraph 7.02(e)(i) above.

(iii)  For USNRC Net Sales of any Album of the Minimum Recording Obligation recorded during the sixth and seventh Contract Periods in excess of one million (1,000,000) USNRC units, the royalty rate for such excess units of such Album only shall be eighteen percent (18%) of the Royalty Base in lieu of the royalty rate provided in paragraphs 7.02(e)(i) or 7.02(e)(ii) above.

7.03.  (a)  The royalty rate with respect to Net Sales of Records sold for distribution in Canada shall be eighty-five percent (85%) of the otherwise applicable royalty rate set forth herein, except ninety percent (90%) in respect of Net Sales of the Second Album.

(b)  The royalty rate with respect to Net Sales of Records sold for distribution in The United Kingdom, Japan and Australia shall be eighty percent (80%) of the otherwise applicable royalty rate set forth herein, except eighty-five percent (85%) in respect of Net Sales of the Second Album sold for distribution in The United Kingdom.

(c)  The royalty rate with respect to Net Sales of Records sold for distribution in the Benelux Countries, Austria, Switzerland, France, Germany, Greece, Sweden, Denmark, Norway, Finland, Spain, Italy and New Zealand △shall be seventy-five percent (75%) of the otherwise applicable royalty rate set forth herein.

(d)  The royalty rate with respect to Net Sales of Records sold for distribution in the rest of the world (i.e., those countries other than those set forth in paragraphs 7.03(a)



24

7.03(c) above) shall be sixty percent (60%) of the otherwise applicable royalty rate set forth herein, except sixty-six and two-thirds percent (66-2/3%) in respect of Net Sales of the Second Album.

(e)    For purposes of this paragraph 7.03, the sales escalations provided herein, if any, shall not apply.

7.04.    (a)    (i)    Notwithstanding anything to the contrary set forth 'herein, with respect to Net Sales of Records sold in the form of compact discs, the royalty rate shall be eighty five percent (85%) of the otherwise applicable royalty rate set forth herein, except one hundred percent (100%) in respect of Net Sales of the Second Album.

(ii)    For USNRC Net Sales of any Album of the Minimum Recording Obligation other than the Second Album sold in the form of compact discs in excess of five hundred thousand (500,000) units, the royalty rate for such excess units of such Album sold in the form of compact discs only shall be ninety percent (90%) of the otherwise applicable royalty rate set forth herein.

(iii)    For USNRC Net Sales of any Album of the Minimum Recording Obligation other than the Second Album sold in the form of compact discs in excess of one million (1,000,000) units, the royalty rate for such excess units of such Album sold in the form of compact discs only shall be ninety-five percent (95%) of the otherwise applicable royalty rate set forth herein.

(b)    With respect to Net Sales of Records sold in the form of Record configurations not specifically provided for herein, RAF shall accrue a royalty, with respect to each such Record, equal to seventy-five percent (75%) of the otherwise applicable royalty rate for compact discs. Notwithstanding anything to the contrary contained in this paragraph 7.04(b) above, if, as of the end of a particular accounting period, Grantor notifies RAF that a particular new configuration comprises twenty-five percent (25%) or more of all configurations of Records sold in the United States as confirmed by the Recording Industry Association of America (or the then-applicable organization representing the recording industry generally), then, as of the commencement of the immediately subsequent accounting period, the royalty rate for such configuration of Records shall be one hundred percent (100%) of the otherwise applicable royalty rate set forth herein for Records in the compact disc configuration. For purposes of this paragraph only, the term "configurations not specifically provided for herein" means configurations other than vinyl disc, analog cassette, compact disc, and Audio-Visual Devices.

7.05.    (a)    The royalty for Net Sales of EP Records shall be accrued at two-thirds (2/3) of the otherwise applicable Album royalty rate and shall be computed based on the particular Royalty Base of each EP Record.

(b)    With respect to USNRC Net Sales of Long-Play Singles, RAF shall accrue to Grantor's account a royalty of two-thirds (2/3) of the otherwise applicable Singles royalty rate and shall be computed based on the particular Royalty Base of each such Long-Play Single.

(c)    The royalty for Net Sales of Mid-Price Records and Records sold in Armed Forces Post Exchanges shall be accrued at three-fourths (3/4) of the otherwise applicable

25

royalty rate set forth herein and shall be computed based on the particular Royalty Base of each such Record.

(d)    The royalty for Net Sales of premium Records, Budget Records or special configuration Singles (i.e., Singles and/or Long-Play Singles sold at two for the price of one, manufactured in colored vinyl and/or sold with a four-color poster included) shall be accrued at one-half (1/2) of the otherwise applicable royalty rate set forth herein and shall be computed based on the particular Royalty Base of each such Record.

(e)    The royalty rate with respect to Net Sales through Normal Retail Channels of Multiple-Record Albums sold by RAF for distribution shall be calculated by multiplying the otherwise applicable royalty rate by a fraction, the numerator of which shall be the Royalty Base for such Multiple-Record Album, and the denominator of which shall be the Royalty Base applicable to RAF's or its licensees' top-line single-disc LPs multiplied by the number of disc LPs in the Multiple-Record Album.

(f)    For purposes of this paragraph 7.05, the sales escalations provided, herein, if any, shall not apply.

7.06.    (a)    With respect to the following Records and/or exploitation of Master Recordings, the royalty to be accrued hereunder shall be a sum equal to fifty percent (50%) of RAF's net receipts with respect to such exploitation:    (i) Records derived from Master Recordings hereunder sold through record clubs or similar sales plans whether operated by Non-Affiliated Third Parties or otherwise; (ii) licenses of Master Recordings to Non-Affiliated Third Parties for sales of Records by such licensees through direct mail, mail order or in conjunction with TV or radio advertising, including through methods of distribution such as "key outlet marketing" (distribution through retail fulfillment centers in conjunction with special advertisements on radio or television), or by any combination of the methods set forth above or other methods; (iii) licenses of Master Recordings to Non-Affiliated Third Parties on a flat-fee or other royalty basis, provided that with respect to such licenses the royalty shall in no event be greater than the royalty which would be payable to Artist by virtue of applying the applicable pro-rata artist royalty rate with respect to such Master Recording license; (iv) licenses to Non-Affiliated Third Parties for promotional or commercial use of Audio-Visual Recordings described in paragraph 5.02, excluding blanket licenses to exploit RAF's Audio-Visual Recording catalog; and (v) use of the Master Recordings for background music, synchronization in motion pictures and television soundtracks and Records derived therefrom whether produced and/or distributed by Non-Affiliated Third Parties or otherwise, and/or use on transportation facilities.

(b)    In the event that RAF shall distribute or authorize other Persons to distribute Records by means of (i) a so-called "permanent" download (whether or not such download is transferable to a portable device or such download can be "burned" to CD or other format), (ii) by making Master Recordings hereunder available through subscription services, and/or (iii) any Records in which RAF distributes or authorizes any other Person to distribute as a so-called: (A) "stream" (i.e., for simultaneous playback, and not in a downloadable format); or (B) "conditional" download (i.e., any download where the access to the content expires or is "timed-out" when the consumer's subscription or other similar service lapses); (iv) any Ancillary Website Exploitation and; (v) any other form of Electronic Transmission for which a

Kanye West 9.16.20 Twitter

00048

26

rate is not otherwise specifically set forth herein, the royalty to be accrued hereunder in respect of such exploitation shall be determined by applying the applicable royalty rate and Royalty Base set forth herein for an equivalent Record; however, the following deductions shall not apply when computing Artist's royalty with respect to any such "permanent" downloads: (1) Container Charges (as set forth in paragraph 13.10 below); (2) new technology deductions (as set forth in paragraph 7.04(b) above); and (3) free goods (as set forth in paragraphs 13.21(a)(ii) and (iii) below). For the avoidance of doubt, whether a particular Record is distributed (by means of a "permanent" download, through portable subscription services or through other means of Electronic Transmission per this paragraph 7.06(b)) as an individual Master Recording or such Master Recording is part of an entire Album, the royalty that shall be accrued hereunder shall be the applicable Album royalty rate pursuant to the terms set forth herein.

        (c)     [Intentionally deleted, subject to paragraph 5.01 herein].

        (d)     With respect to any and all licenses or other exploitations of Master Recordings not expressly provided for herein, the royalty to be accrued hereunder in respect of such exploitation shall be determined by applying the applicable royalty rate and Royalty Base set forth herein for an equivalent Record.

        (e)     The terms "net receipts" and "net amount received" and similar terms in this paragraph 7.06 shall mean all amounts received by RAF in connection with the subject matter thereof which are solely attributable to the Master Recordings hereunder (excluding catalog and/or administrative fees payable to RAF), after deduction of any costs or expenses or amounts incurred by RAF or which RAF is obligated to pay (such as, without limitation, production costs, mechanical copyright payments, AFM and other union or guild payments).

        (f)     If, pursuant to RAF's agreement ("Club Agreement") with any record club licensee distributing Records hereunder ("Artist Records") through direct mail or mail order operations, (i) the aggregate number of RAF's Records (including Artist Records) distributed thereunder during any applicable period of time as "free" or bonus" records shall exceed the aggregate number of RAF's Records (including Artist Records) sold thereunder during that period (hereinafter such excess Records are referred to as "Excess Club Records"); and (ii) the number of Artist Records distributed thereunder during such period by such licensee as "free" or "bonus" Records shall exceed the number of Artist Records sold during such period by such licensee (hereinafter such excess Records are referred to as "Excess Club Artist Records"), then your royalty account hereunder shall be credited with an amount equal to fifty percent (50%) of the adjusting royalty payment, if any, made by such licensee to RAF solely attributable to the Excess Club Records distributed by that licensee during such period multiplied by a fraction equal to the aggregate number of Excess Club Artist Records distributed by that licensee during such period divided by the Aggregate Qualifying Excess Club Records (as defined in the following sentence), including Excess Club Artist Records, distributed by that licensee during such period. As used in the preceding sentence, "Aggregate Qualifying Excess Club Records" shall mean the aggregate number of "free" or "bonus" Records in excess of Records sold with respect to each particular RAF recording artist whose "free" or "bonus" Records distributed pursuant to a Club Agreement exceed the number of such RAF artist's Records which are sold thereunder during such applicable period. Notwithstanding the foregoing, if pursuant to any particular Club Agreement the record club licensee accounts to RAF in connection with "free" or

Kanye West 9.16.20 Twitter                                                      00049

27

"bonus" records upon a basis which also includes Records released by any company which is a "related company" (i.e., a parent, subsidiary or affiliate of RAF), then with respect to that particular Club Agreement all references to RAF in the preceding provisions of this paragraph 7.06(f) shall be deemed to include such related company(ies).

7.07.    As to Net Sales by RAF or its affiliated licensees of Records derived from Master Recordings by direct mail or mail order, whether or not in conjunction with radio or TV advertising, including through methods of distribution such as "key outlet marketing", or by any combination of such methods (but excluding retail sales via the Internet), the royalty to be accrued hereunder shall be a royalty of four percent (4%) (except seven percent (7%) in respect of such Net Sales during the Second Contract Period) of the Royalty Base for Net Sales of such Records.

7.08.    With respect to Joint Recordings, the royalty to be accrued hereunder shall be the otherwise applicable royalty provided for herein divided by the total number of royalty-earning artists (including Artist) whose performances are embodied on the Joint Recording concerned.

7.09.    As to Records not consisting entirely of Master Recordings delivered hereunder, the royalty to be accrued hereunder shall be pro-rated on the basis of the number of Master Recordings hereunder which are on such Records compared to the total number of royalty-bearing Master Recordings on such Records.

7.10.    (a)    (i)    With respect to USNRC Net Sales of Audio-Visual Devices at a Top-Line price, RAF shall accrue to Grantor's account a royalty of eleven percent (11%) of the applicable Royalty Base, except thirteen percent (13%) in respect of such Net Sales during the second Contract Period.

(ii)    With respect to USNRC Net Sales of Audio-Visual Devices at a Base Price which is less than a Top-Line price, RAF shall accrue to Grantor's account a royalty of eleven percent (11%) of the applicable Royalty Base multiplied by a fraction, the numerator of which is the suggested retail list price that equates to the applicable Base Price and the denominator of which is Nineteen Dollars and Ninety-Five Cents ($19.95), except thirteen percent (13%) in respect of such Net Sales during the second Contract Period.

(b)    (i)    With respect to Net Sales of Audio-Visual Devices outside the United States at a Top-Line price, RAF shall accrue to Grantor's account a royalty of five and one-half percent (5-1/2%) of the applicable Royalty Base, except seven percent (7%) in respect of such Net Sales during the second Contract Period.

(ii)    The royalty for Net Sales of Audio-Visual Devices outside the United States at a price which is customarily considered to be "mid-price" in the country concerned shall be accrued at two-thirds (2/3) of the otherwise applicable royalty rate and shall be computed based on the particular Royalty Base of each such Audio-Visual Device.

(iii)    The royalty for Net Sales of Audio-Visual Devices outside the United States at a Base Price which is customarily considered to be "budget" in the country concerned, shall be accrued at one-half (1/2) of the otherwise applicable royalty rate and shall be computed based on the particular Royalty Base of each such Audio-Visual Device.

28

(c)    For purposes of this paragraph 7.10, the sales escalations provided herein, if any, shall not apply.

8.    ACCOUNTINGS

8.01    Accountings as to royalties accruing or which otherwise would have accrued hereunder shall be made by RAF to Grantor on or before September 30th for the period ending the preceding June 30th, and on or before March 31st for the period ending the preceding December 31st, or such other accounting periods as RAF may in general adopt, but in no case less frequently than semi-annually, together with payment of accrued royalties, if any, earned by Grantor during such preceding half-year, less Advances or other recoupable and/or deductible amounts hereunder. Without limitation of RAF's right to recoup all Advances hereunder against royalties earned hereunder, except as otherwise provided herein, RAF shall not charge against royalties earned with respect to a semi-annual accounting period a contractual Advance which is paid after the end of such accounting period but before such royalties are actually paid, provided that such Advance is being paid solely in connection with an Album of the Minimum Recording Obligation. RAF shall hold a reasonable reserve with respect to each Album of the Minimum Recording Obligation during any semi-annual accounting period which shall be commercially reasonable when considering the difference between: (a) the total number of the applicable Album shipped to Record retailers for commercial sale; and (b) the number of units of the applicable Album sold by such retailers to consumers as reported by Soundscan or any comparable service. Each royalty reserve will be liquidated not later than the end of the fourth full semi-annual accounting period following the period during which such reserve is initially established.

8.02    Royalties in connection with the exploitation of Master Recordings hereunder shall be computed in the same national currency as RAF is accounted to by its licensees and shall be paid at the same rate of exchange as RAF is paid, and shall be subject to any taxes applicable to royalties remitted by or received from foreign sources, provided, however, that royalties on Records sold outside the United States shall not be due and payable by RAF until payment therefor has been received by or credited to RAF in the United States in United States Dollars. If RAF shall not receive payment in the United States, or in United States Dollars, and shall be required to accept payment in a foreign country or in foreign currency, RAF shall deposit to the credit of Grantor (at Grantor's request and expense), in such currency in a depository in the country in which RAF is required to accept payment, Grantor's share of royalties due and payable to Grantor with respect to such sales. Deposit as aforesaid shall fulfill the obligations of RAF as to Record sales to which such royalty payments are applicable. If any law, government ruling or any other restriction affects the amount of the payments which RAF's licensee can remit to RAF, RAF may deduct from Grantor's royalties an amount proportionate to the reduction in such licensee's remittances to RAF.

8.03    (a)    All royalty statements rendered by RAF to Grantor shall be binding upon Grantor and not subject to any objection by Grantor for any reason unless specific objection in writing, stating the basis thereof, is given to RAF within three (3) years from the date rendered. Failure to make specific objection within said time period shall be deemed approval of such statement.

Kanye West 9.16.20 Twitter

00051

29

(b)     All statements hereunder will be deemed conclusively to have been rendered on the due date set forth in paragraph 8.01 above unless Grantor notifies RAF otherwise within ninety (90) days after such due date.

8.04.   (a)     Grantor shall have the right at Grantor's own expense to audit RAF's books and records only as the same pertain to sales or other distributions of Phonograph Records hereunder on which royalties are payable to Grantor or other exploitations of Master Recordings hereunder on which royalties are payable to Grantor, in each case for the six (6) accounting periods prior to RAF's receipt of written notice from Grantor of Grantor's desire to audit such books and records. Grantor may make such an examination for a particular statement only once, and only within three (3) years after the date when RAF renders said statement under paragraph 8.01. Such audit shall be conducted during RAF's usual business hours, and at RAF's regular place of business in the United States where RAF keeps the books and records to be examined. Such audit shall be conducted by an independent certified public accountant.

(b)     Grantor acknowledges that RAF's books and records contain confidential trade information. Neither Grantor nor its representatives shall at any time communicate to others or use on behalf of any other Person any facts or information obtained as a result of such examination of RAF's books and records, unless such disclosure is required pursuant to an order of a court of competent jurisdiction or such information (other than through Grantor's violation of this paragraph 8.04(b)) is publicly available generally and generally known to the public (in addition to the music industry). In the event such disclosure is so ordered, Grantor shall notify RAF in writing promptly following receipt of such order.

8.05.   Grantor will not have the right to bring an action against RAF in connection with any royalty accounting or payments hereunder unless Grantor commences the suit within three (3) years from the date such statement of accounting for royalties or such payment was rendered. If Grantor commences suit on any controversy or claim concerning royalty accountings rendered by RAF under this agreement, the scope of the proceeding will be limited to determination of the amount of the royalties rendered for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Grantor's recovery of any such royalties will be the sole remedy available to Grantor (or Artist) by reason of any claim related to RAF's royalty accountings. Without limiting the generality of the preceding sentence, neither Grantor (nor Artist) will have any right to seek termination of the Term of this agreement or avoid the performance of their obligations under it by reason of any such claim. Notwithstanding the foregoing, in the event any court having jurisdiction over the matter determines fraud or gross negligence on the part of RAF in connection with any such claim, and such determination is not appealed, overturned or reversed, the limitations set forth in this paragraph 8.05 shall not apply.

8.06.   Grantor hereby authorizes and directs RAF to withhold from any monies due Grantor from RAF any part thereof required by the United States Internal Revenue Service and/or any other governmental authority to be withheld, and to pay same to the United States Internal Revenue Service and/or such other authority. No Advances or other payments shall be made pursuant to this agreement until Grantor has completed the W-9 Internal Revenue Service Form.

8.07.   Notwithstanding anything to the contrary expressed or implied elsewhere herein,

if, at any time during or after the Term, the performances embodied on any Master Recording become property of the public domain in any territory of the world such that any Person may reproduce and/or exploit Records embodying such performances in such territory without license from and/or payment to RAF, then no monies whatsoever shall thereafter be accrued to Grantor's account hereunder in connection with the exploitation by RAF or its subsidiaries, affiliates or licensees of such performances in such territory on and after the date on which such performances become property of the public domain in such territory.

## 9.    MECHANICAL COPYRIGHT LICENSES

9.01.    The following provisions shall pertain to Controlled Compositions:

(a)    Each Controlled Composition shall be and hereby is licensed to RAF in the United States and Canada at a copyright royalty rate equal to seventy-five percent (75%) (except one hundred percent [100%] in respect of the Second Album) of the Statutory Rate prevailing at the time of the earlier of: (i) delivery of the Master Recording embodying such Controlled Composition or (ii) the date such Master Recording was required to be delivered hereunder, subject to the provisions of this Article 9. With respect to Records sold and/or distributed in the manner described in paragraphs 7.05 (excluding 7.05(e)), 7.06 (excluding "permanent" downloads of Master Recordings delivered during the second Contract △[Period]) or 7.07, the copyright royalty rate with respect to Controlled Compositions shall be three-fourths (3/4) of the rate set forth in the preceding sentence.

(b)    Copyright royalties with respect to Controlled Compositions shall be payable only on Net Sales hereunder. Copyright royalties shall not be payable with respect to: (A) Records otherwise not royalty-bearing hereunder; (B) non-musical material; and (C) Compositions which have a playing time of less than one (1) minute and thirty (30) seconds in length and/or any so-called "interludes", "intros" or "outros".    Arranged versions of Compositions in the public domain shall be free of copyright royalties if arranged by any of the individuals described in the definition of Controlled Compositions unless such arranged version varies substantially from the original work, in which case such arranged version shall be licensed to RAF at a copyright royalty rate equal to the applicable rate in paragraph 9.01(a) above apportioned according to the same ratio used by ASCAP or BMI in determining performance credits. RAF will not be required to pay mechanical royalties in connection with such arranged version unless Grantor furnishes to RAF, by no later than the date of delivery of the Master Recording embodying such arranged version, documentation satisfactory to RAF of the ratio so used by ASCAP or BMI.

(c)    Notwithstanding anything to the contrary contained herein, if any Record hereunder embodies more than one (1) Master Recording of a particular Controlled Composition, then RAF shall only be obligated to pay the copyright royalty rate(s) referred to in paragraph 9.01(a) with respect to only one (1) such Master Recording.

(d)    (i)    Grantor hereby licenses each Controlled Composition to RAF for synchronization in any promotional Audio-Visual Recording and the uses thereof without payment.

(ii)    On a prospective basis only, following recoupment of all

Kanye West 9.16.20 Twitter                                                                                                          00053

31

production costs incurred with respect to the applicable Audio-Visual Recording, with respect to each Controlled Composition synchronized in an Audio-Visual Recording which RAF exploits commercially on Audio-Visual Devices, RAF shall pay, with respect to Net Sales of Audio-Visual Devices embodying such Audio-Visual Recordings, a copyright royalty of six cents ($.06) for each complete Controlled Composition embodied on each such Audio-Visual Device; provided, however, that RAF shall have no obligation to pay an aggregate copyright royalty in excess of four percent (4%) of the lowest wholesale price payable by the largest category of RAF's customers of the applicable Audio-Visual Device embodying Audio-Visual Recordings hereunder. If less than a complete Controlled Composition is embodied on any such Audio-Visual Device, the copyright royalty shall be pro-rated based upon the number of seconds of the applicable Controlled Composition that is used compared to the length of the complete Controlled Composition as embodied on Artist's original Master Recording of such Composition.

(iii)    Grantor shall procure from the applicable copyright proprietors an irrevocable written consent to RAF's recording of each non-Controlled Composition for Audio-Visual Recordings and the promotional use thereof without payment. RAF shall negotiate in good faith with such copyright proprietors concerning the terms of payment for the commercial exploitation of non-Controlled Compositions taking into consideration then-prevailing industry standards.

(e)    The provisions of this Article 9 shall constitute and are accepted by Grantor, on Grantor's own behalf and on behalf of any other owner of any Controlled Composition(s) or of any rights therein, as full compliance by RAF with all of its obligations under the compulsory license provisions of the applicable copyright law, arising from any use by RAF of Controlled Compositions as provided for herein, and shall constitute a mechanical license. RAF shall have the right to hold reasonable mechanical royalty reserves in respect of sales hereunder. Mechanical royalty reserves maintained by RAF against anticipated returns and credits shall not be held for an unreasonable period of time; retention of a reserve for two years after it is established shall not be considered unreasonable in any case. If RAF makes any overpayment of mechanical royalties on Controlled Compositions (including without limitation, by means of an accounting error or by paying mechanical royalties on Records returned), RAF shall have the right to demand reimbursement of such excess from Grantor (and Grantor shall immediately make such reimbursement) and/or the right to deduct the amount of such overpayment from any and all monies otherwise payable to Grantor hereunder. RAF shall account for mechanical royalties on a quarterly basis. Grantor's right to audit RAF's books and records as the same relate to copyright royalties for Controlled Compositions shall be subject to the terms and conditions set forth in Article 8 in connection with Grantor's audit rights.

(f)    Any assignment made of the ownership or copyright in any Controlled Composition shall be made subject to the provisions of this Article 9.

(g)    Upon RAF's request, Grantor shall cause the issuance to RAF and RAF's designees of mechanical licenses to reproduce all Compositions on Phonograph Records hereunder distributed outside the United States and Canada on terms no less favorable to RAF and RAF's designees than those generally applicable to Record manufacturers in each country in question. The obligation to account for and pay royalties for the mechanical reproduction of Compositions on sales of Phonograph Records outside of the United States shall be solely that of RAF's affiliates and licensees.

2:19-cv-00366-RMG   Date Filed 09/18/20   Entry Number 116-6   Page 55 of 60

9.02. Notwithstanding anything to the contrary contained herein, Grantor warrants, represents, and agrees that, in the United States and Canada, RAF shall have no obligation whatsoever to pay an aggregate copyright royalty rate in respect of any Record hereunder regardless of the number of Controlled Compositions and/or other Compositions contained thereon, in excess of the following sums:

(a)    In respect of an Album: ten (10) times the applicable amount set forth in paragraph 9.01 above (except eleven (11) times such amount in respect of the Second Album and Albums in the compact disc configuration, provided the applicable Album embodies at least eleven (11) different Compositions).

(b)    In respect of an EP Record: five (5) times the applicable amount set forth in paragraph 9.01 above.

(c)    In respect of a Long-Play Single: three (3) times the applicable amount set forth in paragraph 9.01 above.

(d)    In respect of a Single or any Record other than as expressly provided for in this paragraph 9.02: two (2) times the applicable amount set forth in paragraph 9.01 above.

(e)    In respect of a Multiple-Record Album: the aggregate copyright royalty rate set forth in paragraph 9.02(a)(i) above multiplied by a fraction, the numerator of which shall be the Royalty Base for such Multiple-Record Album, and the denominator of which shall be the Royalty Base applicable to PRI's or its licensee's top-line single-disc LPs.

9.03. Without limitation of the generality of clause 9.02 above, if the aggregate of copyright royalties in respect of any Record hereunder exceeds the applicable amounts set forth in this Article 9, then, without limitation of RAF's rights, RAF shall have the right, at its election, if it elects to release such Recording, to deduct the amount of such excess from any and all monies otherwise payable hereunder.

9.04. If any Recordings made under this agreement contain copyrighted non-Controlled Compositions which are not available to RAF under compulsory license, RAF will, subject to the provisions of paragraphs 3.05 and 10.12 hereof, obtain mechanical licenses covering such Compositions for RAF's benefit.

9.05. Grantor hereby grants to RAF the irrevocable right throughout the world to print and reproduce the title to each Composition embodied in a Master Recording delivered hereunder and/or the lyrics to each Controlled Composition embodied in a Master Recording delivered hereunder on the packaging of Phonograph Records embodying such Master Recording without payment to any Person. Grantor hereby further grants to RAF the irrevocable right throughout the world to recreate the title to any Composition embodied in a Master Recording delivered hereunder and/or lyrics to any Controlled Composition embodied in a Master Recording delivered hereunder, in the so-called "text mode" of digital compact cassettes and interactive compact discs embodying such Master Recording, or in comparable media, whether now existing or hereafter developed, without payment to any Person. If RAF is required to pay any monies to any Person for the exercise of any of the rights granted to it under this

33

paragraph 9.05, then RAF shall have the right to demand reimbursement therefor from Grantor (and Grantor shall immediately make such reimbursement) and/or the right to deduct such costs from any and all monies otherwise payable to Grantor hereunder.

9.06.    Grantor will use its best efforts to secure from Artist in favor of RAF the first right of refusal and matching right for Universal Music Publishing to enter into an exclusive co-publishing arrangement with Artist at the end of the term of Artist's exclusive arrangement with EMI Music Publishing.

## 10.    GRANTOR'S ADDITIONAL WARRANTIES AND REPRESENTATIONS

Grantor warrants and represents the following:

10.01. (a)    Grantor is authorized, empowered and able to enter into and fully perform its obligations under this agreement. Neither this agreement nor the fulfillment thereof by any party infringes upon the rights of any Person. Grantor owns and controls, without any limitations, restrictions or encumbrances whatsoever, all rights granted or purported to be granted to RAF hereunder, and Grantor has obtained all necessary licenses and permissions as may be required for the full and unlimited exercise and enjoyment by RAF of all of the rights granted and purported to be granted to RAF herein. RAF will own, possess and enjoy such rights without any hindrance on the part of any Person whatsoever.

(b)    There is in existence between Grantor and Artist a valid and enforceable agreement pursuant to which Artist is required to perform exclusively for Grantor during the Term. Grantor will waive none of its rights under such contract and shall take all steps necessary or desirable to keep the same in full force and effect so that RAF shall have the full benefit of Artist's exclusive services as if Artist had contracted hereunder directly with RAF. Simultaneously with the execution of this agreement, Grantor shall deliver to RAF an agreement between RAF and Artist in the form annexed hereto as Exhibit "A"; Grantor hereby gives its consent and approval to the contents thereof and said Exhibit "A" is hereby made a part hereof. Grantor will require full and complete performance by Artist of such contract. If Artist breaches such contract, Grantor will immediately notify RAF in writing of the details of such breach. If Grantor does not enforce any of Grantor's rights under its contract that relate in any way to RAF's rights hereunder, RAF may, without limitation of RAF's rights, enforce such rights in Grantor's name and/or the name of RAF. In addition to the foregoing, RAF may exercise, in Grantor's stead, Grantor's right to seek injunctive relief against Artist for Artist's breach of Artist's obligations to provide personal services pursuant to the agreement between Grantor and Artist. It is the mutual intention of RAF and Grantor that the rights granted herein specifically but without limitation be a grant of rights to receive injunctive relief pursuant to the provisions of California Civil Code Section 3423 (Fifth) and California Code of Civil Procedure Section 526 (second paragraph 5) concerning the availability of injunctive relief to prevent the breach of a contract in writing for the rendition or furnishing of personal services.

(c)    Grantor is a corporation duly organized, existing and in good standing under the laws of the State of New York. The party executing this agreement on behalf of Grantor is an authorized representative of Grantor, duly authorized to sign on Grantor's behalf.



34

(d)    Grantor has no knowledge of any claim or purported claim which would interfere with RAF's rights hereunder or create any liability on the part of RAF.

10.02. If, as of the date hereof, Grantor or Artist owns or controls any Master Recordings embodying Artist's performances that were recorded prior to the date hereof in addition to the Master Recordings included on the first Album hereunder ("Prior Masters"), or if Grantor or Artist shall, during the Term, acquire ownership of any Prior Masters, Grantor and Artist hereby warrant and represent that no exploitation rights in or to such Prior Masters shall be transferred, conveyed or otherwise granted to any Person during the Term, nor shall Grantor or Artist exploit such Prior Masters. Grantor and Artist hereby warrant and represent that there are no Prior Masters.

10.03. The Master Recordings hereunder and performances embodied thereon shall be produced in accordance with the rules and regulations of the AFM and the American Federation of Television and Radio Artists, in effect at the time such Master Recordings are recorded, and in accordance with the rules and regulations of all other unions having jurisdiction. Artist is or will become and will remain to the extent necessary to enable the performance of this agreement, a member in good standing of all labor unions or guilds, membership in which may be required for the performance of Artist's services hereunder.

10.04. Artist will perform exclusive services hereunder. Artist will not perform for (or license, or consent to, or permit the use by any Person other than RAF of Artist's name or likeness for or in connection with) the recording or exploitation of any Phonograph Record (including, without limitation, any Audio-Visual Device) embodying any Composition recorded by Artist under this agreement (and released during the Term hereof or within one (1) year thereafter) prior to the later of the date five (5) years subsequent to the date of delivery to RAF of the Master Recording embodying that Composition hereunder, or the date two (2) years subsequent to the expiration or termination of the Term.

10.05. Neither the Master Recordings hereunder nor the performances embodied thereon, nor any other "Materials", as hereinafter defined, nor any use thereof by RAF or its grantees, licensees or assigns will violate or infringe upon the rights of any Person. "Materials," as used in this paragraph, means: all Controlled Compositions; each name or sobriquet used by Artist or Grantor, individually or as a group; and all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties furnished or selected by Grantor, Artist or any producer and contained in or used in connection with any Artist Website, Website Material, ECD Material. Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof. Without limiting the foregoing, neither Grantor, Artist nor any Person selected or engaged by Grantor or Artist shall "interpolate", "quote from," "sample", "borrow" or otherwise adapt any copyrighted music, lyrics, spoken words, sounds, musical compositions, sound recordings or other material (collectively, "Embodied Copyrighted Materials") on or in connection with any Master Recordings hereunder without having first obtained the written consent of the applicable copyright proprietors of such Embodied Copyrighted Materials on terms which grant RAF and its designees all rights necessary so that RAF can fully exploit the Master Recordings concerned in accordance with the terms and conditions of this agreement; and Grantor's failure to obtain such written consents shall be deemed a material breach of this agreement. Without limiting the foregoing, if RAF, in the exercise of its good faith business judgment, believes that Embodied Copyrighted Materials are



embodied on any Master Recording hereunder and Grantor has not obtained the aforesaid written consents in respect of such Embodied Copyrighted Materials, then RAF may withhold from any and all monies otherwise payable to Grantor hereunder an amount reasonably related to the potential liability to third parties as a result thereof.

10.06. (a)    Grantor shall be solely responsible for and shall pay all sums due Artist, and the individual producer of the Sides, and all other Persons entitled to receive royalties or any other payments in connection with the sale of Phonograph Records derived from Master Recordings hereunder, and the royalties set forth in Article 7 hereof include all monies due all such parties.

(b)    Notwithstanding anything to the contrary expressed or implied in paragraph 10.06(a) or elsewhere herein, it is understood and agreed that if RAF, with Grantor's prior written approval (which approval may be withheld for any reason), engages producers for any Sides delivered hereunder, or if the producers of any such Sides are regularly employed on RAF's staff or render their services under contract with RAF (it being understood and agreed that if Artist records any Sides with such producers without prior written objection by Grantor, then Grantor's approval with respect to such producers shall be deemed given), the following terms shall apply:

(i)    Grantor's royalty account and the production budget for the applicable recording project will be charged with a Recording Cost item of Thirty Thousand Dollars ($30,000) per Album (or Three Thousand Dollars ($3,000) per Side for a project for the recording of less than an Album). Notwithstanding the foregoing, if RAF is obligated to pay such producers a higher fixed amount (the "Higher Amount") for the applicable project, Grantor's royalty account and the production budget for the applicable recording project will be charged with a Recording Cost item equal to the Higher Amount in lieu of the amounts set forth in the preceding sentence.

(ii)    With respect to Phonograph Records derived from Master Recordings hereunder, RAF shall accrue to the account of Grantor in accordance with the provisions of Article 8 above, a royalty equal to the applicable royalty set forth in Article 7 above, reduced by an amount equal to three percent (3%) with respect to Albums, with proportionate reductions on all sales for which reduced royalties are payable under this agreement. If RAF is obligated to pay producers a royalty greater than the amount set forth in the preceding sentence, Grantor's royalty shall be reduced by such greater amounts instead.

10.07. (a)    Subject to Artist's prior bona fide professional commitments, Artist shall be available from time to time to appear for photography, poster, and cover art, and the like, under the direction of RAF or its nominees and to appear for interviews with representatives of the communications media and RAF's publicity personnel. RAF shall reimburse Artist for all reasonable expenses incurred by Artist in connection with such sessions provided such expenses are pre-approved by RAF and properly documented and such expenses shall not be deemed Advances hereunder.

(b)    Subject to Artist's prior bona fide professional commitments, Artist shall

Kanye West 9.16.20 Twitter

be available from time to time at RAF's request to perform for the purpose of recording for promotional purposes by means of film, videotape, or other audio-visual media performances of Compositions embodied on Master Recordings hereunder.

10.08. (a)     Neither Grantor nor Artist shall authorize or knowingly permit Artist's performances to be recorded for any purpose without an express written agreement prohibiting the use of such recording on Records in violation of the restrictions herein, and Grantor and Artist shall take reasonable measures to prevent the manufacture, distribution and sale at any time by any Person other than RAF of such Records. Neither Grantor, nor any Person deriving any rights from Grantor, shall use or authorize or permit any Person other than RAF to use Artist's name (including any professional name or sobriquet), likeness (including picture, portrait or caricature), autograph (including facsimile signature), or biography in connection with the manufacture and/or exploitation of Records embodying Master Recordings recorded during the Term hereof or any other exploitation of such Master Recordings. Furthermore, except as otherwise provided herein, neither Grantor nor Artist, nor any Person deriving any rights from Grantor or Artist, will use, authorize or permit any Person other than RAF to create, host or maintain any Websites which incorporate any Masters embodying Artist's performances.

(b)     Notwithstanding anything to the contrary contained in paragraph 10.08(a), Artist may perform as a background musician ("sideman") accompanying a featured artist for the purpose of making Recordings for Phonograph Record purposes for third parties during the Term provided that:

(i)     Grantor has fulfilled all of Grantor's material obligations under this agreement, and such engagement does not interfere with the continuing prompt performance of Grantor's obligations to RAF;

(ii)     The member of Artist shall not perform solo or step-out performances on Recordings for such parties in excess of thirty (30) seconds or be separately identified in connection with any solo or step-out performances on such Recordings;

(iii)     The name of the member of Artist performing may not be used except in a courtesy credit to RAF or its designee on the liners used for such Phonograph Records, which courtesy credit shall appear in the same position as the credits accorded to other sidemen and in type identical in size, prominence and all other respects; without limiting the generality of the foregoing, in no event may the likeness of Artist or the professional name of Artist be used in connection with such Phonograph Records. Artist's name or likeness shall not appear in any advertising or promotion in connection with such Recordings, on the front covers of Album containers, on sleeves or labels used for Singles, or in any other form, including (without limitation) in Audio-Visual Recordings, without RAF's prior written consent, which may be withheld for any reason, in RAF's sole discretion;

(iv)     The member of Artist shall not perform Compositions on such Recordings which Artist records hereunder, nor shall Artist be restricted from recording hereunder compositions performed by the member of Artist on such Recordings; and

(v)     The third party record company which distributes the Records on

37

which Artist's performances are contained executes an agreement with RAF in a form satisfactory to RAF.

(c)     Without limiting the generality of the foregoing paragraph 10.08(a), RAF agrees that Artist may perform in theatrical and/or television motion pictures and in other television productions, provided that such performances are substantially non-musical and that the agreement pursuant to which such performances are rendered expressly prohibits the release by any Person of Audio-Visual Devices (other that Audio-visual Devices embodying substantially the entire motion picture or television production) or so-called soundtrack Records embodying such broadcast and/or cablecast performances of Artist.

10.09. Neither Grantor nor Artist, nor any Person deriving any rights from Grantor or Artist, shall at any time, do, or authorize any Person to do, anything inconsistent with, or which might diminish or impair, any of RAF's rights hereunder. Neither Artist nor Grantor shall endorse any products whose use would be detrimental to the Phonograph Record industry, including but not limited to, blank tapes and tape recording equipment.

10.10.     Grantor agrees to and does hereby indemnify, save, defend and hold RAF, its affiliates, parent companies, successors, licensees, agents, employees and assigns harmless of and from any and all liability, loss, damage, cost or expense (including reasonable outside attorneys' fees) arising out of or connected with any breach or alleged breach of this agreement or any claim which is inconsistent with any of the warranties or representations made by Grantor in this agreement, provided the said claim has been settled with Grantor's prior written consent, not to be unreasonably withheld, or has been reduced to final judgment, and agrees to reimburse RAF on demand for any payment made or incurred by RAF with respect to any liability or claim to which the foregoing indemnity applies. Notwithstanding anything to the contrary contained herein, RAF shall have the right to settle without Grantor's consent any claim involving sums of Seven Thousand Five Hundred Dollars ($7,500) or less (or involving claims of ownership or exploitation of intellectual property), and this indemnity shall apply in full to any claim so settled; if Grantor does not consent to any settlement proposed by RAF for an amount in excess of Seven Thousand Five Hundred Dollars ($7,500), RAF shall have the right to settle such claim without Grantor's consent, and this indemnity shall apply in full to any claim so settled, unless Grantor obtains a surety bond from a surety acceptable to RAF in its sole discretion, with RAF as a beneficiary, assuring RAF of prompt payment of all expenses, losses and damages (including reasonable outside attorneys' fees) which RAF may incur as a result of said claim. Pending final determination of any claim involving such alleged breach or failure, RAF may withhold sums due Grantor hereunder in an amount reasonably consistent with the amount of such claim, unless Grantor obtains a surety bond from a surety acceptable to RAF in its sole discretion, with RAF as a beneficiary, in an amount reasonably consistent with the amount of such claim. If no action is filed within one (1) year following the date on which such claim was first received by RAF, RAF shall release all sums withheld in connection with such claim, unless RAF, in its reasonable business judgment, believes an action will be imminently filed. Notwithstanding the foregoing, if after such release by RAF of sums withheld in connection with a particular claim, such claim is reasserted, then RAF's rights under this paragraph 10.10 will apply ab initio in full force and effect. RAF will give Grantor prompt notice of any lawsuit instituted with respect to such a claim, and Grantor shall have the right to participate in the defense thereof with counsel of Grantor's choice and at Grantor's expense provided, however, that RAF shall have the right at all times to maintain control of the conduct of the defense.