38

10.11. Grantor warrants and represents that, as of the date hereof, neither Grantor nor any Artist is a resident of the State of California. Grantor shall notify RAF immediately in the event that Grantor and/or any member of Artist becomes a resident of the State of California.

10.12. The copyright proprietors of all Compositions not licensed under Article 9 and embodied on Master Recordings hereunder shall issue to RAF, promptly upon RAF's request therefor, mechanical licenses (including, without limitation, and, where applicable, so-called "first use" licenses) on terms no less favorable to RAF than those contained in the standard mechanical license issued by the Harry Fox Agency, it being expressly understood and agreed that nothing contained in this paragraph 10.12 shall operate or be deemed to operate in derogation of RAF's rights under Article 9 hereof.

10.13. During the Term hereof, Grantor shall use Grantor's best efforts to cause Artist to be billed, advertised and described in all commercial contexts as an "exclusive recording artist" of RAF or its label designee.

10.14. Neither Grantor nor Artist shall exercise any legal rights which Grantor or Artist may have pursuant to the laws of any jurisdiction (including, without limitation, any right of publicity, right of privacy or any federal or state statutory or common law right) in any manner which would impair, limit or otherwise derogate from the rights herein granted to RAF and its licensees and assignees to own and/or exploit Master Recordings, Artwork and/or Artist's name and likeness hereunder, or any Phonograph Records or other materials derived therefrom.

## 11.   FAILURE OF PERFORMANCE

11.01. RAF reserves the right by written notice to Grantor to suspend the operation of this agreement and its obligations hereunder for the duration of any contingencies by reason of which RAF is materially hampered in its recording, manufacture, distribution or sale of Records, or its normal business operations become commercially impracticable: for example, labor disagreements; fire; catastrophe; shortage of materials; or any cause beyond RAF's control. A number of days equal to the total of all such days of suspension may be added to the Contract Period in which such contingency occurs and the dates for the exercise by RAF of its options as set forth in Article 1, the dates of commencement of subsequent Contract Periods and the Term shall be deemed extended accordingly. No suspension imposed under this paragraph 11.01 shall exceed six (6) months unless such contingency is industry-wide, in which event RAF shall have the right to suspend the applicable Period for the duration of such contingency. If such suspension is not industry-wide, Grantor may request RAF by notice in writing given at any time after the expiration of such six (6) month period to terminate the suspension within thirty (30) days following RAF's receipt of Grantor's said notice. If RAF does not so terminate the suspension, the Term of this agreement will terminate at the end of such thirty (30) day period, or at such earlier date as RAF may designate in writing, and the parties shall be deemed to have fulfilled all their obligations hereunder except those obligations which survive such termination, such as warranties, re-recording restrictions, and the obligation to pay royalties, if payable.

11.02.   If in respect of any Contract Period RAF, except for reasons set forth in paragraph 11.01 above, refuses without cause to allow Grantor to fulfill the Minimum Recording Obligation for such Period, and if no later than sixty (60) days after that refusal takes place,

39

Grantor notifies RAF in writing of Grantor's desire to fulfill such Minimum Recording Obligation, then if RAF does not allow Grantor either to record sufficient Master Recordings to fulfill the Minimum Recording Obligation within sixty (60) days of receipt of such notice, or commence recording of such Minimum Recording Obligation if it cannot be recorded within said sixty (60) days, the Term of this agreement shall terminate upon the expiration of such sixty (60) day period. Upon such termination all parties shall be deemed to have fulfilled all of their obligations hereunder except for those obligations which survive the termination of the Term such as warranties, re-recording restrictions, and the obligation to accrue and pay royalties, if payable, and RAF shall pay, in full settlement of its obligations in connection with such unrecorded Album(s), the applicable amounts set forth below, as reduced by any and all Advances paid by RAF with respect to such unrecorded Album(s), which amounts shall constitute Advances hereunder. This shall be Grantor's sole remedy in connection with RAF's failure to allow Grantor to fulfill the Minimum Recording Obligation. If Grantor shall fail to give notice to RAF within the period specified therefor, RAF shall be under no obligation for its failure to allow Grantor to fulfill such Minimum Recording Obligation.

(a)    If such unrecorded Album is the first Album of the Minimum Recording Obligation for the Initial Period, such payment shall be equal to union scale for the Minimum Recording Obligation not fulfilled for the first Contract Period, less any and all Advances previously paid by RAF with respect to such unrecorded Master Recording(s);

(b)  If such unrecorded Album is other than the first Album of the Minimum Recording Obligation, such payment shall be equal to the difference between the Recording Fund for such unrecorded Album and the Recording Costs for the immediately preceding Album less any Advances previously paid to Grantor, provided that in no event shall such payment exceed one-third (1/3) of the Recording Fund payable with respect to such Album; in the event Recording Costs were paid by Grantor, such calculation will not be made until Grantor has provided satisfactory documentation to establish the amounts of such Recording Costs.

12.    ADDITIONAL REMEDIES

12.01. (a)    Without limitation of any other rights and remedies of RAF, if Grantor fails to record and deliver Recordings within ninety (90) days following the date required hereunder and in accordance with Articles 3 and 4, then RAF may, at its election, suspend its obligations hereunder for a number of days equal to the number of days between the last date on which Grantor is scheduled to deliver Master Recordings and the date on which Grantor actually delivers such Master Recordings, in which event the then current Contract Period, the date for exercise of RAF's options to extend the Term, the dates of commencement of subsequent Contract Periods, and the Term may be extended accordingly. If any such failure exceeds ninety (90) days, in addition to its other rights and remedies, RAF may, at its election, demand reimbursement from Grantor of all monies theretofore paid, excluding third party Recording Costs, but including, without limitation, any monies paid pursuant to paragraph 6.01 above, with respect to the applicable Master Recordings (and Grantor shall immediately make such reimbursement) and/or deduct such costs (including any such third party Recording Costs) from any payments to be made hereunder and/or terminate this agreement by written notice to Grantor and upon such termination RAF shall have no obligations to Grantor hereunder except the obligation to account and pay royalties, if payable.

(b)     Notwithstanding anything to the contrary set forth in paragraph 12.01(a), if Artist's voice or ability to perform as an instrumentalist shall become impaired or if Artist is unable to fulfill any of Grantor's obligations hereunder, including, without limitation, Grantor's obligation to record for and deliver to RAF Masters within the time periods set forth in Articles 3 and 4 above, RAF may, without limiting RAF's other rights or remedies, terminate the Term upon written notice to Grantor, in which event RAF shall have no obligations or liabilities to Grantor under this agreement, except for RAF's obligations, if any, with respect to Masters recorded prior to that termination. If RAF so terminates the Term, Grantor shall pay RAF, on demand, an amount equal to any unrecouped Advances hereunder, other than any Advances attributable to and paid in respect of an Album theretofore delivered by Grantor to RAF and/or any third party Recording Costs with respect to Masters commenced hereunder but not completed prior to Artist's failure described in this paragraph 12.01(b) above.

12.02.  Without limiting any other rights of RAF, it is specifically understood and agreed that in the event of Grantor's dissolution or the liquidation of Grantor's assets, or the filing of a petition in bankruptcy or insolvency or for an arrangement or reorganization by, for or against Grantor, or in the event of the appointment of a receiver or a trustee for all or a portion of Grantor's property, or if Grantor shall make an assignment for the benefit of creditors or commit any act for or in bankruptcy or become insolvent or if Grantor shall fail to fulfill its obligations under this agreement, RAF shall have the option by notice to Grantor either to terminate the Term of this agreement or to require that Artist render Artist's personal services directly to RAF for the remaining balance of the Term upon all the same terms and conditions as are herein contained. In such event Artist shall be deemed substituted for Grantor as a party to this agreement as of the date of RAF's option exercise, and, in respect of Master Recordings recorded subsequently, the royalties and any Advances payable hereunder shall be reduced to two-thirds (2/3) of the amounts prescribed in this agreement.

12.03.  If Artist notifies RAF that Artist will no longer render services to Grantor as required by RAF, other than for the reasons set forth in paragraph 12.02 above, then RAF shall have the same options as set forth in such paragraph 12.02, except that, at RAF's election, in lieu of the provisions of the last sentence of paragraph 12.02, RAF may withhold payments to Artist and Grantor pending settlement of any disputes between Grantor and Artist with respect to the subject matter hereof and/or divide payments to Grantor hereunder between Artist and Grantor in the manner Grantor shares such payments with Artist under its contract with Artist (except that any such payments in dispute between Artist and Grantor shall be withheld by RAF).

12.04.  It is recognized, and Grantor's agreement with Artist shall acknowledge, that Artist's services are of special, unique, unusual, extraordinary and intellectual character involving skill of the highest order which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages in an action at law. Inasmuch as any breach of this agreement (and/or Grantor's agreement) with respect to such services would cause RAF irreparable damage, RAF shall be entitled to injunctive and other equitable relief, in addition to whatever legal remedies are available to RAF, to prevent or cure any such breach or threatened breach. The preceding sentence will not be construed to preclude Grantor or Artist from opposing any application for such relief based upon contest of the facts alleged by RAF in support of the application.



41

12.05. The rights and remedies of RAF as specified in this agreement are not to the exclusion of each other or of any other rights or remedies of RAF; RAF may decline to exercise any one or more of its rights and remedies as RAF may deem fit, without jeopardizing any other rights and remedies of RAF; and all of RAF's rights and remedies in connection with this agreement shall survive the expiration or other termination of the Term. Notwithstanding the specific rights granted to RAF anywhere in this agreement, RAF may at any time exercise any right which it now or at any time hereafter may be entitled to as a member of the public as though this agreement were not in existence.

## 13. DEFINITIONS

13.01. "Advance": An "Advance" constitutes a prepayment of royalties and shall be charged against and shall be recoupable from all royalties (excluding mechanical royalties, other than as expressly permitted herein) accruing hereunder.

13.02. "Album": One or more LPs, sold in a single package (an Album of more than one LP sometimes being referred to as a "Multiple-Record Album").

13.03. "Ancillary Website Exploitation": (a) the leasing of commercial advertising space to Persons other than RAF or its licensees on an Artist Website; (b) the placement on an Artist Website of links to so-called "e-commerce" Websites owned or controlled by Persons other than RAF or its licensees; and (c) the inclusion of computer software, or Website links in ECD Material. Notwithstanding the foregoing, it is understood and agreed that Ancillary Website Exploitation shall be deemed to exclude any placement of advertising and/or hyperlinks in or in connection with RAF Frames.

13.04. (a)    "Audio-Visual Devices": All forms of reproductions of Audio Visual Recordings now or hereafter known, manufactured or distributed primarily for home and/or jukebox use and/or use on or in means of transportation.

(b)    "Audio-Visual Recordings" means every form of recording embodying performances of Artist wherein are fixed visual images, whether of Artist or otherwise, together with sound.

13.05. "Armed Forces Post Exchanges": United States military posts, ships' stores or other United States armed forces facilities, including, without limitation, federal, state and/or local governments.

13.06. "Base Price":

(a)    With respect to Records other than compact discs and Audio-Visual Devices, the Base Price is the "Retail List Price", defined as RAF's suggested retail list price (or the equivalent price category) in the United States for records sold in the United States, and, with respect to Records sold outside the United States, an equivalent of or substitute for an actual or hypothetical retail price ("Retail-related Base") as may be established by RAF or its licensee(s) in conformity with the general practice of the Record industry in such country, or otherwise, provided that RAF may but shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency as the basis for the collection of mechanical

Kanye West 9.16.20 Twitter

copyright royalties. Notwithstanding anything to the contrary expressed or implied in the preceding sentence, it is understood and agreed that if a Retail-related Base cannot be established in a particular country, the Base Price shall be that amount equal to the lowest wholesale price payable by the largest category of RAF's customers in the normal course of business with respect to such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred twenty-six percent (126%), provided however, that if a published price to dealers ("ppd") exists in the applicable country of sale then RAF may apply the ppd in lieu of the lowest wholesale price.

(b)    With respect to Records in the form of compact discs sold for distribution in the United States, the Base Price shall be that amount equal to the lesser of (i) the suggested retail list price in the United States for Records in the form of compact discs, provided such suggested retail list price exists, or (ii) the lowest wholesale price payable by the largest category of RAF's customers in the normal course of business with respect to compact discs embodying such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred and thirty percent (130%). With respect to compact discs sold for distribution outside the United States, the Base Price shall be that amount equal to the lesser of (i) the suggested retail list price in the applicable country for Records in the form of compact discs, provided such suggested retail list price exists, or (ii) the lowest wholesale price payable by the largest category of RAF's customers in the normal course of business with respect to compact discs embodying such Records sold for distribution during the applicable semi-annual accounting period, multiplied by one hundred twenty-six percent (126%), provided however, that if a published price to dealers ("ppd") exists in the applicable country of sale then RAF may apply the ppd in lieu of the lowest wholesale price.

(c)    With respect to Audio-Visual Devices sold in the United States, the Base Price is the net amount actually received by RAF from its customers for the Audio-Visual Device concerned. With respect to Audio-Visual Devices sold outside of the United States, the Base Price is the basis on which RAF is accounted to by its licensees.

(d)    Notwithstanding anything to the contrary contained herein, the Base Price for premium Records and Records exploited pursuant to paragraph 7.07 hereof, shall, at RAF's election, be RAF's or its affiliates' actual sales price of such Records.

(e)    Notwithstanding the foregoing terms of this paragraph 13.06, the Base Price of Records sold by RAF through Normal Retail Channels in the United States through an alternative means of distribution shall be reduced in the same proportion as the otherwise applicable wholesale price of the same or equivalent Record is reduced by RAF for sales of such Record through such alternate method.

13.07. (a)    "Budget Records": Albums sold in a particular country of the Territory outside the United States at a Base Price which is eighty percent (80%) or less of the Base Price in such country of the Territory for top "pop" Albums of the configuration concerned; and Albums sold in the United States at a Base Price which is seventy percent (70%) or less of the Base Price in the United States for top "pop" Albums of the configuration concerned.

(b)    "Mid-Price Records": Albums sold in the United States at a Base Price which is less than eighty percent (80%) but more than seventy percent (70%) of the Base Price in

Kanye West 9.16.20 Twitter                                    00065

52)

43

the United States for top "pop" Albums of the configuration concerned.

13.08. "Composition": A musical composition or medley consisting of words and/or music, or any dramatic material, whether in the form of instrumental and/or vocal music, prose or otherwise, irrespective of length.

13.09. "Controlled Composition": Any Composition wholly or partly written, composed, owned or controlled directly or indirectly by Artist and/or Grantor and/or any individual producer of Master Recordings and/or any Person affiliated with one or more of the foregoing or in which one or more of the foregoing has a direct or indirect interest.

13.10. "Container Charge": Twelve and one-half percent (12-1/2%) of the Base Price for a single-fold disc Album in a standard sleeve with no inserts, a Long-Play disc Single or for a disc Single; fifteen percent (15%) of the Base Price for a disc Album in a double fold jacket or non-standard sleeve or jacket or with inserts; twenty percent (20%) of the Base Price for a pre-recorded analog tape and twenty-five percent (25%) of the Base Price for compact discs or for any other Record (excluding Audio-Visual Devices) other than as expressly provided for in this paragraph 13.10 (unless RAF applies the dollar-and -cents royalty provisions of paragraph 7.04(b)). No Container Charge will be deducted for Singles in stock paper sleeves.

13.11. "Contract Period": The Initial Period or an Option Period as defined in Article 1 hereof.

13.12. "Digital Master": A fully mixed, edited, equalized and leadered digital stereo tape master ready for the production of parts from which satisfactory Records can be manufactured.

13.13. (a)    "ECD Material: All material acquired or created for inclusion in the "enhanced" or multimedia portion of an enhanced CD, CD Plus, CD ROM, DVD, or any other similar configuration, whether now known or hereafter created, (including, without limitation, Videos, photography, graphics, technology, software, so-called "hyperlinks" to URLs, etc.).

(b)    "Mobile Material: artwork, images, biographies, text, Voice Messages, graphics, "wallpaper" and/or other materials (excluding Master Recordings) transmitted to an end user's mobile telephone or personal digital assistant (or other personal communication device).

13.14. "Electronic Transmission": Any transmission to the consumer, whether sound alone, sound coupled with an image, or sound coupled with data, in any form, analog or digital, now known or later developed (including, but not limited to, "cybercasts", "webcasts", "streaming audio", "streaming audio/video", "digital downloads", direct broadcast satellite, point-multipoint satellite, multipoint distribution service, point-point distribution service, cable system, telephone system, broadcast station, and any other forms of transmission now known or hereafter devised) whether or not such transmission is made-on-demand or near on-demand, whether or not a direct or indirect charge is made to receive the transmission and whether or not such transmission results in a specifically identifiable reproduction by or for any transmission recipient. All references in this Agreement to the "distribution" of Records, unless expressly provided otherwise, shall be understood to include the distribution of records by way of Electronic Transmission thereof.

Kanye West 9.16.20 Twitter                                    00066

13.15. "EP Record": A Phonograph Record embodying no less than five (5) and no more than seven (7) Sides, containing no less than twenty (20) minutes of playing time.

13.16. "RAF Frames": any so-called browser frames which reside outside of the RAF Artist Website and which are common to one or more of RAF's main web pages.

13.17. "Joint Recording": Any Master Recording embodying Artist's performances together with the performances of any other Person in respect of which RAF is obligated to pay royalties to a third party.

13.18. "LP": A Phonograph Record embodying no less than ten (10) Sides, containing no less than forty-five (45) minutes of playing time.

13.19. "Long Play Single": A 12-inch vinyl disc Phonograph Record or its non-vinyl equivalent usually embodying three (3), but no more than four (4) Sides.

13.20. "Master", "Recording", "Master Recording": Any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or hereafter known, including Audio-Visual Recordings, intended for reproduction in the form of Phonograph Records, or otherwise.

13.21. "Net Sales": Sales of Records hereunder, paid for, less returns and credits. Net Sales shall specifically exclude the following:

(a)    (i)    Records given away gratis or sold for fifty percent (50%) or less of the Gross Price (as hereinafter defined); Records distributed for publicity, advertising or promotional purposes to disc jockeys, radio or television stations, publishers, distributors, dealers, consumers, or others and Records sold as cutouts, surplus or for scrap.

(ii)    Free or bonus Records given away together with Records sold for monetary consideration (sometimes referred to as "free goods"). The number of Records automatically deemed not sold for royalty purposes under this paragraph 13.21(a)(ii) shall not exceed RAF's standard discount limitation in effect at the time of shipment of the particular Records, which as of the date of this agreement RAF represents is for Singles and Long-Play Singles, 23.08% of the gross total distributed and, for Albums, 15% of the gross total distributed.

(iii)    Free or bonus Records given away pursuant to special sales Plans of limited duration in addition to free goods. Notwithstanding the foregoing, special sales plans for Albums sold through Normal Retail Channels in the United States shall not, without Grantor's prior consent, exceed an additional twelve percent (12%) of the gross total distributed, provided however, that if such special sales plans do exceed twelve percent (12%), Grantor will be paid Grantor's normal royalty on all Albums distributed through such plans in excess of such twelve percent (12%).

(iv)    To the extent that Records hereunder are sold subject to a sales plan entailing a selling price for such Records reduced by a percentage discount from RAF's or its licensee's "Gross Price" (i.e., the selling price to distributors before any discounts or

Kanye West 9:16:20 Twitter

00067

45

free goods or bonus plans), the number of such Records deemed to be Net Sales shall be determined by reducing the number of Records actually sold by the percentage of discount granted applicable to such sale.

(b)     Without limitation of the generality of paragraph 13.21(a) above, RAF shall have the right to deduct from the number of Records sold returns and credits of any nature, including without limitation: (i) those on account of any return or exchange privilege; (ii) defective merchandise; and (iii) errors in billing or shipment, provided that returns shall be pro-rated between royalty-bearing and non-royalty-bearing Records in the same proportion as actually shipped.

(c)     Without limitation of the foregoing, royalties shall not be payable with respect to distributions which are not Net Sales and the terms "Net Sales" and/or "net royalty-bearing sales" shall not include the sales described in paragraphs 13.21(a) and 13.21(b) and shall not include any sales which are being held as royalty reserves.

13.22.   "Non-Affiliated Third Parties":  Persons other than RAF or other members of the Universal Music Group ("UMG") as now or hereafter constituted, and other than Persons as to which RAF or UMG now or hereafter directly or indirectly holds more than a fifty percent (50%) interest or control (including joint ventures) or Persons in which the principals of RAF or UMG now or hereafter collectively hold more than a fifty percent (50%) interest or control.

13.23.   "Normal Retail Channels":  Normal retail distribution channels excluding sales of Records described in paragraphs 7.05(c) and (d), 7.06 and 7.07 herein.

13.24.   "Person":  Any individual, corporation, partnership, association, or other entity, or the legal successors or representative of any of the foregoing.

13.25.   "Recording Costs":  All costs, including, without limitation, preproduction and post-production costs, incurred for and with respect to the production of Master Recordings. Recording Costs include without limitation, union scale; payments for musicians, vocalists, conductors, arrangers, orchestrators, copyists, etc.; payments required by any agreement between RAF and any labor organization; producer's fees; sample fees and clearance costs; studio charges; costs of tape, editing, mixing, mastering to tape, reference discs, and engineering; expenses of travel, per diems (excluding any RAF personnel, except if such personnel is engaged by RAF pursuant to the provisions of paragraph 10.06(b) above), rehearsal halls and vocal coaching; costs of non-studio facilities and equipment; dubbing; costs and transportation of instruments including cartage and rental fees; and other costs and expenses incurred in producing Master Recordings and other costs which are customarily recognized as recording costs in the Phonograph Record industry.  Recording Costs shall not include so-called "per Record" costs required to be paid pursuant to any agreement with the AFofM, AFTRA or any equivalent.  Notwithstanding the foregoing, in the event RAF elects to remix any of the Master Recordings delivered hereunder after the delivery to RAF of the applicable Master Recording pursuant to the terms set forth herein, such remix costs shall constitute an Advance herein, but such amounts shall not reduce the Recording Fund for such applicable Album.

13.26.   "Records", "Phonograph Records":  Any device now or hereafter known, on or by which sound may be recorded and reproduced, which is manufactured or distributed primarily

00068

46

for home and/or consumer and/or jukebox use and/or use on or in means of transportation including "sight and sound" devices or Audio-Visual Devices.

13.27. "Royalty Base":

(a) The Base Price less all excise, sales and similar taxes and less the applicable Container Charges, if any.

(b) RAF may at any time and from time to time change the method by which it computes royalties in the United States from a retail basis to some other basis (the "New Basis"), such as, without limitation, a wholesale basis. The New Basis will replace the then-current Royalty Base and the royalty rates shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars-and-cents royalty amounts payable with respect to the top-line product through Normal Retail Channels as of the date of such change would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate shall be reduced in the ratio of the royalty rate for such sales to the royalty rates for sales of top-line product. If there are other adjustments made by RAF that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

13.28. "Side": A Recording embodying Artist's performance of one (1) Composition or the equivalent thereof, containing no less than two and one half (2-1/2) minutes of continuous sound.

13.29. "Single": A 7-inch vinyl disc Phonograph Record or its non-vinyl equivalent embodying no more than two (2) Sides.

13.30. "Statutory Rate": The minimum statutory compulsory license rate applicable to a Composition of less than five (5) minutes under the copyright laws of the United States. On Records sold in Canada, the prevailing rate agreed upon by the Canadian recording industry and the Canadian music publishing industry or its mechanical collection representative which is applicable to the reproduction of musical compositions, provided however, in no event shall the Canadian Statutory Rate be greater than the United States Rate.

13.31. "Top-Line": with respect to Audio-Visual Devices, a price line with a wholesale price that equates to a suggested retail list price of Nineteen Dollars and Ninety-Five Cents (U.S. $19.95) or more, or outside the United States, the customary top-line price in the applicable territory.

13.32. "Video Costs": Any and all costs incurred by RAF in connection with the production or exploitation of Videos and/or the acquisition of rights with respect thereto.

13.33. "Videos": A so-called "short-form" Audio-Visual Recording.

13.34. "Website": A series of one (1) or more interconnected documents or files that are formatted using the Hypertext Markup Language, or any similar language, and that are



47

intended to be accessible by Internet users.

13.35. "Website Material": All material acquired or created for inclusion on an Artist Website (including, without limitation, Videos, photography, graphics, technology, so-called "hyperlinks" to URLs, on-line chats, and electronic press kits or so-called "EPK"s).

## 14.   MISCELLANEOUS

14.01. Wherever Grantor's approval or consent is required, Grantor shall give RAF written notice of approval or disapproval (the reasons for such disapproval being specifically stated) within seven (7) business days after RAF requests same. If Grantor shall fail to give such notice to RAF as aforesaid, Grantor shall be deemed to have given such consent or approval.

14.02. Any promotional efforts or expenditures made by Grantor or by any Person on behalf of Grantor in connection with any Records hereunder shall be in accordance with applicable legal standards, including Sections 317 and 508 of the Communications Act of 1934, as amended. In the event Grantor is in breach of the preceding sentence, RAF may, without limiting its rights, terminate the Term of this agreement.

14.03. Grantor recognizes that the sale of Records is speculative and agrees that the judgment of RAF with regard to any matter affecting the sale, distribution and exploitation of Records hereunder shall be binding and conclusive upon Grantor. Nothing contained in this agreement shall obligate RAF to make, sell, license, or distribute Records manufactured from the Sides recorded hereunder other than as specifically provided herein. The method, manner and extent of release, packaging, promotion, advertising, distribution and exploitation of Master Recordings and Records shall be within the sole discretion of RAF unless otherwise herein specifically provided.

14.04. RAF may, at its election, assign this agreement or any of its rights hereunder to any subsidiary, affiliate or division of RAF or The Universal Music Group ("UMG"), or any entity that is owned or controlled (in whole or in part) by RAF or UMG, to any subsidiary or licensee in which RAF or UMG now has or may hereafter acquire a substantial interest, or to any entity that merges its assets with those of RAF or UMG or the assets of which are acquired by RAF or UMG, by lease or otherwise, or to any entity acquiring all or a substantial portion of RAF's or UMG's assets, and such rights may be similarly assigned by any assignee.

14.05. All notices required to be given to RAF shall be sent to RAF at its address first mentioned herein, and all royalties, royalty statements and payments and any and all notices to Grantor shall be sent to Grantor at its address first mentioned herein, or such other address as each party respectively may hereafter designate by notice in writing to the other. All notices sent under this agreement shall be in writing and, except for royalty statements shall be sent by registered or certified mail, return receipt requested, and the day of mailing of any such notice shall be deemed the date of the giving thereof (except notices of change of address, the date of which shall be the date of receipt by the receiving party).   All notices to RAF shall be served upon RAF to the attention of the Senior Vice President, Business & Legal Affairs of The Island Def Jam Music Group.

14.06. It is expressly understood and agreed that, RAF shall not be entitled to recover

Kanye West 9.16.20 Twitter

48

damages by reason of any breach by Grantor of Grantor's material obligations hereunder, unless Grantor has failed to remedy such breach within thirty (30) days following receipt of RAF's notice thereof; or, if the breach cannot be reasonably cured within said thirty (30) day period, if Grantor does not commence to cure such breach within said thirty (30) day period and diligently continue to so cure thereafter.

14.07. THIS AGREEMENT IS ENTERED INTO IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF NEW YORK APPLICABLE TO CONTRACTS ENTERED INTO AND TO BE WHOLLY PERFORMED THEREIN (WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAWS PRINCIPLES UNDER NEW YORK LAW). THE PARTIES AGREE THAT ANY ACTION, SUIT OR PROCEEDING BASED UPON ANY MATTER, CLAIM OR CONTROVERSY ARISING HEREUNDER OR RELATING HERETO SHALL BE BROUGHT SOLELY IN THE STATE COURTS OF OR THE FEDERAL COURT IN THE STATE AND COUNTY OF NEW YORK; EXCEPT THAT IN THE EVENT RAF IS SUED OR JOINED IN ANY OTHER COURT OR IN ANY OTHER FORUM IN RESPECT OF ANY MATTER WHICH MAY GIVE RISE TO A CLAIM BY RAF HEREUNDER, THE PARTIES HERETO OTHER THAN RAF CONSENT TO THE JURISDICTION OF SUCH COURT OR FORUM OVER ANY CLAIM WHICH MAY BE ASSERTED BY RAF THEREIN. THE PARTIES HERETO IRREVOCABLY WAIVE ANY OBJECTION TO THE VENUE OF THE ABOVE-MENTIONED COURTS, INCLUDING ANY CLAIM THAT SUCH ACTION, SUIT OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. ANY PROCESS IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY, AMONG OTHER METHODS PERMITTED BY LAW, BE SERVED UPON GRANTOR BY DELIVERING OR MAILING THE SAME IN ACCORDANCE WITH PARAGRAPH 14.05 HEREOF. ANY SUCH PROCESS MAY, AMONG OTHER METHODS, BE SERVED UPON ARTIST OR ANY OTHER PERSON WHO APPROVES, RATIFIES, OR ASSENTS TO THIS AGREEMENT TO INDUCE RAF TO ENTER INTO IT, BY DELIVERING THE PROCESS OR MAILING IT TO ARTIST OR THE OTHER PERSON CONCERNED IN THE MANNER PRESCRIBED IN PARAGRAPH 14.05.

14.08. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof. This agreement constitutes the entire agreement and supercedes all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof. The parties expressly acknowledge that in entering this agreement, they have not relied on any representations, written or unwritten, other than those expressly set forth herein. No modification, amendment, waiver, termination or discharge of this agreement shall be binding upon RAF and Grantor unless confirmed by a written instrument specifically referring to and amending this agreement which is signed by the Senior Vice President of Business & Legal Affairs of RAF and Grantor.

14.09. The parties hereto agree to maintain the confidentiality of any and all financial terms of this agreement and to refrain from disclosing same to any third party provided, however, that: (a) either party shall have the right to disclose such terms to its parents, subsidiaries and/or affiliated companies, and/or to their officers, directors, employees and

49

representatives (collectively, the "Representatives") solely for the purpose of exercising the rights or obligations hereunder and/or to administer this agreement, and subject always to the terms of this paragraph 14.09; and (b) if either party or any of its Representatives becomes legally compelled (by deposition, interrogatories, requests for documents, subpoena, civil investigative demand or similar process) to disclose any such financial terms, such disclosure pursuant thereto shall not be deemed a breach of this paragraph (provided, further, however that the party legally compelled to make such disclosure shall promptly notify the other party hereto of such fact prior to making such disclosure).

14.10.    Grantor understands and acknowledges that this agreement is a valid and binding legal document which affects the legal and financial interests of Grantor. Grantor acknowledges that Grantor has had ample opportunity to read the agreement and that Grantor understands the terms and conditions set forth in the agreement. Grantor hereby acknowledges that RAF has advised Grantor to obtain independent legal counsel in connection with the execution of this agreement and Grantor further acknowledges that it has either obtained such independent legal counsel or has voluntarily waived its right to do so.

14.11. This agreement shall not be construed against either party as the drafter, it being agreed that this agreement has been drafted jointly by the parties.

14.12. This document may be signed in counterparts, and may be executed and delivered by facsimile, which when taken together will have the same effect as if signed in its original by both parties.

ROCK THE WORLD, LLC

_____

An Authorized Representative

THE ISLAND DEF JAM MUSIC GROUP, a division of UMG Recordings, Inc.

Senior Vice President
Business and Legal Affairs

EXHIBIT "A"

Dated as of: April 13, 2005

THE ISLAND DEF JAM MUSIC GROUP,
a division of UMG Recordings, Inc.
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Gentlemen:

Pursuant to an exclusive recording agreement (the "Recording Contract") between Rock The World, LLC ("Grantor") and me, Grantor is entitled to my exclusive services as a recording artist. I have been advised that Grantor is entering into a written agreement with you of even date herewith (the "Agreement"), pursuant to which Grantor is agreeing to furnish my exclusive services as a recording artist. Unless otherwise defined herein, all terms shall have the same meaning as given them in the Agreement.

In consideration of your entering into the Agreement and as a further inducement for you to do so, I hereby represent and agree as follows:

1.      I have read the Agreement, and I fully understand and agree to be bound by all of the terms thereof (including, without limitation, any and all provisions, obligations, representations, warranties and/or restrictions which relate to me in any way). I hereby assent to you and Grantor entering into the Agreement. I hereby acknowledge that you have advised me to obtain independent legal counsel in connection with the execution of the Agreement and this letter agreement. I further acknowledge that, with respect to each of the Agreement, this letter agreement and the Recording Contract, I have either obtained independent legal counsel or have voluntarily waived my right to do so.

2.      I will fully and to the best of my ability perform and discharge all of the obligations undertaken by me pursuant to the provisions of the Recording Contract, as well as all of the obligations, warranties, representations and undertakings contained in the Agreement which relate to me in any way.

3.      (a)      If, during the Term of the Agreement, Grantor shall cease to be entitled to my services as a recording artist, or if Grantor shall fail or refuse to fulfill any of its obligations under the Agreement, then I shall, at your written request (the "Request"), for the remainder of the Term of the Agreement and upon the terms and conditions set forth therein (except as provided in paragraph 3(b) below), be deemed substituted for Grantor as a party to the Agreement as of the date of the Request. Without limiting the foregoing, in such event, I shall do all such acts as shall afford you the same

rights, privileges, and benefits as you would have had under the Agreement if Grantor had continued to be entitled to my recording services, and to fulfill all of its obligations under the Agreement; and such rights, privileges, and benefits shall be enforceable by you directly against me.

(b)    Notwithstanding the foregoing, in the event I am substituted for Grantor as a party to the Agreement, the following shall apply with respect to advances and royalties (including, without limitation, Advances and royalties payable by you pursuant to the Agreement) in respect of Master Recordings embodying my performances:

(i)    With respect to Master Recordings embodying my performances which are recorded after the date of the Request, you shall have the right, in your discretion:

(A)    To suspend payment of all monies to me and/or Grantor (whether Advances, royalties or otherwise, and whether pursuant to the Recording Contract, the Agreement or otherwise), pending settlement of any disputes between me and Grantor with respect thereto; or

(B)    To suspend payment of all Advances to Grantor under the Agreement, pending settlement of any disputes between me and Grantor with respect thereto; to pay directly to me all advances payable pursuant to the Recording Contract; to pay directly to me royalties at a rate not in excess of the royalty rate provided for in the Recording Contract; and to hold the balance of all other royalties payable pursuant to the Agreement, pending final settlement of any disputes between me and Grantor with respect thereto.

(ii)    With respect to Master Recordings embodying my performances which are recorded prior to the date of the Request, I shall continue to look to Grantor for payment of any and all advances and royalties payable to me in respect thereof.

4.    Except as provided in paragraph 3(b) above, I will look solely to Grantor for the payment of any and all monies payable to me in respect of services rendered by me and/or Recordings embodying my performances pursuant to the Recording Contract and/or in accordance with the Agreement and/or your manufacture, distribution, sale or other use or exploitation of any such Recordings; and you shall have no responsibility to me whatsoever for any such payments.

5.    In accordance with the provisions of paragraph 10.10 of the Agreement, I agree to and do hereby indemnify, save and hold you harmless of and from any and all liability, loss, damage, cost or expense (including attorneys' fees) arising out of or connected with any breach or alleged breach of this agreement, the Agreement or the Recording Contract or any claim which is inconsistent with any of the warranties or representations contained in this agreement, the Agreement or the Recording Contract,

52)

52

and agree to reimburse you on demand for any payment made or incurred by you with respect to any of the foregoing. Pending final determination of any claim involving such alleged breach or failure, you may withhold sums due me.

6.     If there is more than one (1) individual signing this agreement on behalf of Artist, then all references to "I", "me" and "my" shall be deemed references to "we", "us" and "our", respectively; all of our obligations hereunder and under the Agreement shall be joint and several; and your rights hereunder and under the Agreement shall apply to each of us individually and collectively.

7.     **THE PROVISIONS OF PARAGRAPH 14.07 OF THE AGREEMENT SHALL ALSO APPLY TO THIS AGREEMENT.**

8.     This agreement may not be modified except by an instrument in writing executed by all parties hereto. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

9.     This document may be signed in counterparts, and may be executed and delivered by facsimile, which when taken together will have the same effect as if signed in its original by both parties.

Very truly yours,

Kanye West

ACCEPTED AND AGREED:

THE ISLAND DEF JAM MUSIC GROUP,
a division of UMG Recordings, Inc.

Senior Vice President
Business and Legal Affairs

CONSENTED AND AGREED:

ROCK THE WORLD, LLC

An Authorized Representative

**Roc-A-Fella Records, LLC**
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Dated as of January 11, 2011

Roc The World, LLC
c/o West Entertainment Services
1790 Broadway, 10th Floor
New York, New York 10019
Attention: Louise West, Esq.

**Re:    Roc-A-Fella Records, LLC – w – Roc The World, LLC / Kanye West / Jay Z Duet Album**

Dear Sir / Madam:

Reference is made to the exclusive recording agreement (the "Agreement") dated as of April 13, 2005 by and between Roc-A-Fella Records, LLC ("RAF") and Roc The World, LLC (the "Grantor") f/s/o Kanye West (the "Artist"), as amended and in full force and effect as of the date hereof. For good and valuable consideration, the receipt of which Grantor hereby acknowledges, notwithstanding anything to the contrary expressed or implied in the Agreement, the following shall constitute the further understanding between RAF and Grantor with respect to the Agreement:

1.    **MINIMUM RECORDING OBLIGATION**:                   Grantor agrees to deliver to RAF one (1) Album (the "Duet Album") which shall embody the musical performances of Artist and Shawn Carter p/k/a "Jay-Z". Grantor acknowledges and agrees that the Duet Album shall be delivered to RAF in accordance with the terms and procedures of the Agreement for the delivery of Albums thereunder. For the avoidance of doubt, the Duet Album shall not be deemed in fulfillment of any portion of the Minimum Recording Obligation under the Agreement.

2.    **RECORDING FUND**:        RAF shall pay Recording Costs for the Duet Album as provided below. Such Recording Costs shall be deemed Advances and recoupable from royalties accruing to Grantor's account hereunder as provided below. The Recording Fund for the Duet Album shall be Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Duet Album Recording Fund"). One Million Dollars ($1,000,000) of the Duet Album Fund (the "Duet Album Advance") shall be paid to Grantor promptly following the complete execution hereof. The balance of the Duet Album Recording Fund ($1,500,000) shall be administered by RAF and if, after deduction of all Recording Costs paid or incurred by RAF in connection with such Duet Album, with an allowance for a reasonable provision for recording costs (including

J:\IDJ- Legal\McMillan\wpdata\Kanye West\Duet Album Amendment, vfinal.doc

00076

**Roc-A-Fella Records, LLC**
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019

Dated as of January 11, 2011

Roc The World, LLC
c/o West Entertainment Services
1790 Broadway, 10th Floor
New York, New York 10019
Attention: Louise West, Esq.

Re:   **Roc-A-Fella Records, LLC – w – Roc The World, LLC / Kanye West / Jay Z Duet Album**

Dear Sir / Madam:

Reference is made to the exclusive recording agreement (the "Agreement") dated as of April 13, 2005 by and between Roc-A-Fella Records, LLC ("RAF") and Roc The World, LLC (the "Grantor") f/s/o Kanye West (the "Artist"), as amended and in full force and effect as of the date hereof. For good and valuable consideration, the receipt of which Grantor hereby acknowledges, notwithstanding anything to the contrary expressed or implied in the Agreement, the following shall constitute the further understanding between RAF and Grantor with respect to the Agreement:

1.    **MINIMUM RECORDING OBLIGATION**:         Grantor agrees to deliver to RAF one (1) Album (the "Duet Album") which shall embody the musical performances of Artist and Shawn Carter p/k/a "Jay-Z". Grantor acknowledges and agrees that the Duet Album shall be delivered to RAF in accordance with the terms and procedures of the Agreement for the delivery of Albums thereunder. For the avoidance of doubt, the Duet Album shall not be deemed in fulfillment of any portion of the Minimum Recording Obligation under the Agreement.

2.    **RECORDING FUND**:      RAF shall pay Recording Costs for the Duet Album as provided below. Such Recording Costs shall be deemed Advances and recoupable from royalties accruing to Grantor's account hereunder as provided below. The Recording Fund for the Duet Album shall be Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Duet Album Recording Fund"). One Million Dollars ($1,000,000) of the Duet Album Fund (the "Duet Album Advance") shall be paid to Grantor promptly following the complete execution hereof. The balance of the Duet Album Recording Fund ($1,500,000) shall be administered by RAF and if, after deduction of all Recording Costs paid or incurred by RAF in connection with such Duet Album, with an allowance for a reasonable provision for recording costs (including

initial so-called "sample advance payments") not yet billed or accrued, there remains any balance of the Duet Album Recording Fund, it shall be paid to Grantor promptly following delivery of all Master Recordings and other materials required to be delivered to RAF pursuant to Articles 3 and 4 of the Agreement. Any amounts withheld for unpaid Recording Costs, which amounts are not used to pay such costs, shall be paid to Grantor within sixty (60) days following such delivery. Any Recording Costs incurred by Grantor or Artist that are billed or invoiced to RAF after such date, shall be forwarded to and shall become the sole responsibility of Grantor for payment. The Duet Album Advance and one-half (1/2) of the actual Recording Costs incurred in respect of the Duet Album shall be recoupable solely from any and all record royalties (excluding mechanical royalties) otherwise payable to Grantor under the Agreement with respect to the Duet Album. For the avoidance of doubt and notwithstanding anything expressed or implied to the contrary in paragraph 6.01(a) of the Agreement, any Recording Costs incurred in excess of the Duet Album Recording Fund shall be paid directly by Grantor.

3.    **ROYALTIES:**

(a)    RAF shall accrue to the account of Grantor, in accordance with the provisions of Article 8 of the Agreement, a royalty of fifteen percent (15%) of the Royalty Base for Net Sales through Normal Retail Channels in the United States of the Duet Album provided, however, no royalties shall be due and payable to Grantor until such time as all Advances have been recouped by or repaid to RAF in respect of the Duet Album. For the avoidance of doubt, all foreign territorial and configuration reductions under the Agreement shall also apply to the Duet Album.

(b)    (i)    With respect to Compositions embodied in the Duet Album, each Controlled Composition shall be and hereby is licensed to RAF in the United States and Canada at a copyright royalty rate (the "Contractual Rate") equal to one hundred percent (100%) of the Statutory Rate prevailing at the time of commencement of recording of the Master Recording embodying such Controlled Composition subject to the provisions of Article 9 of the Agreement.

(ii)    Notwithstanding anything to the contrary contained herein, Grantor warrants, represents, and agrees that, in the United States and Canada, RAF shall have no obligation whatsoever to pay an aggregate copyright royalty rate in respect of the Duet Album regardless of the number of Controlled Compositions and/or other Compositions contained thereon, in excess of twelve (12) times the applicable amount set forth in paragraph 9.02(a) of the Agreement, as amended.

4.    **RIGHTS:**    RAF shall have, and Grantor hereby grants to RAF, all of the same rights in and to the Duet Album and all materials embodied thereon that RAF has with respect to Master Recordings and Audio-Visual Recordings delivered to RAF by Grantor under the Agreement. Further, all of Grantor's obligations, warranties, representations and covenants that apply with respect to Master Recordings and Audio-Visual Recordings delivered by Grantor to RAF under the Agreement shall also apply with respect to Master Recordings and Audio-Visual Recordings delivered to RAF by Grantor in connection with the Duet Album, excluding any and all contributions thereto by Shawn Carter p/k/a "Jay-Z".

5.     **MISCELLANEOUS**:

(a)     All terms not expressly defined herein shall have the same meanings as given to them in the Agreement.  Except as expressly or by necessary implication modified hereby, all provisions of the Agreement shall remain in full force and effect in accordance with their terms.

(b)     This agreement shall be binding on and inure to the benefit of the respective parties, their legal representatives, successors and assigns.

(c)     This amendment coupled with the Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof, and shall not be modified or amended except by an instrument in writing which specifically refers to this agreement and is signed by an authorized representative of each party hereunder.  Any such instrument signed by RAF shall be signed by the Executive Vice President, Business and Legal Affairs of The Island Def Jam Music Group, a division of UMG Recordings, Inc.

(d)     This document may be signed in counterparts, and may be executed and delivered by facsimile, which when taken together will have the same effect as if signed in the original by all parties hereto.

Very truly yours,

ROC-A-FELLA RECORDS, LLC

By:_____
an authorized representative

AGREED AND ACCEPTED:

ROC THE WORLD, LLC

By:_____
An authorized signatory

Fed. Tax ID #:_____

# INDUCEMENT AGREEMENT

In order to induce Roc-A Fella Records, LLC ("Company") to enter into the foregoing amendment ("Amendment") dated as of January 11, 2011, to the agreement, dated as of April 13, 2005, between Roc The World, LLC ("Grantor") and Company with respect to the undersigned's recording services (the "Agreement"), as amended, the undersigned hereby:

     (a)     acknowledges that he has read and is familiar with all the terms and conditions of the Agreement and the Amendment and has had a full opportunity to have the contents and legal affects thereof explained to him by an attorney of his own, independent selection;

     (b)     assents to the execution of the Amendment and agrees to be bound by the terms and conditions thereof, including but not limited to each and every provision of the Amendment that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Amendment, and hereby guarantees to Company the full and faithful performance of all the terms and conditions of the Amendment by the undersigned and by Grantor, excluding the provisions of paragraphs 9 and 10 thereof which shall be considered in good faith by the undersigned;

     (c)     acknowledges and agrees that Company shall be under no obligation to make any payments to the undersigned or otherwise, for or in connection with this inducement and for or in connection with the services rendered by the undersigned or in connection with the rights granted to Company thereunder and the fulfillment of the undersigned's obligations pursuant to the Amendment; and

     (d)     acknowledges and affirms that the Agreement is in full force and effect as of the date hereof and, except as modified by the Amendment, the Agreement (and the undersigned's obligations thereunder) are hereby ratified and confirmed.

_____
Kanye West

Kanye West 9.16.20 Twitter

00080

## THE ISLAND DEF JAM MUSIC GROUP,
### A DIVISION OF UMG RECORDINGS, INC.
### 1755 BROADWAY
### NEW YORK, NEW YORK 10019

Dated as of May 4, 2012

Rock The World, LLC
c/o West Entertainment Services
1790 Broadway
Suite 800
New York, NY 10019
Attention: Louise West, Esq.

### Re:    Roc-A-Fella Records, LLC – w – Rock The World, LLC / Kanye West / Sixth & Seventh Album Amendment

Dear Gentlepersons:

Reference is made to the exclusive recording agreement between **The Island Def Jam Music Group**, a division of UMG Recordings, Inc. (as successor-in-interest to Roc-A-Fella Records, LLC [collectively, "IDJ"]) and **Rock The World, LLC** ("Grantor") f/s/o **Kanye West** (the "Artist"), dated as of April 13, 2005, as amended and in full force and effect as of the date hereof (the "Recording Agreement"). All terms not specifically defined herein shall have the same meaning used in the Recording Agreement, unless otherwise provided herein (hereinafter, the "Amendment"). For good and valuable consideration, the receipt of which each party hereby acknowledges, the parties agree to modify the Recording Agreement as follows:

### I.    Sixth Album & Seventh Album [Option].

1.    Exercise of Option for Sixth Album. Grantor hereby acknowledges that IDJ timely and properly exercised its option to extend the Term of the Recording Agreement for the fifth Option Period during which IDJ is entitled to receive delivery of the sixth Album of the Minimum Recording Obligation (the "Sixth Album").

2.    Advances / Recording Budgets. Notwithstanding anything to the contrary contained in the Recording Agreement (including, without limitation, paragraph 6.01[b][i] of the Recording Agreement), solely in connection with the Sixth Album and the Seventh Album (as defined below), IDJ shall pay the following Advances:

(a)    Sixth Album. Solely in connection with the Sixth Album, IDJ will pay Grantor an Advance in the amount by which Twelve Million Dollars (**$12,000,000**) (the "Sixth Album Recording Fund") exceeds the Recording Costs incurred by IDJ in connection with the Master



Recordings recorded during the fifth Option Period (the "Album Six Masters"). The Sixth Album Recording Fund shall be paid as follows:

(i)    Eight Million Dollars (**$8,000,000**) shall be paid to Grantor promptly following the complete execution hereof; and

(ii)    The balance of the Sixth Album Recording Fund (i.e., **$4,000,000**) shall be administered by IDJ (in accordance with the terms of paragraph 6.01[a] of the Recording Agreement) and if, after deduction of all Recording Costs paid or incurred by IDJ in connection with the Sixth Album, with an allowance (the "Sixth Album Allowance") for a reasonable provision for Recording Costs (including initial so-called "sample advance payments") not yet billed or accrued (the "Sixth Album Further Costs"), there remains any balance of the Sixth Album Recording Fund, it shall be paid to Grantor promptly following delivery of all Master Recordings and other materials required to be delivered to IDJ pursuant to Articles 3 and 4 of the Recording Agreement in connection with the Sixth Album.  IDJ shall pay the Sixth Album Allowance, less any Sixth Album Further Costs actually incurred, to Grantor promptly after IDJ reasonably believes that it has received bills or accruals for all Recording Costs actually incurred in connection with the Sixth Album.

(b)    Seventh Album.  Solely in connection with the sixth Option Period during which IDJ is entitled to receive delivery of the seventh Album of the Minimum Recording Obligation (the "Seventh Album"), IDJ will pay Grantor an Advance in the amount by which Six Million Dollars (**$6,000,000**) (the "Seventh Album Recording Fund") exceeds the Recording Costs incurred by IDJ in connection with the Master Recordings recorded during the sixth Option Period (the "Album Seven Masters"). The Seventh Album Recording Fund shall be paid as follows:

(i)    Three Million Dollars (**$3,000,000**) to Grantor promptly following commencement of recording of the Album Seven Masters in accordance with the terms of the Recording Agreement; and

The balance of the Seventh Album Recording Fund (i.e., **$3,000,000**) shall be administered by IDJ (in accordance with the terms of paragraph 6.01[a] of the Recording Agreement) and if, after deduction of all Recording Costs paid or incurred by IDJ in connection with the Seventh Album, with an allowance (the "Seventh Album Allowance") for a reasonable provision for recording costs (including initial so-called "sample advance payments") not yet billed or accrued (the "Seventh Album Further Costs"), there remains any balance of the Seventh Album Recording Fund, it shall be paid to Grantor promptly following delivery of all Master Recordings and other materials required to be delivered to IDJ pursuant to Articles 3 and 4 of the Recording Agreement in connection with the Seventh Album.  IDJ shall pay the Seventh Album Allowance, less any Seventh Album Further Costs actually incurred, to Grantor promptly after IDJ reasonably believes that it has received bills or accruals for all Recording Costs actually incurred in connection with the Seventh Album.

(c)    Pre-Paid Advances.    Notwithstanding anything to the contrary contained in the Recording Agreement, as amended, the prior payment of Seven Hundred Fifty Thousand Dollars



2                    Kanye West LP 6-7 Amendment (JJ)

(**$750,000**) in connection with the Sixth Album and the prior payment of Seven Hundred and Fifty Thousand Dollars (**$750,000**) in connection with the Seventh Album, shall not be deducted from any of the Advances described herein but shall nonetheless be deemed general Advances against the Royalty Account (as defined in paragraph 3[a] below).

3.  <u>Royalties</u>.  Notwithstanding anything to the contrary contained in the Recording Agreement, paragraph 7.02 of the Recording Agreement is hereby amended to provide that in lieu of the royalty set forth in the Recording Agreement, a royalty of twenty-two percent (22%) of the Royalty Base for USNRC Net Sales shall apply solely in connection with the Album Six Masters and the Album Seven Masters.  For the avoidance of doubt, the sales escalations provided in paragraph 7.02 of the Recording Agreement shall not apply to the royalty rates set forth in this paragraph 3.

4.  <u>Mechanical Royalties</u>. Without limiting any of the provisions of paragraph 9.01, subparagraph 9.01(a) is hereby modified such that each Controlled Composition embodied on a Master Recording recorded in connection with either the Sixth Album or the Seventh Album shall be and hereby is licensed to IDJ in the United States and Canada at a copyright royalty rate equal to one hundred percent (100%) of the Statutory Rate prevailing at the time of the earlier of: (i) delivery of the applicable Master Recording embodying such Controlled Composition, or; (ii) the date such Master Recording(s) was required to be delivered hereunder, subject to the provisions of this Article 9.

5.  Subparagraph 4.01(a)(i) of the Agreement is hereby modified such that each remaining Album of the Minimum Recording Obligation hereunder other than the Sixth Album shall be delivered to IDJ no later than twelve (12) months (as opposed to 180 days) following commencement of the applicable Contract Period hereunder.

## II.  <u>Miscellaneous</u>.

1.  Nothing herein contained shall constitute a partnership between, or joint venture by, the parties hereto, or constitute either party the agent of the other, and neither party shall become liable for any representation, act or omission of the other which is contrary to the provisions of this paragraph.

2.  This writing sets forth the entire understanding between the parties hereto with respect to the subject matter hereof, and no modification, amendment or waiver of this document shall be binding upon either party hereto unless confirmed by a written instrument signed by an authorized signatory of the party sought to be bound.  No waiver of any provision of, or waiver of a default under this Amendment or any failure to exercise rights hereunder shall prejudice the rights of either party thereafter, nor shall it form precedent for the future.

3.  Except as expressly or by necessary implication modified hereby, the terms and binding effect of the Recording Agreement are hereby ratified and confirmed without limitation or exception.

3                        Kanye West LP 6-7 Amendment (JJ)

4.    This Amendment may be signed in counterparts, and may be executed and delivered by facsimile and or electronic mail as a pdf, which when taken together will have the same effect as if signed it its original form by all the parties.

Very truly yours,

THE ISLAND DEF JAM MUSIC GROUP,
A division of UMG Recordings, Inc.

By_____
an authorized representative

AGREED AND ACCEPTED:

ROCK THE WORLD, LLC

By:_____
An authorized signatory

4                    Kanye West LP 6-7 Amendment (JJ)

00084

# INDUCEMENT AGREEMENT

In order to induce The Island Def Jam Music Group, a division of UMG Recordings, Inc. ("Company") to enter into the foregoing amendment ("Amendment") dated as of May 4, 2012, to the agreement, dated as of April 13, 2005, between Roc The World, LLC ("Grantor") and Company with respect to the undersigned's recording services (the "Agreement"), as amended, the undersigned hereby:

     (a)      acknowledges that he has read and is familiar with all the terms and conditions of the Agreement and the Amendment and has had a full opportunity to have the contents and legal affects thereof explained to him by an attorney of his own, independent selection;

     (b)      assents to the execution of the Amendment and agrees to be bound by the terms and conditions thereof, including but not limited to each and every provision of the Amendment that relates to the undersigned in any way, directly or indirectly, the services to be rendered thereunder by the undersigned and restrictions imposed upon the undersigned in accordance with the provisions of the Amendment, and hereby guarantees to Company the full and faithful performance of all the terms and conditions of the Amendment by the undersigned;

     (c)      acknowledges and agrees that Company shall be under no obligation to make any payments to the undersigned or otherwise, for or in connection with this inducement and for or in connection with the services rendered by the undersigned or in connection with the rights granted to Company thereunder and the fulfillment of the undersigned's obligations pursuant to the Amendment; and

     (d)      acknowledges and affirms that the Agreement is in full force and effect as of the date hereof and, except as modified by the Amendment, the Agreement (and the undersigned's obligations thereunder) are hereby ratified and confirmed.

_____

Kanye West

     Kanye West LP 6-7 Amendment (JJ)



00085

## LETTER OF DIRECTION

Rock The World, LLC
c/o Sweeney, Johnson & Scates, LLC
152 W. 57th Street, 8th Floor
New York, New York, 10019
Attn: Ron Sweeney, Esq.

Kanye West
c/o Carroll, Guido & Groffman, LLP
1790 Broadway, 20th Floor
New York, New York 10019
Attn: Michael Guido, Esq.

Dated: May 4, 2012

The Island Def Jam Music Group (by FedEx)
a division of UMG Recordings, Inc.
1755 Broadway, 8th Floor
New York, NY 10019
Attn: Sr. VP, Business and Legal Affairs

Gentlepersons:

1.    Reference is made to the agreement by and between you as successor in interest to Roc-
A-Fella Records, LLC ("you" or "IDJ") and Rock The World, LLC ("RTW"), regarding
the exclusive recording services of Kanye West ("Artist"), dated as of April 13, 2005, as
amended through the date hereof (the "Agreement"), including without limitation by that
amended dated as of the date hereof (the "2012 Amendment). All terms not specifically
defined herein shall have the same meaning used in the Agreement, unless otherwise
provided herein.

2.    Pursuant to paragraph 2(a) of the 2012 Amendment, you have agreed to increase the
Recording Fund for the album to be delivered in fulfillment of the Minimum Recording
Obligation for the fifth Option Period to Twelve Million Dollars ($12,000,000), of which
Eight Million Dollars ($8,000,000) (the "Execution Advance") shall be payable promptly
after the full execution of the 2012 Amendment. We hereby irrevocably instruct you to
pay One Million Two Hundred Thousand Dollars ($1,200,000) of the Execution Advance
directly to RTW (the "RTW Execution Advance") and Six Million Eight Hundred
Thousand Dollars ($6,800,000) of the Execution Advance directly to Artist. Artist
hereby directs you to pay One Million Three Hundred Thousand Dollars ($1,300,000) of
such Six Million Eight Hundred Thousand Dollars ($6,800,000) of the Execution
Advance payable to Artist pursuant to the preceding sentence to Three Kings LLC, c/o

1

00086

Sweeney, Johnson & Scates, LLC, 152 W. 57th Street, 8th Floor, New York, New York, 10019, Attn: Ron Sweeney, Esq.

3.    Pursuant to paragraph 2(b) of the 2012 Amendment, you have agreed to increase the Recording Fund for the album to be delivered in fulfillment of the Minimum Recording Obligation for the sixth Option Period to Six Million Dollars ($6,000,000), of which Three Million Dollars ($3,000,000) (the "LP7 Commencement Advance") shall be payable promptly after the commencement of the recording of such album. We hereby irrevocably instruct you to pay Four Hundred and Fifty Thousand Dollars ($450,000) of the LP7 Commencement Advance directly to RTW (the "RTW LP7 Advances") and Two Million Five Hundred Fifty Thousand Dollars ($2,550,000) of the LP7 Commencement Advance directly to Artist.

4.    RTW irrevocably instructs you to pay directly to Avant Garde Management, Inc. (i) One Hundred Twenty Thousand Dollars of the Execution Advance, and (ii) Forty Five Thousand Dollars ($45,000) of the RTW LP7 Advance. Such payments shall be made to Avant Garde Management, Inc., c/o Sweeney, Johnson & Scates, LLC, 152 W. 57th Street, 8th Floor, New York, New York, 10019, Attn: Ron Sweeney, Esq., or elsewhere as Avant Garde Management, Inc. may direct you in writing.

5.    With respect to:

> (i)  any master recordings made during the first, second, third or fourth Contract Periods, we hereby request and irrevocably authorize you (A) to directly pay to Artist 80% of all Net Royalties (as defined below), and (B) to directly pay RTW 20% of all Net Royalties;

> (ii) any master recordings made during the fifth, sixth or seventh Contract Periods, we hereby request and irrevocably authorize you (i) to directly pay to Artist 85% of all Net Advances (as defined below") and 85% of all Net Royalties (as defined below), and (ii) to directly pay RTW 15% of all Net Advances and 15% of all Net Royalties; and

> (iii) any master recordings made after the end of the seventh Contract Period, if any, 100% of all monies payable in connection therewith shall be paid directly to Artist.

As used herein, "Net Advances" shall mean Advances payable to RTW or Artist pursuant to the Agreement (not including the Execution Advance or the LP7 Commencement Advance), less all Recording Costs or other similar third party payments.

As used herein, "Net Royalties" shall mean gross royalties (or "net receipts" where "net receipts" are payable in lieu or royalties pursuant to paragraph 7.06 of the Agreement), excluding mechanical royalties, payable under the Agreement, less all royalties and other amounts payable to any third party producers, mixers, outside artists, sample claimants or other third parties.

2

You will prepare separate accounting statements for RTW and Artist starting with the statement for the accounting period ending June 30, 2012. Each of RTW and the Artist will have a separate and independent right to audit your books and records with respect to such statements in accordance with the terms of the Agreement.

6.    RTW has assigned all its prospective rights and obligations under the Agreement to Artist and Artist has assumed all of RTW's prospective rights and obligations under the Agreement. You hereby consent to such assignment. In furtherance of the foregoing, RTW and Artist have agreed that (i) Artist may deal directly with IDJ in connection with all matters related to the Agreement, and may amend and modify the Agreement as Artist and IDJ may agree; and (ii) all rights of approval, consent or consultation that extend to RTW and/or Artist under the Agreement shall hereafter extend to, and may be given by, Artist alone. Notwithstanding the foregoing, (i) Artist has agreed not to modify the Agreement in a manner which would have a disproportionate impact on the rights of RTW, and (ii) Artist has agreed not to modify (or waive any of RTW's rights under) paragraph 5.01(b)(xvi) of the Agreement without RTW's consent (i.e., RTW will continue to be entitled to have its logo printed on Records derived from the Master Recordings delivered pursuant to the Agreement and in advertisements therefore in accordance with the terms of the Agreement).

7.    Your compliance with this authorization will constitute an accommodation to us alone; no other party is a beneficiary of it. All payments to Artist or Avant Garde Management, Inc. under this authorization will constitute payment to RTW and you will have no liability whatsoever by reason of any erroneous payment or failure to comply with this authorization. We will indemnify and hold you harmless against any claims asserted against you and any damages, losses or expenses you incur by reason of any such payment or otherwise in connection herewith.

All monies becoming payable to Artist under this authorization will be remitted to Artist at the address first set forth above or otherwise as Artist directs you in writing and will be accompanied by statements with respect to those payments. (We understand that royalty payments instructions of this nature are usually placed in effect with respect to the accounting period in which you receive them if they are delivered to you within the first

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

00088

three months of that period, and with respect to the next accounting period it delivered after that time, although administrative factors may result in variations from that procedure.)

Very truly yours,

ROCK THE WORLD, LLC

By:_____

KANYE WEST

ACCEPTED AND AGREED:

THE ISLAND DEF JAM MUSIC GROUP,
a division of UMG Recordings, Inc.

By:_____

4

00089

three months of that period, and with respect to the next accounting period it delivered after that time, although administrative factors may result in variations from that procedure.)

Very truly yours,

ROCK THE WORLD, LLC

By: _____

_____
KANYE WEST

ACCEPTED AND AGREED:

THE ISLAND DEF JAM MUSIC GROUP,
a division of UMG Recordings, Inc.

By:_____

**THE ISLAND DEF JAM MUSIC GROUP,**
**A DIVISION OF UMG RECORDINGS, INC.**
**1755 BROADWAY**
**NEW YORK, NEW YORK 10019**

Dated as of May 7, 2012

Getting Out Our Dreams II, LLC
c/o Carroll, Guido & Groffman, LLP
1790 Broadway, 20th Floor
Suite 800
New York, NY 10019
Attention: Michael Guido, Esq.

> **Re:    Roc-A-Fella Records, LLC – w – Getting Out Our Dreams II, LLC f/s/o**
> **Kanye West: Exclusive Recording Agreement**

Gentleperson(s):

This agreement (including Exhibit A, which is attached hereto and incorporated herein by this reference) shall constitute an exclusive recording agreement between **The Island Def Jam Music Group**, a division of UMG Recordings, Inc. ("IDJ") and Getting Out Our Dreams II, LLC ("Grantor" or "you") with respect to the services of **Kanye West** (the "Artist"). The terms and conditions of this agreement shall be the terms and conditions set forth in the attached Exhibit A (i.e., the exclusive recording agreement, dated as of April 13, 2005, between IDJ [as successor-in-interest to Roc-A-Fella Records, LLC] and Rock The World, LLC with respect to Artist, as amended and in full force and effect as of the date hereof) (the "Recording Agreement")) as modified and supplemented by the terms set forth below in this letter agreement and with all other changes being made that are necessary by implication. If any terms below conflict with the terms of the Recording Agreement, the terms below shall govern. All references to Grantor in this agreement, including Exhibit A hereto, shall be deemed references to Getting Out Our Dreams II, LLC . IDJ and Grantor acknowledge and agree that the terms and conditions of the Recording Agreement are incorporated herein solely as a matter of convenience, and that this agreement shall constitute a new recording agreement that is separate and apart from the Recording Agreement and for which separate consideration has been provided. For the avoidance of doubt, all terms not specifically defined herein shall have the same meaning used in the Recording Agreement, unless otherwise provided herein. For good and valuable consideration, the receipt of which each party hereby acknowledges, the parties agree to modify the terms and conditions of the Recording Agreement which are being incorporated herein as follows:

1.    **TERM / RECORDING OBLIGATION:**

    (a)    Provided that IDJ exercises the Initial Option (as defined below), the term of this agreement (the "Term") will begin immediately upon the expiration of the term of the Recording Agreement (or, if IDJ so advises, such period will begin on the date of such exercise notice) and shall continue for a first Contract Period (sometimes referred to as the "Initial Period") ending on the earlier of: (a) twelve (12) months after the delivery to IDJ of the last Master Recordings that are required to be delivered hereunder in fulfillment of the Minimum Recording Obligation during the Initial Period; or (b) nine (9) months after the initial commercial release in the United States of the Album required to be delivered hereunder in fulfillment of the Minimum Recording Obligation during the Initial Period. IDJ

00091

may exercise its option for the Initial Period (the "Initial Option") by sending notice to Grantor to that effect at any time prior to the expiration of the term of the Recording Agreement. For the avoidance of doubt, the Option Warning mechanism described in subparagraph 1.02(b) of the Recording Agreement will apply to the Initial Option. Notwithstanding anything to the contrary contained herein, the month of December shall not be included when computing the ending date of the Initial Period.

(b)    Grantor grants IDJ one (1) separate option to extend the Term for additional Contract Period (sometimes referred to as the "Option Period"). IDJ may exercise such option by sending Grantor a notice at any time before the expiration of the Initial Period. If IDJ exercises such option, the Option Period will commence upon the end of the Initial Period (or, if IDJ so advises, such period will begin on the date of such exercise notice) and end on the date twelve (12) months after the initial commercial release in the United States of the Album required to be delivered hereunder in fulfillment of the Minimum Recording Obligation during such Option Period. For the avoidance of doubt, the Option Warning mechanism described in subparagraph 1.02(b) of the attached Recording Agreement will apply to the option described in this subparagraph 1(b). Notwithstanding anything to the contrary contained herein, the month of December shall not be included when computing the ending date of any Option Period.

(c)    The Minimum Recording Obligation hereunder shall be as follows:

| Contract Period | Minimum Recording Obligation |
|---|---|
| Initial Period | one (1) Album (the "Eighth Album") |
| Option Period | one (1) Album (the "Ninth Album") |

(d)    (i)    Notwithstanding anything to the contrary set forth in the Recording Agreement, IDJ will only have the right to exploit the Master Recordings delivered hereunder, all Artwork created for use on or in connection with Records or other derivatives of such Master Recordings and Mobile Materials embodying such Master Recordings and/or Artwork (collectively, the "Subject Materials") hereunder until the date seven (7) years after IDJ's United States retail street date for the last Record Delivered by you in fulfillment of your Minimum Recording Obligation hereunder (the "Exploitation Period"). Notwithstanding the foregoing, in the event your account hereunder is in an unrecouped position as of the date that the Exploitation Period would otherwise expire, then the Exploitation Period will be extended until the earlier of: (A) the day after the last day in the accounting period after the term in which you either receive an accounting statement showing your account to be in a recouped position; or (B) the date on which you pay to IDJ a sum equal to the then current amount of that unearned balance (which amount will be applied to your account hereunder).

(ii)    Further notwithstanding anything to the contrary set forth above, IDJ may non-exclusively distribute its existing inventory of Subject Materials during the six (6) month period immediately following the expiration or termination of the Exploitation Period (the "Sell-Off Period"). During the six (6) month period immediately preceding the Sell-Off Period, IDJ shall not manufacture Records embodying Master Recordings hereunder in excess of then anticipated customer orders. During the Sell-Off Period, IDJ shall not sell Records embodying Master Recordings hereunder at scrap or cut-out prices unless agreed to by you. IDJ shall have the same rights to make and promote existing inventories of the Subject Materials during the Sell-Off Period as it has hereunder during the Exploitation Period, except as set forth in the preceding sentence or as otherwise expressly set forth herein.

(e)    Notwithstanding anything to the contrary contained in the Recording Agreement, each Album of the Minimum Recording Obligation hereunder shall be delivered to IDJ no later than twelve (12) months following commencement of the applicable Contract Period hereunder.

Page 3

2.    **RIGHTS:**  Notwithstanding anything to the contrary contained in the Recording Agreement, in applying subparagraph 5.01(a) of the Recording Agreement to the Subject Materials, the first four (4) sentences thereof shall be deemed to be deleted and replaced with the following:

"(a)    As between IDJ and Grantor: all Master Recordings recorded during the Term which embody the performances of Artist, from the inception of recording thereof, all artwork created for use on or in connection with Phonograph Records or other derivatives of such master Recordings, including without limitation, for use in advertising and Artist Websites ( "Artwork"), shall be deemed "worked made for hire" for Grantor; all such Master Recordings, from inception of the recording thereof, and all Phonograph Records and other reproductions made therefrom, together with the performances embodied therein, and all Artwork, and all copyright therein and thereto, and all renewals and extensions thereof, shall be entirely Grantor's property, and except for the license granted below, free from any claims whatsoever by IDJ, throughout the world and in perpetuity.  Accordingly, as between Grantor and IDJ, Grantor shall have the exclusive right to obtain registration of copyright (an all renewals and extensions) in those Master Recordings and in all Artwork, in Grantor's names, as the owner and author thereof.  If for any reason any such Master Recordings or Artwork are deemed not to be "works made for hire", then IDJ hereby irrevocably assigns to Grantor all of Grantor's right tile, and interest in and to such Master Recordings and Artwork (including, without limitation, all copyright therein, and all renewals and extensions thereof in perpetuity throughout the universe.  You warrant, represent and agree that throughout the Territory during the Exploitation Period, IDJ is the sole and exclusive licensee of all Subject Materials, which license entitles IDJ, among other things, to exercise all right, title and interest in the Territory in the copyright in and to such Subject Materials (but excluding the copyrights in the Compositions contained therein). Each item of Subject Materials, from its inception, will be licensed exclusively to IDJ in the Territory during the Exploitation Period, free from any claims by you, Artist or any other Person, and IDJ has the right to use and control same subject to the terms herein.  You and/or the Artist shall execute and deliver to IDJ a short form exclusive copyright license in a form suitable for registration in the United States Copyright Office and any other such instruments of transfer and other documents regarding the rights of IDJ or its designees in the Subject Materials subject to this agreement as IDJ may reasonably request to carry out the purposes of this agreement, and in the event you fail to sign such documents within seven (7) business days (or less, if needed and stated in the request) after your receipt of IDJ's written request therefor, IDJ may sign such documents in your name or the name of Artist (and you hereby appoint IDJ your agent and attorney-in-fact solely for such purposes) and make appropriate disposition of them consistent with this agreement.  All  Subject Materials shall contain all such, trademarks, trade names, information, logos and other items, as IDJ customarily includes on such Subject Materials, as applicable, including, without limitation, Internet Addresses, so-called "watermarks", "meta-data", and "hyperlinks" to Internet Addresses." In addition to the logo provided for in section 5.01(b)(xvi) of the Recording Agreement, all Records and accompanying Artwork manufactured by IDJ and its licensees hereunder will indicate appropriate ownership credit and copyright notice as determined by Grantor in consultation with IDJ.  Notwithstanding the foreign, IDJ (or its licensee in the country concerned) will have the right to identify itself as the exclusive licensee, manufacturer, and distributor of the Subject Materials in each country of the Territory.

3.    **ADVANCES:**

(a)    Promptly following full execution hereof, IDJ shall pay to you an Advance in the amount of Three Million Dollars ($3,000,000)(the "Execution Advance"). For the avoidance of doubt, the Execution

2:19-cv-00366-RMG   Date Filed 09/18/20   Entry Number 116-7   Page 34 of 60

Advance shall be deemed an Advance made hereunder, and shall not be recoupable from any royalties or other monies due to you under the Recording Agreement, if any, except as set forth in the following sentence. Notwithstanding the foregoing, in the event that either one (1) or more of the following events occur, then the Execution Advance may be recovered from either the Artist Royalty Share (as defined below) payable pursuant to the Recording Agreement, or the share of profits payable to Artist (or any entity furnishing Artist's recording services) in connection with the Sixth Album and/or the Seventh Album:

(i)       If IDJ fails to either exercise its option to extend the term of the Recording Agreement for the sixth Option Period (i.e., for the "Seventh Album"), to exercise the Initial Option hereunder, or, to extend the term hereof for the Option Period; or,

(ii)      If either the Sixth Album, the Seventh Album, the Eighth Album or the Ninth Album is not delivered to IDJ in a Timely Manner under the Recording Agreement or hereunder, as applicable. The term "Timely Manner", as used in the preceding sentence, means that the applicable Album must be delivered within twelve (12) months after IDJ has notified Grantor in writing that Grantor has failed to deliver the applicable Album within the time period set forth in subparagraph 4.01(a)(i) of the Recording Agreement.

(iii)     The term "Artist Royalty Share", as used in this subparagraph 3(a), shall mean royalties payable pursuant to Article 7 of the Recording Agreement less that portion of such royalties required to be paid to Rock The World, LLC ("RTW") pursuant to the Assignment and Assumption Agreement (as such term is defined in paragraph 6 below).

(b)    (i)     In connection with your Delivery to IDJ of the Masters constituting the Eighth Album and the Masters constituting the Ninth Album, IDJ will pay you Advances in the amount by which the applicable sum indicated below ("Recording Fund") exceeds the Recording Costs for the Album concerned:

        (A)     Eighth Album: Two Million Dollars ($2,000,000).

        (B)     Ninth Album: Two Million Dollars ($2,000,000).

(ii)      Each Advance referred to in this subparagraph 3(b), less any Recording Costs incurred by IDJ in connection with the Album concerned, will be paid promptly after Delivery of the Album concerned.

## 4.   PAYMENTS & ACCOUNTINGS:

(a)     In connection with the sale or other exploitation of Phonograph Records derived from the Master Recordings recorded during the Initial Period and the Option Period, in lieu of accruing royalties to your account hereunder in accordance with the provisions of Article 7 of the Recording Agreement (which have been incorporated herein), IDJ shall pay to Grantor the Net Proceeds and Net Licensing Proceeds earned in connection therewith. In determining such Net Proceeds and Net Licensing Proceeds, the following shall apply:

(i)      On Records sold for distribution through normal retail channels in the United States (it being agreed that Net Proceeds will be computed and paid in accordance with the provisions of Exhibit B, attached hereto and incorporated herein by this reference):

(A)     IDJ shall be entitled to, and shall, deduct fees from Net Billings equal to twenty six percent (26%) of Net Billings hereunder, which fees IDJ shall retain and utilize for its own

Page 5

account ("Distribution Fee"). Notwithstanding the immediately preceding sentence, the Distribution Fee shall be twenty-five percent (25%) of Net Billings rather than twenty-six percent (26%) of Net Billings, commencing as of the first full accounting period hereunder after which Net Billings hereunder exceed Fifteen Million Dollars ($15,000,000), in the aggregate from inception, if at all. For the avoidance of doubt, the Distribution Fee will be inclusive of all services to be provided by IDJ, including, without limitation, marketing, promotion, A&R administration, copyright administration, A&R, press, legal & business affairs, sales and accounting (record royalties and mechanical royalties).

    (B)  In consideration of IDJ providing services relating to the exploitation of the applicable Master Recordings through Ancillary Exploitation Channels in the Territory, IDJ shall be entitled to, and shall, deduct fees from Net Licensing Billings equal to twenty percent (20%) of Net Licensing Billings hereunder, which fees IDJ shall retain and utilize for its own account ("Licensing Fee") and which shall be in lieu of the Distribution Fee.

    (ii)  On Records sold for distribution through normal retail channels outside of the United States, IDJ agrees to pay you in connection with the Net Sale of Records consisting entirely of Master Recordings delivered hereunder and sold by IDJ or its licensees, a royalty computed at the applicable percentage indicated below, of the applicable so called "published price to dealers" (the "PPD") with respect to the Record concerned, it being agreed that such royalties will be computed, adjusted and paid in accordance with the provisions of Exhibit C, attached hereto and incorporated herein by this reference:

    (A)  Subject to the other provisions of the attached Exhibit C, on NRC Net Sales of Albums outside of the United States: 25% ("Basic Rate")

    (B)  Subject to the other provisions of the attached Exhibit C, on NRC Net Sales of Singles outside of the United States: 16% (the "Basic Rate")

    (iii)  For the avoidance of doubt, on Records sold for distribution outside of the United States other than through normal retail channels, you shall be paid the applicable Basic Rate, as adjusted in accordance with the provisions of the attached Exhibit C.

5.  **MARKETING**:

    Solely in connection with its commercial release of the Eighth Album and the Ninth Album in the United States, IDJ will advance or incur all costs to third parties in connection with marketing, promotion, publicity, and advertising, including without limitation, the cost of promotional Records and Videos (hereinafter referred to collectively as the "Third Party Marketing Costs") that are part of the marketing plan approved in writing by you for the Album concerned; provided, however, that IDJ shall be required to incur Third Party Marketing Costs up to, but not in excess of, an amount equal to twenty-five percent (25%) of the amount of Net Billings that IDJ reasonably projects (in IDJ's sole reasonable good faith discretion based on projected sales less returns and discounts and without the deduction of any reserve) will be earned in connection with its distribution of the Album concerned. Notwithstanding anything to the contrary set forth herein, all Third Party Marketing Costs paid for by IDJ pursuant to a mutually approved marketing budget or any other costs paid for by IDJ in connection with the marketing, promotion, publicity and advertising of Records hereunder with your prior written consent, will be Advances and will be deducted from Net Billings or Net Licensing Billings, as applicable, in the computation of Net Proceeds, otherwise payable to you hereunder.

Page 6

## 6.   **DIGITAL RETAIL STORE**:

IDJ agrees that during the term hereof, Artist may set up and maintain an on-line digital record store (the "Artist Store") on the terms set forth in this paragraph. IDJ agrees to cause UMG to authorize the Artist Store as an authorized digital retailer of UMG on the same terms as then customarily apply to UMG's other similarly situated third party digital retailers (including price and payment terms wherein UMG is paid for each sale appropriately). In addition to selling online versions of Standard LPs (as hereinafter defined) and Deluxe LPs (as hereinafter defined) in the Artist Store on a non-exclusive basis, Artist shall be entitled to sell exclusive "super-deluxe"online versions ("Super Deluxe Version") of Records released by IDJ hereunder in the Artist Store, provided that:

(a)      Artist will consult with UMG in advance with respect to any such Super Deluxe Version (including, without limitation, the tracklisting for such Super Deluxe Version) and will deliver all such Super Deluxe Versions in advance to IDJ for ingestion into the UMG system and for delivery back to the Artist Store per standard practice with any retailer;

(b)      Artist has previously delivered to IDJ a so-called standard ("Standard LP") and, if IDJ has so requested, a so-called "deluxe" version ("Deluxe Version") of the applicable Album for the current album cycle in question;

(c)      such Super Deluxe Version shall be exclusive to the Artist Store for a period not to exceed ninety (90) days and thereafter UMG may deliver such Super Deluxe Version as it deems fit to its other online retail partners;

(d)      in no event shall Artist be entitled to exploit any Super Deluxe Version and/or any other materials which contain uncleared third party elements; and

(e)      Artist agrees that any such Super Deluxe Version shall not be delivered to IDJ in fulfillment of Artist's Minimum Recording Obligation hereunder.

## 7.   **ADDITIONAL WARRANTYAND REPRESENTATION:**

In addition to the warranties and representations made by you in the Recording Agreement (which were incorporated herein by reference), you hereby warrant and represent that prior to the date hereof, Rock the World, LLC ("RTW") and Artist entered into an agreement wherein RTW assigned to Artist all of RTW's right, title and interest in and to the Recording Agreement, and Artist agreed to assume all such rights and the obligations associated therewith (the "Assignment and Assumption Agreement").

## 8.   **DEFINITIONS:**

The following defined terms shall be deemed added hereto:

(a)      "Advance" means a prepayment of Net Proceeds or Net Licensing Billings. Advances are chargeable against and recoupable from any Net Proceeds or Net Licensing Billings otherwise payable hereunder. All monies paid to you or Artist hereunder during the Term of this agreement, as well as all monies paid on behalf of you or Artist with your consent, at your request, or pursuant hereto, other than royalties paid pursuant to this agreement, constitute Advances.

(b)      "Ancillary Exploitation Channels" means any and all distribution channels other than Normal Retail Channels, including, without limitation, so-called "secondary exploitation channels", as that term is understood within the record industry, such as, by means of example only, exploitations

through key outlet sales, master use licenses (including, without limitation, master use synchronization licenses and licenses to include Masters on compilation Records) licenses or sales to record clubs, licenses, sales by or through direct mail and mail order, and premium sales.

(c)     "Limited Download" means a digital transmission of a time-limited or other use-limited download of a Master to a local storage device (e.g., the hard drive of the user's computer or a portable device), using technology designed to cause the downloaded file to be available for listening only either (1) during a limited time (e.g., a time certain or a time tied to ongoing subscription payments), or (2) for a limited number of times

(d)     "Mobiletone" means a digital transmission (including without limitation by means of Permanent Download, Limited Download, or Stream) of a Master (or portion[s] thereof) which may or may not be accompanied by Mobile Material to an end user's mobile telephone or personal digital assistant (or other personal communication device). (as used in the preceding sentence, "Mobile Material" means artwork, images, polyphonic (midi) ringtones, voice messages, voice ringers, graphics, "wallpaper" and/or other materials (excluding Masters) transmitted to an end user's mobile telephone, personal digital assistant, or other personal communication device).

(e)     "Net receipts," "net sums," or "net amount received" and similar terms in this agreement -- royalties or flat payments received by IDJ in the United States in connection with the subject matter thereof solely attributable to Masters or Videos hereunder, less all of IDJ's custom manufacturing, duplication, and packaging costs, less all advertising expenses and less any costs or expenses that IDJ is required to incur (such as, without limitation, production costs, mechanical royalties and other copyright payments, AF of M and other union or guild payments).

(f)     "Net Billings" -- has the meaning given in Exhibit B hereto.

(g)     "Net License Billings" - has the meaning given in Exhibit B hereto.

(h)     "Net Licensing Proceeds" - has the meaning given in Exhibit B hereto.

(i)     "Net Proceeds" - has the meaning given in Exhibit B hereto.

(j)     "NRC Net Sales" -- Net Sales of the applicable Record sold for distribution through normal retail channels.

(k)     "Permanent Download" means a digital transmission of a download of a Master to a local storage device (e.g., the hard drive of the user's computer or a portable device) which is not subject to the time or use limitations applicable to Limited Downloads and is permanently available for listening an unlimited number of times (unless deleted by the user).

(l)     "Sample" or "sample" means the embodiment of pre-existing Recording(s) and/or Composition(s) on a Master or Masters hereunder; provided, however, if all rights required for the purpose of manufacturing and distributing Records hereunder may be obtained by IDJ pursuant to a compulsory mechanical license such embodiment is not a Sample.

(m)     "Stream" means a digital transmission of a Master Recording to allow a user to listen to such Master Recording (e.g., Real Audio or Windows Media Audio), that is configured by the provider of such transmission in a manner designed so that such transmission will not result in a substantially complete reproduction of the Master being made on a local storage device (e.g., the hard drive of the

Page 8

user's computer or a portable device) so that such reproduction is available for listening other than at substantially the time of the transmission

(n)　　"Special Program Discounts" means price discounts given to IDJ customers in respect of any special discount program.

(o)　　"Surplus Records" means more than a six (6) month supply (as determined in IDJ's sole discretion) of a certain Record in a particular configuration or, at IDJ's election, such other formula as IDJ may, from time to time, use in order to determine surplus product in respect to Records released on its own labels.

(p)　　"Total Net Billings" means Net Billings plus Net Licensing Billings.

Please sign below if you are in accordance with the foregoing.

Very truly yours,

THE ISLAND DEF JAM MUSIC GROUP,
A DIVISION OF UMG RECORDINGS, INC.

By:
an authorized representative

AGREED AND ACCEPTED:

GETTING OUT OUR DREAMS II, LLC

By: _____
An authorized signatory

Kanye West LP 8-9 Agreement (5.07.12)　00098



Page 9

## SCHEDULE "1"
## INDUCEMENT LETTER

Dated as of: May 7, 2012

THE ISLAND DEF JAM MUSIC GROUP,
a division of UMG Recordings, Inc.
1755 Broadway
New York, New York 10019

Gentlemen:

Pursuant to an exclusive recording agreement (the "Recording Contract") between Getting Out Our Dreams II, LLC ("Grantor") and me, Grantor is entitled to my exclusive services as a recording artist. I have been advised that Grantor is entering into a written agreement with you of even date herewith (the "Agreement"), pursuant to which Grantor is agreeing to furnish my exclusive services as a recording artist. Unless otherwise defined herein, all terms shall have the same meaning as given them in the Agreement.

In consideration of your entering into the Agreement and as a further inducement for you to do so, I hereby represent and agree as follows:

1.      I have read the Agreement, and I fully understand and agree to be bound by all of the terms thereof (including, without limitation, any and all provisions, obligations, representations, warranties and/or restrictions which relate to me in any way). I hereby assent to you and Grantor entering into the Agreement. I hereby acknowledge that you have advised me to obtain independent legal counsel in connection with the execution of the Agreement and this letter agreement. I further acknowledge that, with respect to each of the Agreement, this letter agreement and the Recording Contract, I have either obtained independent legal counsel or have voluntarily waived my right to do so.

2.      I will fully and to the best of my ability perform and discharge all of the obligations undertaken by me pursuant to the provisions of the Recording Contract, as well as all of the obligations, warranties, representations and undertakings contained in the Agreement which relate to me in any way.

3.      (a)      If, during the Term of the Agreement, Grantor shall cease to be entitled to my services as a recording artist, or if Grantor shall fail or refuse to fulfill any of its obligations under the Agreement, then I shall, at your written request (the "Request"), for the remainder of the Term of the Agreement and upon the terms and conditions set forth therein (except as provided in paragraph 3(b) below), be deemed substituted for Grantor as a party to the Agreement as of the date of the Request. Without limiting the foregoing, in such event, I shall do all such acts as shall afford you the same rights, privileges, and benefits as you would have had under the Agreement if Grantor had continued to be entitled to my recording services, and to fulfill all of its obligations under the Agreement; and such rights, privileges, and benefits shall be enforceable by you directly against me.

(b)      Notwithstanding the foregoing, in the event I am substituted for Grantor as a party to the Agreement, the following shall apply with respect to advances and royalties (including, without limitation, Advances and royalties payable by you pursuant to the Agreement) in respect of Master Recordings embodying my performances:

(i)      With respect to Master Recordings embodying my performances which are recorded after the date of the Request, you shall have the right, in your discretion:

(A)      To suspend payment of all monies to me and/or Grantor (whether Advances, royalties or otherwise, and whether pursuant to the Recording Contract, the Agreement or otherwise), pending settlement of any disputes between me and Grantor with respect thereto; or

Page 10

                (B)      To suspend payment of all Advances to Grantor under the Agreement, pending settlement of any disputes between me and Grantor with respect thereto; to pay directly to me all advances payable pursuant to the Recording Contract; to pay directly to me royalties at a rate not in excess of the royalty rate provided for in the Recording Contract; and to hold the balance of all other royalties payable pursuant to the Agreement, pending final settlement of any disputes between me and Grantor with respect thereto.

                (ii)      With respect to Master Recordings embodying my performances which are recorded prior to the date of the Request, I shall continue to look to Grantor for payment of any and all advances and royalties payable to me in respect thereof.

        4.      Except as provided in paragraph 3(b) above, I will look solely to Grantor for the payment of any and all monies payable to me in respect of services rendered by me and/or Recordings embodying my performances pursuant to the Recording Contract and/or in accordance with the Agreement and/or your manufacture, distribution, sale or other use or exploitation of any such Recordings; and you shall have no responsibility to me whatsoever for any such payments.

        5.      I agree to and do, in the manner set forth in paragraph 10.10 the Agreement, hereby indemnify, save and hold you harmless of and from any and all liability, loss, damage, cost or expense (including attorneys' fees) arising out of or connected with any breach or alleged breach of this agreement, the Agreement or the Recording Contract or any claim which is inconsistent with any of the warranties or representations contained in this agreement, the Agreement or the Recording Contract, and agree to reimburse you on demand for any payment made or incurred by you with respect to any of the foregoing. Pending final determination of any claim involving such alleged breach or failure, you may withhold sums due me.

        6.      **THE PROVISIONS OF PARAGRAPH 14.07 OF THE AGREEMENT SHALL ALSO APPLY TO THIS AGREEMENT.**

        7.      This agreement may not be modified except by an instrument in writing executed by all parties hereto. The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof.

Very truly yours,

Kanye West

ACCEPTED AND AGREED TO:

THE ISLAND DEF JAM MUSIC GROUP,
a division of UMG Recordings, Inc.

By: _____
    Executive Vice President
    Business & Legal Affairs

CONSENTED AND AGREED TO:

GETTING OUT OUR DREAMS II, LLC

By: _____
    An Authorized Representative

Page 11

## Exhibit A

Attached to that certain exclusive recording agreement, dated as of May 7, 2012, between Island Def Jam Music Group, a division of UMG Recordings, Inc. and Getting Out Our Dreams II, LLC with respect to the services of Kanye West.

**See attached for exclusive recording agreement, dated as of April 13, 2005, between Island Def Jam Music Group, a division of UMG Recordings, Inc. and Rock The World, LLC with respect to the services of Kanye West.**

## Exhibit B

Attached to that certain exclusive recording agreement, dated as of May 7, 2012, between Island Def Jam Music Group, a division of UMG Recordings, Inc. and Getting Out Our Dreams II, LLC with respect to the services of Kanye West.

1.01.    Intentionally omitted.

1.02.    As used herein, "Net Proceeds" means Total Net Billings less:

        (a)    the Distribution Fee;

        (b)    the Licensing Fee;

        (c)    a reserve against anticipated returns of Distributed Product distributed by IDJ and/or credits for such returns during and after the Term of this agreement. In establishing such reserves, IDJ will take into consideration the sale and returns history of previous Records shipped hereunder as well as that of the Record concerned, Soundscan reports (or similar retail sales reports) and reports from IDJ's distributor regarding to what extent the Record concerned is "selling through" at retail outlets. Notwithstanding anything to the contrary contained herein, one hundred and eighty (180) days prior to the expiration or termination of the Exploitation Period of this agreement, IDJ will have the right to withhold reserves in an amount sufficient in IDJ's reasonable business judgment to cover anticipated returns and credits during those last one hundred eighty (180) days and during and after the Sell Off Period, it being understood that such reserves may exceed the percentages applicable during the Term of this agreement as set forth above. Returns of Distributed Product will first be applied against the most recent sales and then against the oldest reserves. If the amount of actual returns and/or credits exceed the amount of reserves held by IDJ then, without limiting IDJ's other rights, such amount will be paid by you within five (5) days following IDJ's written demand therefore;

        (d)    IDJ's standard charges (i.e., the same rate charged by UMD to its wholly-owned labels) for the manufacturing or handling of Records or the reproduction of artwork, sleeves, labels, covers or other containers of such Records;

        (e)    Any and all Advances paid by IDJ hereunder (including, without limitation, Third Party Marketing Costs);

        (f)    Any and all applicable taxes imposed on IDJ with respect to the manufacture, distribution, license, sale, and/or other exploitation of Distributed Product hereunder (e.g. sales tax, VAT, etc.);

        (g)    Any and all co-op advertising monies. During the last six (6) months of the Term of this agreement, IDJ may deduct from Net Billings a reasonable reserve for any such costs incurred by IDJ during such period, which reserve will be liquidated no later than twelve (12) months after the end of the Term hereof;

        (h)    IDJ's standard charges (i.e., the same rate charged by UMD to its wholly-owned labels) for returns handling and refurbishing Distributed Product, whether such Records were distributed by IDJ or by a Person other than IDJ;

        (i)    IDJ's standard charges (i.e., the same rate charged by UMD to its wholly-owned labels) for refurbishing Records manufactured by any Person other than IDJ;

        (j)    Credits to IDJ's customers for actual returns of Distributed Product not shipped by IDJ hereunder made during each accounting period;

Page 13

   (k)  Special Program Discounts and/or price reduction programs; and

   (l)  Any other amounts due IDJ under this agreement and all other costs of any other service rendered by IDJ or product furnished or monies spent by IDJ on your behalf hereunder, provided any such service, product, or monies are provided or spent in the normal course of handling Records or Videos hereunder and are consistent with similar services, products or monies that are provided or spent for similar-type arrangements; and

   1.03. IDJ will compute Net Proceeds hereunder on a calendar semi-annual basis. Within ninety (90) days after the close of each such calendar semi-annual period IDJ will send you an accounting statement covering the Net Proceeds for the accounting period concerned and will remit to you the net amount of such Net Proceeds, if any, after deducting any such amount, if any, that IDJ may be required to withhold pursuant to the applicable state tax laws, the U.S. Tax Regulations, or any other applicable statute, regulation, treaty, or law. Such accounting statements will be rendered in accordance with IDJ's regular accounting practices. Notwithstanding anything to the contrary contained herein, IDJ, during the Exploitation Period hereof, is not obligated to render an accounting statement with respect to any calendar semi-annual periods in respect of which there is no significant (as determined by IDJ in its reasonable commercial judgment) change between the accounting rendered with respect to the calendar semi-annual period immediately preceding such particular calendar semi-annual period and the accounting that would otherwise be rendered with respect to such particular semi-annual period unless you request, in writing, an accounting statement for one or more particular semi-annual periods.

   1.04. All accounting statements rendered by IDJ will be conclusively binding upon you and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is given to IDJ and an audit pursuant to paragraph 1.05 for that statement is completed within three (3) years from the date such statement is rendered. Failure to make such written objection or conduct the audit within said time period will be deemed to be your approval of such statement, your waiver of such audit rights, and your waiver of the right to sue IDJ for additional Net Proceeds in connection with the applicable accounting period. Each statement will be deemed rendered when due unless you notify IDJ that the applicable statement was not received by you and such notice is given within ninety (90) days after the applicable due date specified in paragraph 1.01 above, in which event the statement will be deemed rendered on the date actually sent by IDJ. You will not have the right to sue IDJ in connection with any accounting, or to sue IDJ for monies due on account of the exploitation of Distributed Product hereunder during the period an accounting covers, unless you commence the suit within three (3) years and six (6) months after the date the applicable statement is rendered to you.

   1.05. You may, at your own expense, audit IDJ's books and records directly relating to this agreement that report the sales or other exploitation of Distributed Product for which Net Proceeds are payable hereunder. You may make such audit only for the purpose of verifying the accuracy of statements sent to you hereunder and only as provided herein. You may initiate such audit only by giving notice to IDJ at least thirty (30) days prior to the date you intend to commence your audit. Your audit will be conducted by a reputable independent accountant experienced in record industry audits in such a manner so as not to disrupt IDJ's other functions and will be completed promptly. You may audit a particular statement only once and only within three (3) years after the date such statement is rendered as provided in paragraph 1.04 above. Your audit may be conducted only during IDJ's usual business hours and at the place where it keeps the books and records to be examined. You will not audit IDJ's books and records more than once during any calendar year of the Term of this agreement. Your auditor will review his tentative written findings with a member of IDJ's finance staff designated by IDJ before rendering a report to you so as to remedy any factual errors and clarify any issues that may have resulted from misunderstanding.

   1.06. You acknowledge that IDJ may invoice free goods in accordance with its standard policies.

**\* END OF EXHIBIT B \***

Page 14

## Exhibit C

Attached to that certain exclusive recording agreement, dated as of May 7, 2012, between Island Def Jam Music Group, a division of UMG Recordings, Inc. and Getting Out Our Dreams II, LLC with respect to the services of Kanye West.

      1.01.    Intentionally omitted.

      1.02.    (a)    With respect to audio-only compact discs and Electronic Transmissions of Masters hereunder, the royalty rate (which will be deemed to be the Basic Rate with respect to such configuration or method of exploitation) is one hundred percent (100%) of the otherwise applicable royalty rate in the applicable country for the configuration and price category concerned; provided, if such exploitation is at a price that does not fall within IDJ's top-line price category applicable to such method of exploitation, the otherwise applicable royalty rate will be computed, reduced, and adjusted in accordance with the applicable other provisions of this Exhibit C.

      (b)    With respect to Records sold in the form of new configurations (including, but not limited to, Mini Disc, DVD Audio and audiophile Records), the royalty rate (which will be deemed to be the Basic Rate with respect to such configurations) is eighty percent (80%) of the otherwise applicable royalty rate in the applicable country for the configuration and price category concerned.

      (c)    With respect to Midline Records and EPs, the royalty rate is three-fourths (3/4) of the Basic Rate. With respect to Budget Records, premium records, and Records in the form of transparent or colored vinyl, the royalty rate is one half (1/2) of the Basic Rate for the configuration concerned. With respect to any Record sold in the Territory by IDJ or its licensee in conjunction with a television advertising campaign, during the semi-annual accounting period in which that campaign begins as well as the next such period, the royalty rate with respect to the advertised Records sold in the countries in which the campaign occurs is one half (1/2) of the otherwise applicable royalty rate, provided: (i) if IDJ wholly owns its licensee in the country concerned, IDJ will not thereby reduce your royalty by more than its and its licensee's actual costs in connection with such campaign, and the aforesaid reduction of the royalty rate will only apply during the semi-annual accounting period in which the applicable campaign begins as well as the next such period; and (ii) if IDJ does not wholly own its licensee in the country concerned, the otherwise applicable royalty rate will not be reduced if IDJ's licensee does not reduce the monies payable to IDJ because of such advertising campaign. With respect to any Multiple Record Album, the royalty rate is the Basic Rate for the configuration concerned if, at the beginning of the royalty accounting period concerned, the Suggested Retail List Price of such Album is at least the number of cassettes, compact discs or other configuration packaged together times the Suggested Retail List Price for "top-line" Albums marketed by IDJ or its principal licensee in the country where the Multiple Record Album is sold (the "top-line" price). If the Suggested Retail List Price applicable to such Multiple Record Album is less than the number of cassettes, compact discs or other configuration packaged together times the "top-line" price, then the applicable royalty rate for such Multiple Record Album will be equal to the otherwise applicable royalty rate multiplied by a fraction, the numerator of which is the Suggested Retail List Price of such Multiple Record Album, and the denominator of which is the number of cassettes, compact discs or other configuration packaged together times the "top-line" price (but not less than one half (1/2) of the applicable royalty rate prescribed in paragraph 7.01 for such Album).

      (d)    Intentionally deleted.

      1.03.    (a)    Your royalty will be the sum equal to eighty percent (80%) of IDJ's Net Receipts with respect to the following Records and/or exploitation of Masters hereunder: (1) Records sold through record clubs or similar sales plans; (2) licenses for methods of distribution such as "key outlet marketing" (distribution through retail fulfillment centers in conjunction with special advertisements on radio or television), direct mail, mail order, or by any combination of the methods set forth above or other methods; (3) licenses for distribution other than through normal retail channels or other than by the primary distributor(s) of

Page 15

IDJ Records in the territory concerned for the configuration concerned; and (4) Masters hereunder licensed by IDJ for use in synchronization in motion pictures, television productions, or television commercials.

(b)    With respect to any exploitation of Mobile Material for which IDJ receives a royalty or other payment which is directly attributable to such Mobile Material, your royalty will be an amount equal to eighty percent (80%) of IDJ's Net Receipts from such royalty or other payment where such percentage equals the applicable Basic Rate set forth in paragraph 1.01(a) above.

1.04.    (a)    If IDJ or its licensees license Videos of Distributed Product, your royalty will be eighty percent (80%) of the Net Receipts received by or credited to IDJ in the United States derived therefrom after deducting from gross receipts a fee, in lieu of any overhead or distribution fee, of twenty-two percent (22%) of the gross receipts in connection therewith. It is specifically agreed that IDJ has and will have the right to license such Videos to third parties (e.g., club services) for no payment, in which case no payment will be made to you in connection therewith.

(b)    With respect to home video devices embodying Videos of Distributed Product manufactured and distributed by IDJ or its licensee in the country concerned, you will be entitled to a royalty computed as provided in this Article, but the following rate will apply instead of the rates specified in subparagraph 4(a)(ii) of the agreement to which this Exhibit C is attached: (i) On units sold for distribution outside the United States: 15% of the applicable so-called "published price to dealers". Said royalties are inclusive of any third party payments required in connection with the sale of such devices including, without limitation, artist and producer royalties.

1.05.    As to a Record not consisting entirely of Masters or Videos of Distributed Product, the otherwise applicable royalty rate will be prorated on the basis of the number of Masters or Videos of Distributed Product embodied on such Record compared to the total number of Masters or Videos (including the Masters and Videos of Distributed Product) contained on such Record. As to Joint Recordings, the royalty rate will be the royalty rate provided for herein divided by the number of Persons with respect to whom IDJ is obligated to pay a royalty (including you).

1.06.    No royalties will be due or payable in respect of (a) Records furnished on a no-charge basis or sold to disc jockeys, publishers, employees of IDJ or its licensees, motion picture companies, radio and television stations and other customary recipients of free, or discounted or promotional Records sold for less than or equal to fifty percent (50%) of the Record's highest posted wholesale list price; (b) Records sold or distributed by IDJ or its licensees for promotional purposes; (c) Records sold at close-out prices, for scrap, at less than inventory cost or at fifty percent (50%) (or less) of the Record's highest posted wholesale price whether or not such Records are intended for sale to third parties; and (d) Records (or fractions thereof) given away or shipped on a so-called "no charge" or "freebie" basis (whether or not intended for resale; whether billed or invoiced as a discount in the price to IDJ's or its licensee's customers or as a Record shipped at no charge), including, without limitation, Records shipped as "bonus" or "free" Records (such as, by way of example only, any such Records that are distributed free to dealers in lieu of a discount).

1.07.    The royalty payable to you hereunder includes all royalties (other than mechanical royalties) due you, Artist, the individual producers and all other Persons in connection with the sale of Records of Distributed Product or other exploitation of Masters of Distributed Product.

## * END OF EXHIBIT C *

**THE ISLAND DEF JAM MUSIC GROUP,**
**A DIVISION OF UMG RECORDINGS, INC.**
**1755 BROADWAY**
**NEW YORK, NEW YORK 10019**

Dated as of May 7, 2012

Mr. Kanye West
c/o Carroll, Guido & Groffman, LLP
1790 Broadway, 20ᵗʰ Floor
Suite 800
New York, NY 10019
Attention: Michael Guido, Esq.

### Re:    Roc-A-Fella Records, LLC – w – Kanye West: Profit Share Agreement

Dear Mr. West:

Reference is made to the exclusive recording agreement between **The Island Def Jam Music Group**, a division of UMG Recordings, Inc. (as successor-in-interest to Roc-A-Fella Records, LLC [collectively, "IDJ"]) and **Rock The World, LLC** ("Grantor") with respect to **Kanye West** (the "Artist"), dated as of April 13, 2005, as amended and in full force and effect as of the date hereof, including, without limitation, that certain amendment of even date herewith (the "Recording Agreement"). All terms not specifically defined herein shall have the same meaning used in the Recording Agreement, as amended, unless otherwise provided herein (hereinafter, the "Amendment"). For good and valuable consideration, the receipt of which each party hereby acknowledges, the parties agree to modify the Recording Agreement as follows:

1.    Profit Share.

     (a)    In addition to Royalties payable to Artist pursuant to the Recording Agreement in connection with the Master Recordings recorded during the fifth Option Period (the "Album Six Masters") and the Master Recordings recorded during the sixth Option Period (the "Album Seven Masters"), IDJ will accrue to Artist's account hereunder fifty percent (50%) of the Profits earned in connection with the Album Six Masters and the Album Seven Masters and no other Master Recordings (Artist's share of Profits may sometimes hereinafter be referred to as the "Profit Share"); provided, however, that the Profit Share otherwise payable to Artist hereunder shall be applied to the unrecouped balance in respect of the royalty account under the Recording Agreement (the "Royalty Account"), if any. Notwithstanding the foregoing, IDJ shall maintain a separate account with respect to that share of Advances and royalties which are paid directly to RTW (the "RTW Account") and a separate account with respect to that share of Advances and royalties that are paid directly to Artist (the "Artist Account"). For the avoidance of doubt, the RTW Account shall not be deemed payable until such time as the Royalty Account is fully recouped by royalties other than the Profit Share and the Profit Share shall not be paid through to Artist until such time as the Royalty Account is fully recouped.

00106

Page 2

(b)    "Profits": Net Revenues less (i) Expenses and (ii) all applicable and customary taxes (i.e., not including income taxes) or other similar payments included in Net Revenues and required to be paid by IDJ pursuant to applicable laws which are directly attributable to the exploitation of the applicable Masters, if any. For the avoidance of doubt, Profits shall be calculated on a cumulative basis (i.e., from the date hereof in connection with the applicable Masters). Furthermore, in calculating Profit Share, IDJ shall have the right to hold reasonable reserves in accordance with paragraph 8.01 of the Recording Agreement in respect of anticipated returns of applicable Records hereunder. "Net Revenues": (i) in respect of the exploitation of the applicable Masters in the United States, 100% of Net U.S. Revenues and (ii) in respect of the exploitation of the applicable Masters outside the United States, a royalty equal to twenty-five percent (25%) of the Foreign Royalty Base in respect of Net Sales of Records derived from the applicable Masters. "Foreign Royalty Base": the published price to dealers in the applicable country of sale, without any so-called "container charges" or "packaging deductions". "Net U.S. Revenues": Gross revenues actually derived from the exploitation of Masters in the United States, less actual returns, reserves and credits or discounts to IDJ's customers in connection with Records embodying such Masters. "Expenses": The following expenses relating to the applicable Artist Masters: (i) a distribution and marketing services fee to be retained by IDJ equal to eighteen percent (18%) of Net U.S. Revenues (the "Distribution Fee") together with any additional a la carte or other charges in respect thereof. For the avoidance of doubt, the Distribution Fee shall not be applied to so-called "Ancillary Net Receipts" and so-called "License" income received pursuant to the applicable Masters, provided however that all such Ancillary Net Receipts and License income shall be disbursed as follows: fifty percent [50%] of the gross amount in Ancillary Net Receipts and License income received hereunder shall first be applied towards Grantor's account as provided for in the Recording Agreement; then, eleven and one half percent [11.5%] of the gross amount in Ancillary Net Receipts and License income received hereunder shall be applied to your account hereunder; and then, the balance shall be retained by IDJ for its own account; (iii) any and all marketing, promotion and publicity costs to the extent not recouped from the Artist royalties (with a credit back as and when recouped); (iv) Advances and other recoupable amounts paid to or on behalf of Grantor and/or Artist or any other party in respect of the applicable Masters to the extent not recouped from the Artist royalties (with a credit back as and when recouped); (v) Artist royalties; (vi) mechanical royalties; and (vii) any and all other third party costs actually incurred or paid by IDJ which are directly attributable to the applicable Masters.

2.    Profit Accountings.

Subject to subparagraph 1(a) above, but notwithstanding anything the contrary contained in the Recording Agreement, paragraphs 4(a) through 4(f) below shall apply solely in connection with Profit Share accountings.

(a)    IDJ will prepare accounting statements of Net Revenue, Expenses, and Profits hereunder on a calendar semi-annual basis. On or before each September 30 or March 31st, IDJ will send such accounting statements to you for the semi-annual accounting period ending the immediately preceding June 30th or December 31st, together with payment of your share of Profits hereunder, if any, for the semi-annual accounting period concerned (less any previous payments of Profits to you) after deducting any and all unrecouped Advances and such amount, if any, that IDJ

Page 3

may be required to withhold pursuant to the applicable state tax laws, the U.S. Tax Regulations, or any other applicable statute, regulation, treaty, or law. Your fifty percent (50%) share of Profits hereunder (i.e., the Profit Share) is sometimes referred to in this paragraph 4 as "Artist Distributions". Profits payable for any semi-annual accounting period will not be charged with Advances or Expenses paid after the end of such period; provided, if at the end of any accounting period ("Closed Period") IDJ reasonably anticipates that the calculation of Profits for the next accounting period will result in a Cumulative Loss (it being agreed that in making such determination IDJ will include a good faith estimate of the anticipated Net Revenue and the anticipated Expenses for the next accounting period), IDJ will be entitled to hold a reasonable reserve (which, for the avoidance of doubt, shall be separate from any reserves withheld in respect of anticipated returns of applicable Records hereunder) consistent with same from amounts due to you for the applicable Closed Period for the amount of your share of such anticipated loss, provided that in no event will such reserve exceed the amount equal to fifty percent (50%) of the Artist Distributions otherwise payable to you for the applicable Closed Period. IDJ will liquidate any such reserves within one (1) full accounting period after the period in which such reserve was initially established. The calculation of Profits will be made irrespective of the tax treatment of a particular expense, i.e. the fact that the tax authorities requires amortization of a particular expense will not diminish the deductibility of that expense in the accounting period expended. In addition, an expense incurred will be deductible in the accounting period incurred irrespective of the possibility that the actual payment might be delayed into the following accounting period.

(b)     Royalties for Records sold for distribution outside the United States ("foreign sales") will be computed in the same national currency and at the same rate of exchange as IDJ is accounted to by its licensees with respect to the sale concerned and will be subject to costs of conversion and any taxes applicable to royalties remitted by or received from foreign sources. Royalties on Records sold outside the United States are not due and payable by IDJ until payment therefor has been received by or credited to IDJ in the United States in United States dollars. For purposes of accounting Profits hereunder, IDJ will treat any foreign sale as a sale made during the same six (6) month period in which IDJ receives its licensee's accounting and payment or credit for that sale. If any law, government ruling or other restriction affects the amount that a IDJ licensee can remit to IDJ, IDJ may deduct from Net Revenue hereunder an amount proportionate to the reduction in such licensee's remittances. If IDJ cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale, except as provided in the next sentence. IDJ will, at your request and at your expense, deduct from the monies so blocked and deposit in a foreign depository the equivalent in local currency of the portion of royalties that would be payable to you pursuant to the terms hereof on the foreign sales concerned, to the extent such monies are available for that purpose, and only to the extent to which there is a Cumulative Profit hereunder as of the close of the accounting period immediately preceding the accounting period in which such blocked monies are made available to IDJ in such local currency. All such deposits will constitute Profit payments to you for accounting purposes, and such deposits will fulfill IDJ's obligations in connection therewith.

(c)     Profits under this agreement will be determined and apportioned on a cumulative basis from inception. If payments of a share of Profits are made to you hereunder with respect to one (1) accounting period and the cumulative calculation of your Profits in a later accounting

Page 4

period reveals that based on such cumulative calculation Profits have not been apportioned in accordance with the provisions of this agreement, all such "overpayments" to you will be deducted from all sums thereafter due to you. If IDJ makes any overpayment to you (e.g., by reason of an accounting error or by paying you your share of Profits on Records returned later) you will reimburse IDJ to the extent that IDJ does not deduct such sums from monies due you hereunder. IDJ will have the right to deduct from any monies payable to you hereunder such amount, if any, that IDJ may be required to withhold pursuant to the applicable state tax laws, the U.S. Tax Regulations, or any other applicable statute, regulation, treaty, or law.

(d)     All accounting statements rendered by IDJ hereunder shall be conclusively binding and not subject to any objection by you for any reason unless specific objection in writing, stating the basis thereof, is given to IDJ within three (3) years from the date such statement is rendered and an audit pursuant to subparagraph (e) below for that statement is completed within six (6) months after such objection notice is given; provided such six (6) month period shall be extended by the amount of time, if any, that IDJ prevents you from commencing such audit. Each statement will be deemed rendered when due unless you notify IDJ in writing that the applicable statement was not received by you and such notice is given within ninety (90) days after the applicable due date specified in subparagraph 4(a) above, in which event the statement will be deemed rendered on the date actually sent by IDJ. Failure to make such written objection or conduct the audit within said time periods will be deemed to be your approval of such accounting statement, your waiver of such audit rights, and your waiver of the right to sue IDJ for additional sums owed for the applicable accounting period. You will not have the right to sue IDJ in connection with any Profit accounting, or to sue IDJ for recovery of sums owed for a particular accounting period, unless you commence the suit within one (1) year after completion of your audit for the applicable period.

(e)     You may, at your own expense, audit IDJ's books and records directly relating to this agreement that report the sales or other exploitation of Records for which monies are payable hereunder. You may make such audit only for the purpose of verifying the accuracy of statements sent to you hereunder and only as provided herein. You may initiate such audit only by giving notice to IDJ at least thirty (30) days prior to the date you intend to commence your audit. Your audit will be conducted by a reputable independent certified public accountant experienced in recording industry audits in such a manner so as not to disrupt IDJ's other functions and will be completed promptly. You may audit a particular statement only once and only within three (3) years after the date such statement is rendered as provided in subparagraph 2(a) above. Notwithstanding the foregoing, in the event you conduct an audit of the Royalty Account (the "Royalty Audit"), then such Royalty Audit shall be considered an audit conducted pursuant to and in fulfillment of your rights as set forth this subparagraph 4(b) with respect to the particular statement and Accounting Period that is audited. Your audit may be conducted only during IDJ's usual business hours and at the place where IDJ keeps the books and records to be examined. You will not be entitled to examine any records that do not specifically report sales of Records on which Profits are payable hereunder, however, you will be permitted to examine IDJ's manufacturing records with respect to Records made hereunder. Your auditor will review his or her tentative written findings with a member of IDJ's finance staff designated by IDJ before rendering a report to you so as to remedy any factual errors and clarify any issues that may have resulted from misunderstanding.

Page 5

3.    Reversion.

(a)    IDJ hereby agrees to assign to you all of its right, title and interest in all of the Album Six Masters and the Album Seven Masters (other than Master Recordings recorded specifically for a so-called Soundtrack Album or other multi-artist album; provided that with respect to Master Recordings not recorded specifically for such an album but that nonetheless appear on such an album, you will automatically be deemed to have granted to IDJ a license for the continuing exploitation of such Master Recordings on each such album), on the conditions contained in this paragraph 6, the day after the last day of the semi-annual accounting period (the "Reversion Date") in which falls the date twenty (20) years after the initial commercial release date in the United States of the Seventh Album. Notwithstanding the foregoing, in the event the Royalty Account is in an unrecouped position as of the Reversion Date, the Reversion Date will be extended until the day after the last day in the accounting period after the term in which you receive an accounting statement showing the Royalty Account to be in a recouped position. If the Royalty Account is in an unrecouped position after the twenty (20) year period described above, at any time after the term hereof Grantor may pay to IDJ a sum equal to the then current amount of that unearned balance, in which event the Reversion Date shall be the date IDJ receives such payment. Further notwithstanding anything to the contrary contained in this subparagraph 6(a) or elsewhere in this paragraph 6, IDJ's obligation to assign to Grantor the Album Six Masters and the Album Seven Masters is expressly conditioned upon Grantor meeting its obligation to deliver each of the Sixth Album, the Seventh Album, the Eighth Album (as hereinafter defined) and the Ninth Album (as hereinafter defined) hereunder in a Timely Manner in accordance with the applicable provisions of Articles 3 and 4 of the Recording Agreement. Grantor and Artist acknowledge and agree that Grantor's obligation to meet the condition set forth in the preceding sentence is at the essence of the rights granted by IDJ to Grantor pursuant to this paragraph 6 and such obligation shall be deemed a condition precedent to such rights. The term "Timely Manner", as used in this subparagraph 3(a), means that the applicable Album must be delivered within twelve (12) months after IDJ has notified Grantor in writing that Grantor has failed to deliver the applicable Album within the time period set forth in subparagraph 4.01(a)(i) of the Recording Agreement.

(b)    All Masters that revert to you pursuant to this paragraph 6 are referred to as "Reverted Masters." After the Reversion Date, IDJ will not manufacture Records derived from the Reverted Masters or sell Records derived from the Reverted Masters, subject to the next sentence. With respect to each Reverted Master, IDJ will not be deemed in breach hereof or otherwise liable to you, as an infringer of copyright or otherwise, with respect to its inadvertent continuing manufacture and sale of Recordings hereunder, until six (6) months after you have notified IDJ of the Reversion Date of such Master, which notice may be given at any time after six (6) months prior to the Reversion Date.

(c)    IDJ and its licensees will have six (6) months from the Reversion Date to sell off the existing inventory of Records embodying one or more of the Reverted Masters on a non-exclusive basis. During the six (6) month period prior to such sell-off period, IDJ will not manufacture more units of such Records than were manufactured in the preceding six (6) month period in anticipation of selling off excessive amounts of inventory. After the sell-off period at Grantor's written request, IDJ will destroy all remaining inventory and provide Grantor with a certificate of destruction.

Kanye West Profit Share Agreement

(d)     The reversion rights described in this paragraph 6 are subject to any non-exclusive licenses granted by IDJ to third parties in connection with the use or compilation of Reverted Masters hereunder with other reproductions, such as motion pictures. At Grantor's written request, after the date of Grantor's notice to IDJ regarding the Reversion Date as provided in subparagraph 6(b) above, IDJ will inform Grantor of any such rights possessed by a licensee and will instruct any such licensee to pay Grantor directly for any such exploitation of a Reverted Master after the Reversion Date, but the failure of a licensee to so pay directly will not be a breach hereof. Any money received by IDJ from a licensee in respect of such an exploitation of a Reverted Master after the Reversion Date will be paid credited to Grantor's account hereunder.

(e)     In connection with Grantor's use of a Reverted Master, Grantor will obtain consents by any Persons to whom IDJ has any contractual liability for an obligation that Grantor would otherwise be responsible for hereunder or whom Grantor has directed IDJ to pay hereunder (e.g., direct payment agreements, obligations to producers and other persons who rendered services in connection with Grantor's Recordings hereunder); and Grantor will obtain new mechanical licenses from the copyright proprietors of Compositions embodied on the Reverted Masters. With respect to Masters recorded in the United States and Canada, Grantor, or the parties licensing rights to the Reverted Masters from Grantor, will also become a first party to the Record Manufacturers' Special Payments Fund Agreement entered into by IDJ with the American Federation of Musicians of the United States and Canada, or the successor agreement then in effect, and all other applicable union agreements. No rights in the Reverted Masters will be effectively conveyed to Grantor until Grantor has complied with all the provisions of the preceding sentence. However, Grantor's failure to comply with the preceding sentence will not be deemed to grant any extended rights to IDJ in connection with the Reverted Masters.

(f)     After the Reversion Date, in connection with Grantor's use of the Reverted Masters, Grantor will make all payments required in connection with the manufacture, sale or distribution of Records derived from the Reverted Masters (or other exploitation of the Reverted Masters) including, without limitation, all royalties and other payments to performing artists, producers, owners of copyrights in musical compositions, the Music Performance Trust Fund and Special Payments Funds, and other unions and union funds. You will comply with the applicable rules and regulations of the American Federation of Musicians and any other union having jurisdiction and other applicable laws, rules and regulations covering any use of the Reverted Masters by Grantor or any Person deriving rights from Grantor, in the manufacture and sale of Records or otherwise. Grantor and Artist will indemnify and hold harmless IDJ and its licensees from all claims, damages, liabilities and costs arising out of any use of the Reverted Masters or the exercise of rights in the Reverted Masters by Grantor or Artist or any Person deriving rights from either of you.

(g)     IDJ will instruct its foreign licensees not to manufacture or sell (subject to a six (6) month non-exclusive sell-off period) Records derived from the Reverted Masters after the applicable Reversion Date. If Grantor notify IDJ of any such continuing manufacture in a foreign territory, IDJ will instruct the licensee concerned to discontinue it, but IDJ will have no liability by reason of such manufacture at any time.

(h)     You will not identify or allow others to identify Records derived from the Reverted Masters with IDJ, directly or indirectly.

4.    Digital Retail Store.

IDJ agrees that during the term hereof, Artist may set up and maintain an on-line digital record store (the "Artist Store") on the terms set forth in this paragraph. IDJ agrees to cause UMG to authorize the Artist Store as an authorized digital retailer of UMG on the same terms as then customarily apply to UMG's other similarly situated third party digital retailers (including price and payment terms wherein UMG is paid for each sale appropriately). In addition to selling online versions of Standard LPs (as hereinafter defined) and Deluxe LPs (as hereinafter defined) in the Artist Store on a non-exclusive basis, Artist shall be entitled to sell exclusive "super-deluxe" online versions ("Super Deluxe Version") of Records released by IDJ hereunder in the Artist Store, provided that:

      (a)    Artist will consult with UMG in advance with respect to any such Super Deluxe Version (including, without limitation, the tracklisting for such Super Deluxe Version) and will deliver all such Super Deluxe Versions in advance to IDJ for ingestion into the UMG system and for delivery back to the Artist Store per standard practice with any retailer;

      (b)    Artist has previously delivered to IDJ a so-called standard ("Standard LP") and, if IDJ has so requested, a so-called "deluxe" version ("Deluxe Version") of the applicable Album for the current album cycle in question;

      (c)    such Super Deluxe Version shall be exclusive to the Artist Store for a period not to exceed ninety (90) days and thereafter UMG may deliver such Super Deluxe Version as it deems fit to its other online retail partners;

      (d)    in no event shall Artist be entitled to exploit any Super Deluxe Version and/or any other materials which contain uncleared third party elements; and

      (e)    Artist agrees that any such Super Deluxe Version shall not be delivered to IDJ in fulfillment of Artist's Minimum Recording Obligation hereunder.

5.    Miscellaneous.

      (a)    Nothing herein contained shall constitute a partnership between, or joint venture by, the parties hereto, or constitute either party the agent of the other, and neither party shall become liable for any representation, act or omission of the other which is contrary to the provisions of this paragraph.

      (b)    This writing sets forth the entire understanding between the parties hereto with respect to the subject matter hereof, and no modification, amendment or waiver of this document shall be binding upon either party hereto unless confirmed by a written instrument signed by an authorized signatory of the party sought to be bound. No waiver of any provision of, or waiver of, a default under this Amendment or any failure to exercise rights hereunder shall prejudice the rights of either party thereafter, nor shall it form precedent for the future.

Page 8

(c)     Except as expressly or by necessary implication modified hereby, the terms and binding effect of the Recording Agreement are hereby ratified and confirmed without limitation or exception.

(d)     This Amendment may be signed in counterparts, and may be executed and delivered by facsimile and or electronic mail as a pdf, which when taken together will have the same effect as if signed in its original form by all the parties.

Very truly yours,

THE ISLAND DEF JAM MUSIC GROUP,
A division of UMG Recordings, Inc.

By: _____
an authorized representative

AGREED AND ACCEPTED:

By: _____
Kanye West

## QUINN EMANUEL URQUHART & SULLIVAN, LLP

## MEMORANDUM

### PRIVILEGED & CONFIDENTIAL
### ATTORNEY-CLIENT PRIVILEGE
### ATTORNEY WORK PRODUCT

**TO:**  File

**FROM:**  Quinn Emanuel

**DATE:**  January 9, 2019

**RE:**  Kanye West's Label Agreements

Below are the key terms of Kanye West's main licensing agreement and subsequent modifications thereto.

| Parties | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| May 31, 2011 [Original Label Agreement] | Island Def Jam Music Group ("IDJ") and Getting Out Our Dreams, Inc. ("GM") |
| May 7, 2012 [2012 Label Amendment] | IDJ and GM |
| Mar. 17, 2016 [2016 Label Amendment] | IDJ and GM (NB: "UMG" is named as the party in contract with GM). |

1

| Duration | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| May 31, 2011 [Original Label Agreement] | **Term** <br><br> Three (3) Contract Years commencing on April 1, 2011. As used herein, "Contract Year" shall mean a period of twelve (12) months, unless otherwise suspended or extended as set forth in this agreement. IDJ shall have the right to suspend the Term during any Contract Year in which GM does not deliver to IDJ at least two (2) Albums, and the applicable Contract Year will be suspended until such two (2) Albums have been so delivered. |
| May 7, 2012 [2012 Label Amendment] | **Term**, Section (1)(A) <br><br> IDJ and GM hereby agree to extend the term of the Label Agreement for a period of two (2) years, commencing on the date immediately following the day on which the Label Agreement was originally scheduled to expire (i.e., March 31, 2014) and continuing through and until the date March 31, 2016 (the "Extended Term"). The terms and conditions of the Label Agreement during the Extended Term shall be the same as the terms and conditions of the Label Agreement prior to the Extended Term, except as otherwise set forth herein. The two (2) years comprising the Extended Term may sometimes be referred to herein as the "fourth Contract Year" and the "fifth Contract Year". |
| Mar. 17, 2016 [2016 Label Amendment] | **Term/Product,** Section 1 <br><br> Notwithstanding anything to the contrary contained in the Label Agreement (including, without limitation, this Label Amendment), UMG and GM hereby agree to extend the term of the Label Agreement for a period of two (2) years, commencing on the date immediately following the day on which the Label Agreement was originally scheduled to expire (i.e. March 31, 2016) and continuing through and until March 31, 2018 (the "Extended Term"). The terms and conditions of the Label Agreement during the Extended Term shall be the same as the terms and conditions of the Label Agreement prior to the Extended Term, except as otherwise set forth herein. The two (2) years comprising the Extended Term may sometimes be referred to as the "Sixth Contract Year" and the "Seventh Contract Year". For the purpose of clarification, GM will be deemed to have satisfied its delivery obligations for the Fifth Contract Year so that the Fifth Contract Year shall end on March 31, 2016. |

2

| Obligations | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| May 31, 2011<br><br>[Original Label Agreement] | **Services**<br>During the Term, as defined below, GM will provide to IDJ exclusive record label executive services (including the exclusive record label executive services of Kanye West ("Kanye")), including, without limitation, exclusive talent-finding and submission to IDJ of recording artists, A +R services in relation to submitted artists accepted by IDJ, and general oversight of the development, creative, marketing, promotion and label services related to such artists and their recordings. GM and Kanye shall continue to have the right to render services in respect of the recording artists signed prior to the date hereof, which are: John Legend, Kid Cudi, Mr. Hudson and Big Sean, provided, however that same shall not materially limit the ability of GM and/or Kanye to perform its or his services and obligations hereunder.<br><br>In the event that IDJ passes on a submitted Artist (a "Rejected Artist"), GM will have the right to take such Rejected Artist to a third party label subject to the following (i) the Rejected Artist will first be offered (through GM) to other labels within the UMG group of labels, and such other UMG labels shall have no longer than ten (l0) business days from the date IDJ rejects such artist to determine if such other UMG label wishes to enter into a recording agreement with GM with respect to such artist (and the financial terms of such agreement as to GM will be the same as those contained herein, other than the Overhead and Advance payments to GM); (ii) if no other UMG label enters into an agreement with GM with respect to the particular rejected artist, then GM shall have the right to enter into an agreement with a third party label in respect of the Rejected Artist, subject to GM or such label paying IDJ an offset against Overhead payments in an amount equal to the Overhead payment in the applicable Contract Year multiplied by a fraction, the numerator of which is one (1) and the denominator of which is the number of Artists then signed to the GM label; and (iii) GM will neither furnish the services of nor provide A +R or label services related to more than two (2) Rejected Artists will be signed to exclusive recording agreements with record labels other than IDJ during the Term. If neither GM nor Kanye, nor any of GM or Kanye's affiliates, enters into an agreement related to the services of a Rejected Artist with a third party label (but the Rejected Artist does so directly and not through or otherwise affiliated with GM and/or Kanye), GM and Kanye shall have no obligation to IDJ pursuant to the foregoing. An agreement related to Kanye's services (for example, as a producer or re-mixer) for a Rejected Artist (whether engaged by a third party label, a Rejected Artist or any other entity) shall not give rise to Overhead re-payment obligation described above. |

3

| Obligations | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | **Creative**<br>Key Man: During the Term, Kanye will be the key creative executive of GM.<br><br>Creative Issues: During the Term, GM and Kanye shall have complete Creative Control, subject only to meaningful consultation with IDJ, with respect to selection of Compositions to be recorded, Producers, Recording Studios, selection of Album Artwork, and Video concept and Director. Any other creative issues will be determined by GM and Kanye, subject only to IDJ's reasonable approval not to be unreasonably withheld or delayed.<br><br>If the Creative Issues and materials are not timely delivered for reasons within GM's and/or Kanye's sole control, based on schedules of which GM is made aware and has approved, or if any materials would, as confirmed by a third party retailer, significantly impair the commercial viability of a product, then, subject to GM's and Kanye's prior written approval, not to be unreasonably delayed and, if denied, then with commercially reasonable specific reasons as to such denial, IDJ may proceed based on a viable alternative which GM and Kanye have reasonably approved in writing in advance as above.<br><br>Artist Submission: During the Term, GM and Kanye will submit all available artists which GM desires to furnish to a record label and/or enter into an agreement for such artist's exclusive recording services, exclusively to IDJ for consideration. GM and IDJ will mutually determine the basic material terms on which the applicable accepted artists will enter into exclusive recording agreements on IDJ's standard form agreement and in accordance with industry standards and IDJ and its parent Company's standard terms and conditions.<br><br>GM and Kanye to have reasonable approval of the terms of the Artist agreements, subject to IDJ and UMG policies as to minimum contractual terms, and shall be involved in the negotiation of same.<br><br>IDJ to provide customary label services, including, without limitation, business and legal affairs functions.<br><br>Label Roster / Artist Contributions:<br>IDJ will contribute to the New Label the following artists: (i) Big Sean; and (ii) Pusha T, when such artist signs an exclusive agreement with IDJ. |

4

| Obligations | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| May 7, 2012 [2012 Label Amendment] | **Term.** Section (1)(b)<br><br>IDJ hereby waives its right to suspend the Term for GM's failure to deliver to IDJ at least two (2) Albums during the first Contract Year (i.e., during the period April 1, 2011 to March 31, 2012).<br><br>[NB: The two album obligation is in the "term"/duration section of the original label agreement]<br><br>Artist Signings, Section (6)(c)-(d)<br><br>(c) With respect to each Contract Year of the Term other than the first Contract Year, you may cause IDJ to accept one (1) artist of your choice, submitted by you hereunder in accordance with the terms hereof, by notice to IDJ to such effect (such right being referred to herein as a "Put"). Upon proper exercise of a Put, the applicable artist will be deemed an Artist hereunder. The material terms of any Artist Agreement entered into as a result of your exercise of a Put shall be subject to IDJ's and your mutual approval. With respect to IDJ approving said material terms, IDJ shall not withhold its approval of a recording fund in connection with the first Album required to be delivered under such Artist Agreement that does not exceed Five Hundred Thousand Dollars ($500,000) or other terms that are consistent with an exclusive recording agreement of that magnitude and with IDJ's standard terms and conditions and policies as to contractual terms. For the avoidance of doubt, your failure to exercise a Put with respect to a Contract Year shall cause your right to exercise such Put to lapse, it being understood that you may not exercise such Put in any subsequent Contract Year.<br><br>(d) That certain section of the Label Agreement entitled "Services", located on page 1 of the Label Agreement, is hereby modified such that: (i) the 2nd paragraph thereof is revised to allow for three (3) Rejected Artists during the Term, as opposed to two (2); and, (ii) the Overhead reduction formula described in such paragraph shall not apply except as follows: it is specifically understood and agreed that if there shall be more than two (2) Rejected Artists signed by you and/or Principal to recording agreements with the same Person (or with record labels or divisions within the same parent company or organization) other than IDJ at any time during the Term, then the Overhead reduction formula described in such paragraph shall apply. For the avoidance of doubt, in the event that IDJ determines that it does not wish to exercise the option to extend the term of an Artist Agreement for an additional contract period and GM decides that it does so wish to exercise such option, then without limiting any |

5

| Obligations | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | of IDJ's rights (e.g., without limitation, such artist shall first be offered to other labels within the Universal Music Group), GM shall have the option to exercise such option on its own behalf and have IDJ assign to GM all prospective rights and obligations under the applicable Artist Agreement. If GM exercises the option described in the preceding sentence, then the applicable Artist shall be deemed a Rejected Artist hereunder. Principal shall devote significant personal efforts and such time as may be necessary to the Artists' recordings hereunder and the fulfillment of GM's obligations to IDJ. In no event shall activities under such third party agreements materially interfere with the Principal's or your obligations hereunder. |
| Mar. 17, 2016 [2016 Label Amendment] | [NB: Delivery Obligations are discussed in Section 1 under "Term" (Duration)].<br><br>Further Delivery Obligations, Section 5:<br><br>Cruel Summer Film. One Million Five Hundred Thousand Dollars ($1,500,000) ("Film Costs") in overall film cost Expenses shall be removed from GM's unrecouped balance (i.e., the Film Costs shall be "forgiven"), provided at least four (4) GM albums (inclusive of the joint album by "Big Sean and "Jhene Aiko") are delivered to UMG for release within fifteen (15) months from the date hereof. |

| Profit Advances | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| May 31, 2011 [Original Label Agreement] | **Profit Share**<br><br>IDJ will pay to GM an advance ("Profit Advance") recoupable against GM's share of Profits, in the amount of One Million Dollars ($1,000,000); which will be paid one-half (112) promptly following the execution of this short-form agreement, and one-half (112) promptly after the complete execution of the more formal agreement, but in no event later than June 15,2011. |
| May 7, 2012 [2012 Label Amendment] | **Profit Advances**, Section 2<br><br>IDJ will pay GM the following amounts, each of which shall be deemed a Profit Advance (i.e., a prepayment of GM's share of Profits), as follows: |

6

| Profit Advances | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | (a) Three Hundred Thousand Dollars ($300,000) promptly following full execution hereof (the "Execution Payment"). GM hereby acknowledges its receipt of the Execution Payment pursuant to that certain amendment to the Label Agreement, dated April 24, 2012; consequently, paragraph 2 of such amendment shall no longer apply; <br><br> (b) Two Hundred Thousand Dollars ($200,000) promptly following January 1, 2013; and <br><br> (c) Promptly following the commencement of the fourth Contract Year of the Term (i.e., April 1, 2014), an amount equal to One Million Dollars ($1,000,000) less the amount of Profit Advances then remaining unrecouped, but in no event less than Five Hundred Thousand Dollars ($500,000). <br><br> **Marketing**, Section 5 [NB: Advances are discussed here as well] <br><br> (a) In connection with the initial commercial release in the United States of each Album hereunder, you will prepare and submit to IDJ, for IDJ and you to mutually approve, a marketing plan and accompanying budget with respect to all costs of marketing, promotion, publicity, and advertising, including without limitation, the cost of promotional Records and videos (hereinafter referred to collectively as the "Third Party Marketing Costs"). In the event of a disagreement between IDJ and you as to any element of a marketing plan or accompanying budget, then at Principal's request, senior executives of both IDJ and GM will make themselves available to each other to attempt to resolve the dispute; if a disagreement persists after such discussion(s), then IDJ's decision with respect thereto shall control. IDJ will provide certain of IDJ's in-house services in connection with any such marketing plan, such as promotion, marketing, publicity and advertising, and creative (e.g., video production and artwork supervision). Any and all decisions with respect to how IDJ provides any of such in-house services will be made mutually by IDJ and you, provided that in the event of a dispute, IDJ's decision shall control. <br><br> (b) IDJ will advance or incur Third Party Marketing Costs that are part of the marketing plan approved in writing by IDJ and you for the Album concerned; provided, however, that in connection with each such Album, IDJ |

7

| Profit Advances | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | shall incur Third Party Marketing Costs of no less than the greater of: (1) Two Hundred Fifty Thousand Dollars ($250,000); or, (ii) an amount equal to twenty five percent (25%) of the amount in Net U.S. Revenues that IDJ projects earning from sales of its initial shipment of the Album concerned, which projection IDJ determines in its sole good faith reasonable discretion. |
| Mar. 17, 2016 [2016 Label Amendment] | **Profit Advances**, Section 2 <br><br> UMG will pay GM the following amounts, each of which shall be deemed a Profit Advance (i.e., a prepayment of GM's share of Profits), as follows: <br><br> (a) Sixth Contract Year. <br><br>     i. Two Hundred Fifty Thousand Dollars ($250,000) promptly following the complete execution hereof (the "Execution Profit Advance"); and <br><br>     ii. Two Hundred Fifty Thousand Dollars ($250,000) promptly following delivery to UMG of the next GM artist studio album (the "Delivery Profit Advance") (solely for the purpose of this paragraph 2[a][ii], the joint album featuring the performances of the artist p/k/a "Big Sean" and the artist p/k/a "Jhene Aiko" ("Joint Album"' shall be deemed a GM studio album), provided such album is delivered to UMG for commercial release in 2016. For the avoidance of doubt, the parties hereby acknowledge that the Joint Album has been delivered to UMG and the Delivery Profit Advance shall be payable to GM promptly following the complete execution hereof. <br><br> (b) Seventh Contract Year: Five Hundred Thousand Dollars ($500,000) promptly following the commencement of the Seventh Contract Year, less the amount of Profit Advances then remaining unrecouped. <br><br> **GM General Marketing Fund**, Section (3)(B) <br><br> During the Extended Term, solely in connection with GM's artists, GM shall have a discretionary marketing fund of Two Hundred Fifty Thousand Dollars ($250,000) (the "GM General Marketing Fund") per Contract Year of the Extended Term. Notwithstanding the generality of the foregoing, the GM General Marketing Fund shall be |

8

00117

| Profit Advances | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | administered by UMG and paid directly to "third-party" vendors at GM's direction, promptly following UMG's receipt of invoices that comply with UMG's reasonable requirements and applicable support documentation in connection therewith. For the purpose of this paragraph 3B, the parties stipulate that DONDA Services, Donda Design Lab, LLC., and the individual p/k/a "Consequence" are all approved "third party" vendors. |

| Overhead Funding | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| May 31, 2011<br><br>[Original Label Agreement] | **Label Overhead Funding**<br><br>During each Contract Year of the Term, IDJ shall fund Eight Hundred Thousand Dollars ($800,000) toward the New Label's operating expenses ("Overhead Funding") payable in equal quarterly installments of Two Hundred Thousand Dollars ($200,000) each at the beginning of each quarter, and subject to a customary stop/loss provision [such that if at any time after the twenty-fourth (24th) month of the Term the label has then-current or cumulative losses of Three Million Five Hundred Thousand Dollars ($3,500,000) or more then IDJ shall have the option by written notice to GM to terminate the Term within thirty (30) days after such cumulative Loss has been reached]. For the avoidance of doubt, fifty percent (50%) of the Profit Advance (i.e. Five Hundred Thousand Dollars ($500,000)) shall be disregarded for purposes of computing the loss threshold set forth in this paragraph. |
| May 7, 2012<br>[2012 Label Amendment] | **Label Overhead Funding**, Section 3<br><br>(a) Solely in the event that the account under the Label Agreement earns at least Twenty Million Dollars ($20,000,000) (the "Revenue Threshold") in Net U.S. Revenues during any Contract Year of the Term, then the amount that IDJ is currently required to pay to GM in Overhead Funding with respect to such Contract Year and each subsequent Contract Year (i.e., $800,000 if the second or third Contract Year, and $1,000,000 if the fourth or fifth Contract Year) shall be increased by One Hundred Thousand Dollars ($100,000) (the "Additional |

| Overhead Funding | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | Overhead Funding"). IDJ shall pay GM the Additional Overhead Funding, if at all, promptly after IDJ has determined that the Revenue Threshold has been achieved. For purposes of clarification, once the Revenue Threshold is achieved, the Additional Funding will apply to each subsequent Contract Year, but the Overhead Funding will not increase further in such subsequent Contract Year simply because the Revenue Threshold is achieved again. (For example, if the account under the Label Agreement earns $20,000,001 in the second Contract Year, the Overhead Funding for the third Contract Year will be $100,000 over the minimum, or $900,000. If the account under the Label Agreement earns only $18,000,000 in the third Contract Year, the Overhead Funding for the fourth Contract Year will remain at $100,000 over the applicable minimum for that year, or $1,100,000. If the account under the Label Agreement earns $20,000,001 in third Contract Year, the Overhead Funding for the fourth Contract year will still be $1,100,000 (and will not increase to $1,200,000).<br><br>(b) Solely in the event that the account under the Label Agreement earns in excess of Twenty Three Million Dollars ($23,000,000) in Net U.S. Revenues during any Contract Year of the Term, then the amount that IDJ is required to pay to GM in Overhead Funding with respect to such Contract Year and each subsequent Contract Year (i.e., $900,000 if the second or third Contract Year, or $1,100,000 if the fourth or fifth Contract Year) shall be increased by Fifty Thousand Dollars ($50,000); and, the amount that IDJ is required to pay to GM in Overhead Funding with respect to such Contract Year and each subsequent Contract Year shall be further increased by Fifty Thousand Dollars ($50,000) with respect to each full Three Million Dollars ($3,000,0000) in Net U.S. Revenues earned hereunder during such Contract Year that is in excess of Twenty Three Million Dollars ($23,000,000). IDJ shall pay GM such Additional Overhead Funding, if at all, promptly after IDJ has determined that the requisite Net U.S. Revenue amount has been achieved. For purposes of clarification, once a threshold for additional Overhead Funding is achieved, the additional Overhead Funding amount will apply to each subsequent Contract Year, but the Overhead Funding will not increase further simply because the same additional Overhead Funding threshold is achieved again subsequently. (For example, if the account under the Label Agreement earns $20,000,001 in the second Contract Year, the Overhead Funding for the third Contract Year will be $100,000 over the minimum , or $900,000. If the account under the Label Agreement earns $23,000,001 in the third Contract Year, the Overhead Funding for the fourth Contract Year will be $150,000 over the applicable minimum for that year, or $1,150,000. If the account under the Label Agreement earns $20,000,001 in the fourth Contract Year, the Overhead Funding for the fifth Contract year will still be $1,150,000.). |

| Overhead Funding | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | (c) Notwithstanding anything to the contrary contained in subparagraphs 3(a) and 3(b) above, IDJ shall not pay GM Overhead Funding with respect to each Contract Year that is less than, nor more than, the following amounts:<br><br>          Minimum   Maximum<br> second Contract Year $800,000  $1,500,000<br> third Contract Year  $800,000  $1,500,000<br> fourth Contract Year $1,000,000 $2,000,000<br> fifth Contract Year  $1,000,000 $2,000,000 |
| Mar. 17, 2016<br>[2016 Label<br>Amendment] | **Label Overhead Funding**, Section 3<br><br>UMG shall pay GM Overhead Funding in the amount of Three Million Two Hundred Thousand Dollars ($3,200,000) during the Extended Term (i.e., One Million Six Hundred Thousand Dollars ($1,600,000) per year of the Extended Term, paid on a quarterly basis). |

| Royalties/Profits/Distribution Fee | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| May 31, 2011<br><br>[Original Label<br>Agreement] | **Profit Share**<br>IDJ will accrue to GM's account hereunder a profit share ("Profit Share") in an amount equal to fifty percent (50%) of the New Label's Profits, provided that the Profit Share shall not be due and payable until all Profit Advances have been recouped by IDJ from the Profit Share otherwise payable to GM hereunder.<br><br>**"Profits"**: Net Revenues less (i) Expenses and (ii) all applicable and customary taxes or other payments included in Net Revenues and required to be paid by IDJ pursuant to applicable law which are directly attributable to the |

| Royalties/Profits/Distribution Fee | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | exploitation of masters by New Label Artists, if any. For the avoidance of doubt, Profits shall be calculated on a cumulative basis (i.e., from the commencement of the New Label Term). Furthermore, in calculating Profit Share, IDJ shall have the right to hold reasonable reserves in respect of anticipated returns of Records hereunder.<br><br>**"Net Revenues"**: (i) in respect of the exploitation of Artist Masters in the United States, 100% of Net U.S. Revenues and (ii) in respect of the exploitation of Artist Masters outside the United States, a royalty equal to twenty-five percent (25%) of the Foreign Royalty Base in respect of Net Sales of Records derived from Label Artist masters. "Foreign Royalty Base": the published price to dealers in the applicable country of sale, without any so-called "container charges" or "packaging deductions".<br><br>"Net U.S. Revenues": Gross revenues actually derived from the exploitation of Artist Masters in the United States, less actual returns and credits of Records embodying New Label Artist masters.<br><br>"Expenses": The following expenses relating to New Label Artist masters: (i) a distribution and marketing services fee to be retained by IDJ equal to eighteen percent (18%) of Net U.S. Revenues (the "Distribution Fee") together with any additional a la carte or other charges in respect thereof [the Distribution Fee shall not be applicable to so-called "Ancillary Net Receipts" and / or so-called "License" income received pursuant to the applicable Artist agreement; (ii) manufacturing, artwork and production costs; (iii) any and all marketing, promotion and publicity costs to the extent not recouped from the Artist royalties (with a credit back as and when recouped); (iv) advances and other recoupable amounts paid to or on behalf of New Label Artists or any other party in respect of New Label Artist masters to the extent not recouped from the Artist royalties (with a credit back as and when recouped); (v) Artist royalties; (vi) mechanical royalties; (vii) New Label Overhead Funding; and (viii) any and all other costs actually incurred or paid by IDJ which are directly attributable to the New Label.<br><br>GM intends to hire an A+R Executive for the New Label, and part of such A+R Executive's compensation will include a one percent (1%) override royalty ("Exec Override Royalty") to be paid on a prospective basis only following recoupment of the applicable New Label Artist's royalty account pursuant to their respective recording agreement (on an album by album basis, as otherwise computed under the IDJ A+R royalty plan applicable to senior executives). Such Exec Override Royalty shall otherwise be calculated and paid in the same manner and at the same times as the applicable New Label Artist's recording agreement. IDJ shall pay the Exec Override Royalty on behalf of |

Kanye West 9.16.20 Twitter

| Royalties/Profits/Distribution Fee | |
|---|---|
| **Agmt. Date/ Name** | **Terms** |
| | New Label, as and when required, it being understood and agreed that seventy-five percent (75%) of such Exec Override Royalty payments shall be deducted from Profits otherwise due and payable to GM hereunder, and the balance shall be borne by IDJ (and shall not be an Expense hereunder). |
| May 7, 2012 [2012 Label Amendment] | **Distribution Fee**, Section 4 [NB: Discusses royalties here as well]<br>(a) Solely in the event that Net U.S. Revenues derived from the Net Sale of Records hereunder with respect to any Contract Year of the Term exceed Twenty Five Million Dollars ($25,000,000)(the "Second Revenue Threshold"), the Distribution Fee shall prospectively be reduced to seventeen percent (17%) of Net U.S. Revenues with respect to the distribution, sales and other exploitation of Records hereunder (the "New Rate") during the remainder of such Contract Year; provided, however, that if the Second Revenue Threshold is achieved or exceeded during any two (2) consecutive Contract Years of the Term, then the Distribution Fee shall prospectively be reduced to the New Rate with respect to the remainder of the Term.<br><br>(b) Solely in the event that the revenue derived from the royalty payable hereunder with respect to the exploitation of Artist Masters outside of the United States ("Foreign Revenue") exceeds the amount set forth below under the column entitled "Foreign Revenue" during any Contract Year of the Term, then the royalty payable hereunder with respect to exploitation of Artist Masters outside of the United States shall prospectively be increased from twenty five percent (25%) to the rate set forth below under the column entitled "Royalty" and shall remain in effect only during the remainder of the applicable Contract Year:<br><br>Foreign Licensing Revenue    Royalty<br>Six Million Dollars ($6,000,000)    26%<br>Ten Million Dollars ($10,000,000)    27% |
| Mar. 17, 2016 [2016 Label Amendment] | **Distribution Fee,** [NB: Discusses royalties here as well]<br><br>During the Extended Term, in the event that Foreign Revenue exceeds Fifteen Million Dollars ($15,000,000) during any Contract Year of the Extended Term, the royalty payable hereunder with respect to the exploitation of Artist Masters outside of the United States shall prospectively be increased to twenty-eight percent (28%). |

13